**JOHN PIERCE LAW, P.C.**
John M. Pierce
jpierce@johnpiercelaw.com
21550 Oxnard St.
3rd Flr., PMB 172
Woodland Hills, CA 91367
(213) 349-0054

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| LAURA LOOMER, as an individual, LAURA LOOMER, in her capacity as a Candidate for United States Congress, and LAURA LOOMER FOR CONGRESS, INC.,<br><br>Plaintiffs,<br><br>vs.<br><br>META PLATFORMS, INC., MARK ZUCKERBERG, in his capacity as ceo of Meta Platforms, Inc. and as an individual, TWITTER, INC., and JACK DORSEY, in his capacity as former CEO of Twitter, Inc. and as an individual, THE PROCTOR & GAMBLE CO., and DOES 1-100, individuals,<br><br>Defendants | Case No.: 3:22-cv-02646-LB<br>Hon. Laurel Beeler<br><br><br><br><br>**PLAINTIFFS' OMNIBUS MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT AS AMENDED** |

## TABLE OF CONTENTS

ISSUES TO BE DECIDED ...........................................................................................................6

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................6

FACTUAL BACKGROUND .......................................................................................................7

STANDARD OF REVIEW ........................................................................................................11

ARGUMENT ...............................................................................................................................12

I.    PLAINTIFFS' ACTION IS NOT BARRED BY RES JUDICATA. .................................12

II.   PLAINTIFFS HAVE CONSTITUTIONAL STANDING. ...........................................13

    A.    Plaintiffs Can Satisfy The Civil RICO Standing Requirements. ........................14

    B.    Plaintiffs Can Satisfy The Constitutional Standing Requirements. ....................18

    C.    Defendants Jack Dorsey's And Mark Zuckerberg's Individual Actions Are Fairly Traceable To Plaintiffs' Injuries ............................................................................19

III.  PLAINTIFFS' CLAIMS ARE NOT BARRED BY SECTION 230 OF THE CDA .........21

PLAINTIFFS' OMNIBUS MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT AS AMENDED - 1

    A.   **Twitter And Facebook's Content Creation Falls Outside The Scope Of Immunity** .....................21

    B.   **Plaintiffs Do Not Treat Facebook And Twitter As Publishers Or Speakers.**.........................22

    C.   **Defendants Are Liable For Content They Create, And Immunity Does Not Extend To The Class Of Claims Brought Forward.** ............................................23

IV.   PLAINTIFFS' RICO CLAIM (COUNT I) IS SUPPORTED BY SUFFICIENT FACTS AND A COGNIZABLE LEGAL THEORY FOR RELIEF..............................................24

    A.   **Defendants Engaged In Conduct Befitting A RICO Claim.** .....................................24

    B.   **Defendants Formed An Enterprise.** ....................................................25

    C.   **Defendants Displayed A Pattern Of Racketeering Activity.** ..................................27

    D.   **Defendants Engaged In Racketeering Activity.** ...........................................28

V.   PLAINTIFFS' RICO CONSPIRACY CLAIM (COUNT II) IS SUPPORTED BY SUFFICIENT FACTS AND A COGNIZABLE LEGAL THEORY FOR RELIEF. ..............................................35

CONCLUSION .......................................................................................**35**

## TABLE OF AUTHORITIES

## Cases

*Alan Neuman Prods., Inc. v. Albright*, 862 F.2d 1388, 1392 (9th Cir. 1988) ...................................28

*Alexander Grant & Co. v. Tiffany Indus., Inc*., 770 F.2d 717, 719 (8th Cir. 1985) ...........................19

*Asia Econ. Inst. v. Xcentric Ventures LLC*, No. CV 10–01360–SVW (PJW), 2011 WL 2469822, at *6–7 (C.D.Cal. May 4, 2011) .....................................................................................21

*Barnes v. Yahoo!, Inc*., 570 F.3d 1096, 1101 n.3 (9th Cir. 2009)................................................22, 23

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)) .................11

*Bennett v. Spear*, 520 U.S. 154, 162, 117 S. Ct. (1997)........................................................18

*Bixler v. Foster*, 596 F.3d 751, 756 (10th Cir. 2010)...........................................................13

*Brittain v. Twitter, Inc*., 2019 WL 2423375, at *2 (N.D. Cal. June 10, 2019)...................................21

*Bunnett & Co. v. Gearheart*, No. 17-cv-01475-RS, 2018 U.S. Dist. LEXIS 31873, at *7 (N.D. Cal. Feb. 27, 2018) .......................................................................................................24, 25

*Canyon Cnty. v. Syngenta Seeds, Inc*., 519 F.3d 969, 972 (9th Cir. 2008) ....................................13

*Commercial Cleaning Servs., L.L.C. v. Colin Serv. Sys., Inc*., 271 F.3d 374, 380-84 (2d Cir. 2001) .........18

*Committee for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814 (9th Cir. 1996)................................16

*Conservation Force v. Salazar*, 646 F.3d 1240, 1241–42 (9th Cir. 2011)........................................11

*Dangaard v. Instagram, LLC*, No. C 22-01101 WHA, 2022 WL 17342198 (N.D. Cal. Nov. 30, 2022)...................22

*Diaz v. Gates*, 420 F.3d 897, 899-900 (9th Cir. 2005).................................................................18

*Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995)..............................................................11

*Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1097 (9th Cir. 2019)..............................21

*Eclectic Props. East, LLC v. Marcus & Millichap Co.*, No. C-09-00511 RMW, 2012 U.S. Dist. LEXIS 28865, at *6 (N.D. Cal. Mar. 5, 2012)...........................................................................................24, 28

*Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 827 (7th Cir. 2016)...............................14

*Envtl. Tectonics v. W.S. Kirkpatrick, Inc.*, 847 F.2d 1052, 1067 (3d Cir. 1988) ........................................18

*Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1162 (9th Cir. 2008).....21, 22

*Fraser v. Team Health Holdings, Inc.*, No. 20-cv-04600-JSW, 2022 U.S. Dist. LEXIS 60544, at *26 (N.D. Cal. Mar. 31, 2022)..............................................................................................28

*Gidding v. Anderson*, No. C 07-04755 JSW, 2009 U.S. Dist. LEXIS 24351, at *23 (N.D. Cal. Mar. 13, 2009)..26, 27

*Grimmett v. Brown*, 75 F.3d 506, 510 (9th Cir. 1996)...............................................................24

*H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 232, 238 (1989)..............................................26, 27

*Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992)...........................................................13

*Lewis v. Lhu*, 696 F. Supp. 723, 727 (D.D.C. 1988)...............................................................14, 19

*Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (en banc) .......................................................11

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 119 L. Ed. 2d 351, 112 S. Ct. 2130 (1992)............................18

*Magnifico v. Villanueva*, 783 F. Supp. 2d 1217 (S.D. Fla. 2011) .......................................................34

*Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (1921). .......................................30

*McNally v. United States*, 483 U.S. 350, 360 (1987)..................................................................16

*Mitsui O.S.K. Lines, Ltd. v. Seamaster Logistics, Inc.*, 913 F. Supp. 2d 780, 791 (N.D. Cal. 2012)...........................24

*Nat'l Org. for Women v. Scheidler*, 510 U.S. 249, 262, 114 S. Ct. 798, 806 (1994) ......................................14

Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001).................................................................11

*New Hampshire v. Maine*, 532 U.S. 742, 748 (2001)..................................................................12

*Odom v. Microsoft Corp.*, 486 F.3d 541, 551 (9th Cir. 2007) .......................................................25, 28

PLAINTIFFS' OMNIBUS MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT AS AMENDED - 3

1   *Opperman v. Path, Inc.*, 87 F. Supp. 3d 1018, 1043-45 (N.D. Cal. 2014)..................................................22

2   *Oscar v. Univ. Students Co-op. Ass'n*, 965 F.2d 783, 785 (9th Cir. 1992) ...................................14

3   *Pandick, Inc. v. Rooney*, 632 F. Supp. 1430, 1433 (N.D. Ill. 1986) ..........................................15

4   *Phoenix Bond & Indem. Co. v. Bridge*, 477 F.3d 928, 932 (7th Cir. 2007) (emphasis in original), aff'd, 553 U.S. 639

5     (2008) ..............................................................................................................................14

6   *Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539, 542 (5th Cir. 2001) .....................................19

7   *Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 690 (9th Cir. 2011) ...................................11

8   *RJ v. Cigna Health & Life Ins. Co.*, No. 5:20-cv-02255-EJD, 2022 U.S. Dist. LEXIS 159152, at *14 (N.D. Cal. Sept.

9     2, 2022)...........................................................................................................................28

10   *Roca v. Wells Fargo Bank, N.A.*, No. 15-cv-02147-KAW, 2016 WL 368153, at *3 (N.D. Cal. Feb. 1, 2016)...........11

11   *Scheidler v. Nat'l Org. of Women, Inc.*, 537 U.S. 393, 404 (2003) .............................................30

12   *See Carpenter v. United States*, 484 U.S. 19, 25-28 (1987) ....................................................16

13   *Swift v. Zynga Game Network, Inc.*, 2010 WL 4569889, at *4-6 (N.D. Cal. Nov. 3, 2010)........................22

14   *Terre Du Lac Ass'n, Inc. v. Terre Du Lac, Inc.*, 772 F.2d 467 (8th Cir. 1985), *cert. denied*, 475 U.S. 1082, 89 L. Ed.

15     2d 718, 106 S. Ct. 1461 (1986)..............................................................................................15

16   *United States v. deVegter*, 198 F.3d 1324 (11th Cir. 1999) ....................................................29

17   *United States v. Enmons*, 410 U.S. 396, 400 (1973)...........................................................17

18   *United States v. Handakas*, 286 F.3d 92, 101 (2d Cir.), *cert. denied*, 537 U.S. 894, 123 S. Ct. 168, 154 L.Ed.2d 160

19     (2002) ..............................................................................................................................29

20   *United States v. McFall*, 558 F.3d 951, 957-58 (9th Cir. 2009) ...............................................31

21   *United States v. Miller*, 953 F.3d 1095, 1102 (9th Cir. 2020) ................................................28

22   *United States v. Rezko*, 776 F. Supp. 2d 651 (N.D. Ill. Oct. 2, 2007)........................................15

23   *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) ..................................................11

24   *United States v. Rybicki*, 354 F.3d 124 (2d Cir. 2003) ........................................................29

25   *United States v. Sorich*, 523 F.3d 702, 709-10 (7th Cir. 2007).................................................15

26   *United States v. Spano*, 421 F.3d 599, 603 (7th Cir. 2005) ...................................................15

27   *United States v. Turkette*, 452 U.S. 576, 583, 101 S. Ct. 2524, 69 L. Ed. 2d 246 (1981)......................25

28   PLAINTIFFS' OMNIBUS MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE COMPLAINT AS AMENDED - 4

*Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) ...........................................28

*W. Radio Servs. Co. v. Glickman*, 123 F.3d 1189, 1192 (9th Cir. 1997) ...................................12

*Walter v. Drayson*, 538 F.3d 1244, 1249 (9th Cir. 2008). ...........................................................24

*Waste Mgmt. of Louisiana, L.L.C. v. River Birch, Inc.*, 920 F.3d 958, 964-73 (5th Cir. 2019), *cert. denied*, 140 S. Ct. 628, 205 L. Ed. 2d 390 (2019)..................................................................................................................14

*Whole Woman's Health v. Hellerstedt*, 579 U.S. 583, 599 (2016) ......................................12, 13

*Zango, Inc. v. Kaspersky Lab, Inc.*, 568 F.3d 1169 (9th Cir. 2009)...........................................22

*Zapata v. Wells Fargo Bank, N.A.*, No. C 13-04288 WHA, 2013 U.S. Dist. LEXIS 173187, at * (N.D. Cal. Dec. 10, 2013).....................................................................................................................................27

## Statutes, Rules, and Regulations

18 U.S.C. § 1343 ......................................................................................................................27, 28

18 U.S.C. § 1951 ..............................................................................................................18, 27, 29

18 U.S.C. § 1952 ......................................................................................................................27, 30

18 U.S.C. § 1961 ......................................................................................................................24, 27

18 U.S.C. § 1962 ...............................................................................................................23, 25, 32

18 U.S.C. § 1964 ............................................................................................................................32

18 U.S.C. § 2339B .........................................................................................................................30

18 U.S.C. § 2385 .....................................................................................................................17, 31

47 USC § 230 ..........................................................................................................................20, 22

Fed. R. Civ. P. 9 ...........................................................................................................................27

Fed. R. Civ. P. 12 .........................................................................................................................10

Fed. R. Evid. 201 .........................................................................................................................10

Fla. Stat. § 836.05 .........................................................................................................................16

Restatement (Second) of Judgments §24 ...............................................................................11, 12

## Other Authorities

PLAINTIFFS' OMNIBUS MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT AS AMENDED - 5

Allum Bokhari, *Report: Mark Zuckerberg admits Facebook's 'clear bias,' dependence on 'activist' fact checkers*, BREITBART (Sept. 19, 2019) ....................................................................................................................... 13

**ISSUES TO BE DECIDED**

1.  Whether Plaintiffs' Claims Are Barred By The Doctrine of Res Judicata

2.  Whether Plaintiffs Have Constitutional Standing

3.  Whether Plaintiffs' Claims Are Barred By Section 230 Of The Communications Decency Act ("CDA") Of 1996

4.  Whether Plaintiffs' Complaint States Claims For Relief

**MEMORANDUM OF POINTS AND AUTHORITIES**

Plaintiffs Laura Loomer ("Ms. Loomer) and Laura Loomer for Congress, Inc. ("LLFC") have demonstrated through their First Amended Complaint ("FAC") that Defendants Meta Platforms, Inc. ("Facebook"), Mark Zuckerberg ("Zuckerberg"), Twitter, Inc. ("Twitter"), Jack Dorsey ("Dorsey"), and The Proctor & Gamble Co. ("P&G") have violated Civil RICO and Civil RICO Conspiracy laws.  Plaintiffs have properly alleged and have pleaded with particularity that Defendants violated every element of the Civil RICO statute, including that Defendants engaged in predicate acts, and that Defendants conspired to do so.

Moreover, Plaintiffs' claims are not barred by Section 230 nor by res judicata.  First, Defendants do not have Section 230 immunity because Defendant Twitter's and Defendants Facebook's content creation falls outside the scope of immunity, Plaintiffs do not treat Facebook and Twitter as publishers or speakers, Defendants are liable for the content they create, and immunity does not extend to the class of claims brought here.  Furthermore, Plaintiffs' claims are not barred by res judicata because, while Ms. Loomer has previously sued Defendants Facebook and Twitter, the current action does not replicate any prior claims and is based on newly revealed information that was unavailable at the time the prior cases were brought.

Therefore, Defendants' motions to dismiss should be denied.  Furthermore, new information is being released daily regarding Defendant Twitter's efforts to censor political speech and interfere in American elections through its collusion with high-level officials in the Executive Branch of the United States government; for this

PLAINTIFFS' OMNIBUS MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT AS AMENDED - 6

reason, if the Court denies Defendants' motions to dismiss, Plaintiffs intend to file a motion seeking leave to amend their complaint to include this additional new information.

**FACTUAL BACKGROUND**

Plaintiff Ms. Loomer is an individual, resident of Florida, and CEO of Laura Loomer For Congress. FAC ¶¶ 5, 10.  Plaintiff Candidate Loomer was the Republican Party nominee in the federal election for U.S. House of Representatives in Florida District 21 for the 2020 Primary and General Election, and a candidate for the Republican Party nomination for U.S. House of Representatives in Florida District 11 in the 2022 Primary Election.  *Id.* ¶¶ 6, 7. Plaintiff LLFC is a Florida corporation that engages in activities that affect interstate and foreign commerce.  *Id.* ¶¶ 8, 9.

Defendant Dorsey is the former CEO of Twitter and is "ultimately accountable for [Twitter's] actions as a company."  *Id.* ¶¶ 14, 138.  Beginning September 5, 2018, Twitter, through executives acting in their official capacity—including Dorsey—began publishing assurances to the public that they would not censor content "based on political ideology" and for Twitter to satisfy its mission to facilitate public dialogue it "need[s] to be open to as many viewpoints as possible."  *Id.* ¶¶ 47, 55.  Twitter further assured candidates that its social media platform ("Platform") was "born to serve the entire public conversation" and that they would verify an account with a blue checkmark (a symbol verifying that an account is not a clone, parody, or scam) after the candidates filed to run for office and won a state primary race.  *Id.* ¶¶ 57, 58, 206.

Defendant Zuckerberg is Chairman and CEO of Facebook.  *Id.* ¶¶ 12.  Beginning on or about September 21, 2019, Facebook, through executives acting in their official capacity—including Zuckerberg—began publishing assurances to the public that speech published by politicians on its Platform would not be subjected to 'independent' 'fact checkers' and that "as a general rule, [voters] should be able to judge what politicians say themselves."  *Id.* ¶¶ 49, 55, 210, 223.

Defendants Twitter and Facebook are social media platforms that neither speak nor publish; they are merely communications networks that distribute information already spoken or published.  *Id.* ¶¶ 31, 32.  These Platforms have transformed over time into public forums that are as integral to a modern society for conveying public opinion as are other common carriers in the performance and distribution of other common goods and services.  *Id.* ¶¶ 25-27.  Historically, once these Platforms—like the common carriers that preceded them—have

secured a dominant market share, they primarily increase revenue by engaging in conduct that is dis-advantageous to competitors and manipulative of the market.  *Id*. ¶¶ 34, 40-46.  Consequently, states are beginning to codify the substantial interest those states have in regulating these Platforms as common carriers and protecting their constituents from the harmful effects of their market manipulations (*Id*. ¶¶ 25-30) and the Supreme Court of the United States has published an opinion that conveys an interest in doing the same.

Twitter and Facebook utilize several mechanisms for furthering their market manipulations.  First, they establish community guidelines that—on their face—seem innocuous, with a particular focus on "hate speech" and "dangerous individuals."  *Id*. ¶¶ 68-82, 101-103, 105-107, 111-116, 118-120, 162, 163, 167, 211.  However, they have regularly made exceptions to these guidelines by allowing users to attack straight white males, by censoring conservative and Republican politicians at much higher rates than they censor liberals, and by banning death threats and incitement to violence unless the threat was aimed at someone labeled, as defined by Facebook, as a 'dangerous individual' or 'dangerous organization.'  *Id*. ¶¶ 146, 150, 159-162, 165-166.  Facebook designated Ms. Loomer as a "dangerous individual" with no due process, and it excused violent threats of incitement made against her.  Second, they deploy so-called 'fact-checkers' who exert activist biases on their Platforms, suppress "clicks," arrange 'preferred' narratives—eerily similar to George Orwell's Ministry of Truth—from "authoritative sources," and otherwise make decisions that cannot be appealed by content creators.  *Id*. ¶¶ 89, 91-94, 103, 105, 213, 256, 257.  In March of 2020, Facebook 'fact-checkers' applied warning labels on about 40 million posts related to the COVID-19 'pandemic.'  When posts including these labels appeared on a user's news feed, they did not go on to view the original content in 95% of cases.  *Id*. ¶ 212.  Third, they manufacture and deploy algorithms that are designed to target and censor conservatives before content can even be reported by human users, while stoking divisiveness and polarization.  *Id*. 121, 124, 125, 127, 151, 155.  Fourth, they deploy 'moderators' who, like "unapologetic liberal torchbearer[s]", exert left-wing bias, ruthlessly censoring conservatives by "shadow banning" while applying different standards and manufacturing exceptions for leftists who violate their community guidelines.  *Id*. 128-135, 142-144, 208, 209, 214, 215.

Contrary to Twitter's claim that it was "born to serve the entire public conversation," or Facebook's claim that it "can't be a policeman on the internet," or Zuckerberg's claim that "it's [not] right for [Facebook] to censor politicians or the news in a democracy" (*Id*. ¶ 210, 223), these Platforms engaged in an astronomical increase in

PLAINTIFFS' OMNIBUS MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT AS AMENDED - 8

speech suppression after 2018; which predominantly targeted conservatives, conservative politicians, or anyone (including investigative journalists) who might question the motive of a political subdivision's response to COVID-19. *Id*. ¶¶ 149-158,168, 170-175, 179, 180, 182, 186-189, 191-193, 200-202, 204, 259.

Defendant P&G is a multinational consumer goods corporation that engages in activities affecting interstate and foreign commerce and is one of Facebook's largest corporate advertisement purchasers. *Id*. ¶ 38.  On April 11, 2019, in conjunction with the Association of National Advertisers ("ANA"), P&G formed a "New Media Supply Chain" that requires that advertising platforms "prove" that their content is "under their complete control." *Id*. ¶ 233.  Shortly thereafter, in May 2019, P&G provided a list of accounts that it wanted to be banned by Facebook. That list included Ms. Loomer, who was also labeled a "Dangerous Individual" by Facebook when it banned her account.  P&G vowed to end its advertiser relationship with Facebook unless Facebook agreed to banning the accounts that P&G wanted banned. *Id*. ¶¶ 234-237.  This information was conveyed to Ms. Loomer and one of her associates by Joshua Althouse, the Public Policy Manager at Facebook out of Facebook's Washington, D.C. office. Althouse conveyed this information to Ms. Loomer and her associate over text message and several phone calls, in which he stated that P&G was putting pressure on Facebook to ban certain high-profile, conservative users, including Ms. Loomer, or else P&G would not renew its advertising agreement with Facebook.[1]  In conjunction with the ANA, P&G applied significant pressure on Facebook, recruiting various other civil rights groups to boycott the Platform for its failure to remove political ads that contain—as the Anti-Defamation League said—"blatant lies." *Id*. ¶ 238.

On November 21, 2018, Ms. Loomer was permanently banned by Twitter for what Twitter called "hateful" conduct and on May 2, 2019, she was banned from Facebook, who claimed that she was a "dangerous" person; "an opinion that is not capable of being proven true or false." *Id*. ¶ 217, 218, 220, 221.  On this date (around August 2, 2019)—in reliance on Twitter's and Facebook's public promises to give candidates access to their Platforms--Ms. Loomer formed LLFC and then announced her candidacy for the Republican nomination for the 21st Congressional District of Florida. *Id*. ¶ 219, 224.  On November 11, 2019, LLFC attempted to set up its official campaign page on

---

[1] Plaintiffs have discovered the identities of some of the Doe Defendants which Plaintiffs will include as Defendants if permitted leave to amend their complaint.

PLAINTIFFS' OMNIBUS MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT AS AMENDED - 9

Facebook for Candidate Loomer, which was promptly banned under an ad hominem veil of "hate speech." *Id.* ¶¶ 225, 226-229, 232.  After Plaintiffs inquired about the ban, Facebook changed its policy on political candidates to exclude candidates who had been previously banned from the Platform, ex post facto. *Id.* ¶ 230, 232, 244.  To add insult to injury, Political Action Committees that attempted to advertise or promote Ms. Loomer's campaign had their advertisements removed while Facebook simultaneously amplified the narratives and advertisements of her Democrat political opponent. *Id.* ¶¶ 240-245.

On August 18, 2020, Candidate Loomer won the Republican Primary for U.S. House Florida District 21, and the following day Twitter announced that Plaintiffs would still not be allowed to use its Platform even though Ms. Loomer was the official Republican Party nominee on the ballot in her district for the general election. *Id.* ¶¶ 246, 247.  On February 24, 2021, Candidate Loomer filed and announced her candidacy for Florida's 21st House District and then switched to Florida's 11th House District amid the redistricting process in Florida. *Id.* ¶ 249.  Ms. Loomer remained the only de-platformed candidate in the nation and lost the 2020 General Election and the 2021 Primary Election—despite significantly out fundraising her opponent—as a direct result of Twitter's and Facebook's election interference and gamesmanship. *Id.* ¶¶ 248, 251.

Ms. Loomer has previously sued Defendants Facebook and Twitter for her removal from these Platforms; however, new information, including admissions, has revealed that these Platforms have been suppressing speech content and political candidates as State Actors in conjunction with the Federal Bureau of Investigation and the White House, specifically to undermine the integrity of American elections. *Id.* ¶¶ 1-3, 20-23, 254-261. Collectively, these Defendants compose the Community Media Enterprise ("CME"), a criminal enterprise, in conjunction with the FBI and other executive branch agencies; the enterprise has engaged in a multiplicity of Predicate Acts through extortion, transportation, transmission, and providing material support and advocating for the overthrow of government, and it has created an artifice of community policies and schemes to exploit and defraud the Plaintiffs and millions of consumers and to cause interference in American politics and it's elections. *Id.* ¶ 37, 40, 42-46, 279, 262-344.

Plaintiffs brought this action because they have suffered significant injury (*Id.* ¶¶ 252-253) and because the CME presents an immediate and ongoing threat to their community by "creating tools that [rip apart] the social

PLAINTIFFS' OMNIBUS MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT AS AMENDED - 10

1   fabric of society," actively interfere with elections, or otherwise dismantle and advocate for the overthrow of

2   government.  *Id*. 331-344.  Plaintiffs allege the defendants are liable for:

3   •       Racketeer Influenced and Corrupt Organizations ("RICO")

4   •       RICO Conspiracy

5                                          **STANDARD OF REVIEW**

6               "A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which

7   relief can be granted 'tests the legal sufficiency of a claim.'"  *Conservation Force v. Salazar*, 646 F.3d 1240, 1241–

8   42 (9th Cir. 2011) (quoting *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)). Review of a Rule 12(b)(6) motion

9   is generally limited to the pleadings, but a district court may "consider certain materials—documents attached to the

10  complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting

11  the motion to dismiss into a motion for summary judgment."  *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir.

12  2003).  Likewise, a court may consider matters that are "capable of accurate and ready determination by resort to

13  sources whose accuracy cannot reasonably be questioned."  *Roca v. Wells Fargo Bank, N.A*., No. 15-cv-02147-

14  KAW, 2016 WL 368153, at *3 (N.D. Cal. Feb. 1, 2016) (quoting Fed. R. Evid. 201(b)).

15              When determining whether a claim has been stated, the Court accepts as true all well-pled factual

16  allegations and construes them in the light most favorable to the plaintiff.  *Reese v. BP Exploration (Alaska) Inc*.,

17  643 F.3d 681, 690 (9th Cir. 2011).  A court may not dismiss a complaint in which the plaintiff has alleged "enough

18  facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct.

19  1955, 167 L.Ed.2d 929 (2007)).  A claim is facially plausible when it "allows the court to draw the reasonable

20  inference that the defendant is liable for the misconduct alleged."  *Id*.

21              If a complaint fails to state a plausible claim, "'[a] district court should grant leave to amend even if no

22  request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the

23  allegation of other facts.'"  *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (en banc) (quoting *Doe v. United*

24  *States*, 58 F.3d 494, 497 (9th Cir. 1995)).

25

26

27

28  PLAINTIFFS' OMNIBUS MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
    DEFENDANTS' MOTION TO DISMISS THE COMPLAINT AS AMENDED - 11

## ARGUMENT

**I.      Plaintiffs' Action Is Not Barred By Res Judicata.**

Defendants Facebook and Twitter argue that this action is barred against them "under the doctrine of res judicata because she previously sued [Facebook and] Twitter in a different court for the same harm ostensibly claimed here–banning her from the platform–and lost."  Twitter's & Dorsey's Mot. to Dismiss 6 (Oct. 27, 2022), ECF No. 79; *see* Facebook's & Zuckerberg's Mot. to Dismiss 6 (Oct. 27, 2022), ECF No. 80.

Res judicata applies when there is "1) an identity of claims, 2) a final judgment on the merits, and 3) identity or privity between parties."  *W. Radio Servs. Co. v. Glickman*, 123 F.3d 1189, 1192 (9th Cir. 1997).  Defendants Facebook and Twitter argue that there is an identity of claims between the current action and Ms. Loomer's prior *Freedom Watch* complaint, and that Plaintiffs' civil RICO claim "'could have been raised' in the prior litigation." Mot. to Dismiss 6-7, ECF No. 79; Mot. to Dismiss 6-7, ECF No. 80.  However, "[t]he Restatement of Judgments notes that development of new material facts can mean that a new case and an otherwise similar previous case do not present the same claim."  *Whole Woman's Health v. Hellerstedt*, 579 U.S. 583, 599 (2016) (first quoting *New Hampshire v. Maine*, 532 U.S. 742, 748 (2001); then citing Restatement (Second) of Judgments §24, Comment f (1980) ("Material operative facts occurring after the decision of an action with respect to the same subject matter may in themselves, or taken in conjunction with the antecedent facts, comprise a transaction which may be made the basis of a second action not precluded by the first.")).  Moreover, "[f]actual developments may show that constitutional harm, which seemed too remote or speculative to afford relief at the time of an earlier suit, was in fact indisputable."  *Id.* at 601.

For instance, the Restatement (Second) of Judgments illustrates the following scenario:

> The government fails in an action against a defendant under an antitrust statute for lack of adequate proof that the defendant participated in a conspiracy to restrain trade.  The government is not precluded from a second action against the same defendant in which it relies on conspiratorial acts post-dating the judgment in the first action, and may rely also on acts preceding the judgment insofar as these lend significance to the later acts.

Restatement (Second) of Judgments, Illustration 12.

While Ms. Loomer has indeed previously sued Defendants Facebook and Twitter for her removal from these Platforms, new factual developments reveal that Defendants have been acting as State Actors by colluding with the Federal Bureau of Investigation and the White House to suppress speech and undermine the integrity of

PLAINTIFFS' OMNIBUS MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT AS AMENDED - 12

American elections.  FAC ¶¶ 1-3, 20-23, 254-261.[2]  While these First Amendment violations may have "seemed too remote or speculative to afford relief at the time of an earlier suit," these violations "w[ere] in fact indisputable." *See Whole Woman's Health*, 579 U.S. at 601.  Because of these revelations, the current action raises conspiratorial acts that post-date the judgment in *Freedom Watch*, and it relies on acts that preceded the judgment only insofar as they lend significance to the post-dating acts.  *See* FAC ¶¶ 42-43, 47, 146, 149-150, 159, 206-209, 216-217, 309-311, 332.

Because it is indisputable that Defendants were constitutionally harming Plaintiffs at the time the *Freedom Watch* complaint was filed, and because new information has brought such harms to light and has revealed conspiratorial acts post-dating the prior judgment, there is no identity of claims between the current and prior actions, and the current claims are new claims that could not have been raised in the prior litigation.  Therefore, this action should not be barred by res judicata.

## II.      Plaintiffs Have Constitutional Standing.

For Plaintiffs to have statutory standing, a civil RICO claim requires: "(1) injuries to [plaintiffs' business or] property (2) that were caused by those [RICO] violations."  *Bixler v. Foster*, 596 F.3d 751, 756 (10th Cir. 2010). In addition, Plaintiffs must show that their harm "was 'by reason of' the RICO violation," which requires Plaintiffs to establish "proximate causation" and "but-for causation."  *See Canyon Cnty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 972 (9th Cir. 2008) (citing *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992)).

---

[2] If Plaintiffs are permitted leave to amend their complaint, they will include newly released information as further evidence that Defendants interfered with American elections.  Such evidence will include information contained in the "Twitter Files," previously undisclosed documents from Twitter, that Twitter's new owner and CEO, Elon Musk, has permitted Matt Taibbi to release.  These files have revealed "that Big Tech works aggressively and in secret with government agencies to subvert the outcome of what the rest of us assumed were free and fair elections.  During the 2020 election, Twitter did this with the help of the FBI, committing censorship on behalf of one candidate while working to hurt the other candidate."  Tim Hains, *Tucker Carlson: What We Learned From "The Twitter Files"*, REALCLEAR (Dec. 6, 2022), https://www.realclearpolitics.com/video/2022/12/06/tucker_carlson_what_we_learned_from_the_twitter_files.html?amp;amp.  In permitting these files to be released, Elon Musk stated that "[t]he obvious reality, as long-time users know, is that Twitter has failed in trust & safety for a very long time and has interfered in elections."  Chris Pandolfo, *Elon Musk Says Twitter 'Has Interfered In Elections'*, FOX BUS. (Nov. 30, 2022), https://www.foxbusiness.com/technology/elon-musk-says-twitter-has-interfered-elections.

PLAINTIFFS' OMNIBUS MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT AS AMENDED - 13

### A. Plaintiffs Can Satisfy The Civil RICO Standing Requirements.

Defendants argue that Plaintiffs have failed to satisfy the requirements for standing under RICO because Plaintiffs failed to "allege a concrete financial injury to her business or property." Mot. to Dismiss 12, ECF No. 79. Defendants also stated that: "[A] showing of 'injury' requires proof of concrete financial loss, and not mere 'injury to a valuable intangible property interest.'" *Id.* (citing *Oscar v. Univ. Students Co-op. Ass'n*, 965 F.2d 783, 785 (9th Cir. 1992). However, they erroneously ignored the holding in *National Organization for Women*, where the Supreme Court reversed the Seventh Circuit and ruled that RICO does not require an economic motive. *See Nat'l Org. for Women v. Scheidler*, 510 U.S. 249, 262, 114 S. Ct. 798, 806 (1994). The Court came to this conclusion based on the "plain language of § 1962(c) and the definition of 'pattern of racketeering activity' in § 1961(1)" [and] that "Congress's inclusion in § 1962(c) of enterprises whose activities 'affect' interstate or foreign commerce further demonstrated that a profit-seeking motive" is not required. *Id.* at 258-59. Here, Plaintiffs have suffered from reputational damage, lost employment opportunities due to employers' fear of being similarly banned for mere association with Ms. Loomer per Defendants' policies, and lost future profits, at the very least. *See* FAC ¶ 252. Furthermore, Ms. Loomer's candidacy for U.S. Congress suffered "reputational damage, deprivation of equal access to voters and [a loss and decline] of campaign donations, and the loss of votes in a federal election." *Id.* at ¶ 253. Moreover, courts have held that the claims of reputational and other damage caused by a defendant's actions satisfy the standing requirement. *See Lewis v. Lhu*, 696 F. Supp. 723, 727 (D.D.C. 1988).

The Plaintiffs have pleaded sufficient facts to show that the RICO claims are the proximate and but-for cause of their injuries. The Plaintiffs are allowed to bring RICO actions for acts of public corruption that resulted in injury to them. *See Waste Mgmt. of Louisiana, L.L.C. v. River Birch, Inc.*, 920 F.3d 958, 964-73 (5th Cir. 2019), *cert. denied*, 140 S. Ct. 628, 205 L. Ed. 2d 390 (2019); *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 827 (7th Cir. 2016). In addition, the "direct victim may recover through RICO whether or not it is the direct recipient of the false statements." *See Phoenix Bond & Indem. Co. v. Bridge*, 477 F.3d 928, 932 (7th Cir. 2007) (emphasis in original), aff'd, 553 U.S. 639 (2008). Here, Plaintiffs can show that all their injuries are attributed to the Defendants through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding and extorting Plaintiffs and others. Defendants committed the predicate acts of committing wire fraud, maliciously threatening to injure property and reputation by written communications, assistance to terrorist

PLAINTIFFS' OMNIBUS MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT AS AMENDED - 14

organizations and advocacy for the overthrow of the government (*see* FAC ¶ 114), which directly and indirectly

gave rise to Plaintiffs' injuries (i.e., removal from Twitter, subsequent reputational, financial, and consequential

harms, etc.).  The predicate acts are reasonably foreseeable to cause her injuries to satisfy proximate cause and the

predicate acts were also the actual (but-for) cause of Plaintiffs' injuries.

Plaintiffs are not required to allege that they were the target of the predicate fraudulent acts.  A plaintiff

only needs to allege that defendants' fraud caused plaintiffs' injuries, either directly or indirectly.  *See Terre Du Lac*

*Ass'n, Inc. v. Terre Du Lac, Inc.*, 772 F.2d 467 (8th Cir. 1985), *cert. denied*, 475 U.S. 1082, 89 L. Ed. 2d 718, 106 S.

Ct. 1461 (1986); *Pandick, Inc. v. Rooney*, 632 F. Supp. 1430, 1433 (N.D. Ill. 1986).  When it comes to the wire

fraud, Plaintiffs showed that the Defendants committed fraud when they knowingly attempted to mislead users (who

viewed Ms. Loomer's social media profiles or wanted to view her profiles) to visit other political organizations and

candidates, instead of her.  Defendants persuaded users that Plaintiffs were not worthy of donations by incorrectly

labeling Ms. Loomer's page as false, fraudulently deactivating and banning Ms. Loomer and her political page and

the option of giving donations along with that, deterring users through its deceptive 'fact-checking' notifications

towards profiles of candidates that directly compete with Ms. Loomer for campaign donations and votes for office,

and by labeling Plaintiffs as "dangerous."  This is evidenced by the fact that, on or about September 19, 2019,

Defendant Zuckerberg admitted that he was aware Facebook's 'factcheckers' exhibited clear activist bias and have

done so for a long time.  *See* Allum Bokhari, *Report: Mark Zuckerberg admits Facebook's 'clear bias,' dependence*

*on 'activist' fact checkers*, Breitbart (Sept. 19, 2019).

Further, Defendants engaged in wire fraud by intentionally attempting to persuade social media users to

redirect their attention and donate money to Defendants' purported supporters or political allies that Defendants

have pecuniary connections with instead.  *See United States v. Rezko*, 776 F. Supp. 2d 651 (N.D. Ill. Oct. 2, 2007)

(holding that wire fraud was adequately pleaded where defendant was alleged to have sought to cause money to go

to defendant's "associates").  Defendants could possibly argue that there are no monetary connections or enough

evidence to show a financial relationship between Defendants and Plaintiffs' political rivals.  However, in *Spano* the

court stated that, "[a] participant in a scheme to defraud is guilty even if he is an altruist and all the benefits of the

fraud accrue to other participants."  *United States v. Spano*, 421 F.3d 599, 603 (7th Cir. 2005) (upholding mail fraud

conviction).  Here, Defendants could possibly state that they are not engaging in fraud because they support different

PLAINTIFFS' OMNIBUS MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE COMPLAINT AS AMENDED - 15

political candidates and are not profiting from their promotion of Plaintiffs' rivals.  Still, this provision also applies where the money earned through the deceit goes to individuals or candidates unrelated to the fraud, including "to charities*."  See United States v. Sorich*, 523 F.3d 702, 709-10 (7th Cir. 2007).

In addition, although Defendants' services are generally free for users, they are still social media businesses that make money through advertisements on their site and subsequently by satisfying the needs of their top advertisers in order to keep them happy and generating income in the process.  Defendants further engaged in fraud when they took away from users the right to decide on which candidate they wanted to follow or whether or not to donate to a political candidate of their choosing.  By blocking/deactivating Ms. Loomer's profile, Defendants took a property right away from Plaintiffs, as well as from the users their fraud was directed to.  Even though Defendants' acts might not directly result in a financial loss to the owner, the "wire fraud statute" safeguards the owner's ability to control how the money is spent.  *See Carpenter v. United States*, 484 U.S. 19, 25-28 (1987); *see also McNally v. United States*, 483 U.S. 350, 360 (1987).  Here, all of Defendants' misrepresentations about the falsity of Ms. Loomer's profile are related to the Defendants' claim that she is a "dangerous individual" solely due to her political party and political views, and its implied commitments to refrain from conduct or ideas not otherwise permitted by its Terms of Service.  Thereby, Defendants wrongfully induced Plaintiffs to rely on their false assurances of inclusion and fairness in the election process.  Proof of this is exhibited when Defendant Zuckerberg said, "We think people should be able to hear what politicians have to say.  I don't think it's right for tech companies to censor politicians in a democracy." FAC ¶ 223.

Finally, Plaintiffs' rights to manage their own political campaign profile, the equal right to spread knowledge and share that profile page, and the ability to lobby donations from users were all valuable items of property that Defendants took from Plaintiffs as a result of the dishonest acts, misrepresentations, and omissions that were intended to deceive Plaintiffs and Platform users indirectly.  Plaintiffs suffered injuries to reputation, monetary and financial loss, as well as a loss in votes when Defendants controlled the fairness of the election process by blocking Plaintiffs' profiles while leaving profiles up of Plaintiffs' rivals.  In *Committee for Idaho's High Desert, Inc*., the court stated, "[I]t is well established that a nonprofit [candidate's] reputational damage or loss of donation revenue constitutes actionable commercial injury."  *See Committee for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814 (9th Cir. 1996).

PLAINTIFFS' OMNIBUS MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT AS AMENDED - 16

The fraudulent actions that Defendants committed clearly directly and indirectly connect to Plaintiffs' injuries.  In addition, the acts of fraud are all related to the other predicate acts including extortion, participation in terrorism, and overthrowing of the government.  Here, the fraud is connected to extortion by the wrongful use of fear of public ridicule and economic harm associated with being banned and labeled a "dangerous individual," and by allowing Defendants to obtain intangible property from Plaintiffs.  FAC ¶ 110.  Defendants used written wire communications to maliciously threaten, to injure Plaintiffs' reputations, and to fraudulently expose Plaintiffs to negative interpretations.  In addition, Defendants extorted with the intent to extort any pecuniary advantage whatsoever, or to compel the person so threatened, or any other person, to do any act or refrain from doing any act against his or her will, which violates the Florida Extortion Statute.  *See* Fla. Stat. § 836.05.  The extortion claim is connected to the wire fraud charge and overall racketeering case through "instances where the obtaining of the property would itself be 'wrongful.'"  As explained above, Defendants obtained property directly and indirectly from Plaintiffs and Platform users.  *See United States v. Enmons*, 410 U.S. 396, 400 (1973); FAC ¶¶ 363-365.

Next, the wire fraud is connected to terrorism by the following pieces of evidence from Plaintiffs' First Amended Complaint.  "Hezbollah and Hamas maintained a widespread presence on Facebook, YouTube and Twitter . . . with many leaders of the organizations, having a Twitter Feed and Facebook page."  FAC ¶ 312. "Carlos Monje, Jr., U.S. policy director for Twitter, stated that Twitter allows accounts associated with political arms of groups designated by the U.S. government as "foreign terrorist organizations."  *Id.* ¶ 314.  Defendant Facebook "allowed these [terrorist] pages to remain searchable and accessible by its user base through basic keyword searches for up to six weeks, and further helped 'the extremist groups because it allow[ed] users to like the pages, potentially providing a list of sympathizers for recruiters.'"  *Id.* ¶ 313.  Finally, on August 17, 2021, "two Taliban spokesmen, Suhail Shaheei and Zabihullah Mujahid had Twitter accounts which have been active for years with more than 351,000 and 310,000 Twitter followers, respectively."  *Id.* ¶ 317.

Defendants blatantly expressed that they were aware of the terrorist activities and terrorist leaders' accounts present on their sites, yet they removed and blocked Ms. Loomer's account and labeled her a "dangerous individual."  Due to the fact that Defendants are run by their advertisers, there is evidence to show a reasonable inference that one of those advertisers is a terrorist organization.  There is no other reason to justify the fact that Defendants think that Plaintiff is more dangerous than a known terrorist leader that murders people.  Thus,

PLAINTIFFS' OMNIBUS MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE COMPLAINT AS AMENDED - 17

Plaintiffs' predicate claim of terrorism against the Defendant is connected to the wire fraud by communications present online and as a whole and relates to the overall claim of racketeering and civil RICO.

Lastly, the wire fraud is connected to overthrowing the government by the Defendants' use of force or violence in advocating for overthrowing the government.  *See* 18 U.S.C. §2385.  Here, through wire communications, the Defendants' attempt to overthrow the government is associated with the terrorist activities and presence on Defendants' Platforms, the wrongful and defamatory banning of Ms. Loomer's account, and manipulation of the election process by controlling and taking away property rights belonging to Plaintiffs and other Platform users.  Thus, there is enough to plausibly show a connection between overthrowing the government and wire fraud, and overall, the link to the predicate act of racketeering charge.  Thus, such allegations plainly satisfy the standing requirements for a civil RICO claim.

**B.   Plaintiffs Can Satisfy The Constitutional Standing Requirements.**

To meet the constitutional standing requirement, a plaintiff must show (1) an injury in fact (2) that is fairly traceable to the actions of the defendant and (3) that likely will be redressed by a favorable decision.  *See Bennett v. Spear*, 520 U.S. 154, 162, 117 S. Ct. (1997); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 119 L. Ed. 2d 351, 112 S. Ct. 2130 (1992).  "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice."  *See Lujan*, 504 U.S. at 561.  Here, Plaintiffs have made "general factual allegations" sufficient to plead constitutional standing.  *Id*.  Whereas, through the facts, evidence, circumstantial evidence, predicate acts, and overall claim of wire fraud Plaintiffs have made showings that go beyond the minimum general factual allegations standard of constitutional standing.

Plaintiffs have constitutional standing based on all the arguments and facts used in the RICO civil claim above.  In addition to the facts and evidence shown above, Plaintiffs can independently show injury in fact through both economic and non-economic damages.  *See Waste Mgmt. of Louisiana, L.L.C.*, 920 F.3d at 964-73; *see also Envtl. Tectonics v. W.S. Kirkpatrick, Inc.*, 847 F.2d 1052, 1067 (3d Cir. 1988) (holding that business competitor had standing to challenge defendant's alleged use of bribery of foreign government officials to obtain contracts).  Many courts have held that injuries involving non-economic assets including business ones, "such as lost customers or business relationships" are identifiable as an injury-in-fact.  *See Diaz v. Gates*, 420 F.3d 897, 899-900 (9th Cir. 2005) (illustrating employers who depressed laborers' wages by illegally hiring undocumented workers at below-

PLAINTIFFS' OMNIBUS MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT AS AMENDED - 18

market wages); *see also Commercial Cleaning Servs., L.L.C. v. Colin Serv. Sys., Inc.*, 271 F.3d 374, 380-84 (2d Cir. 2001) (holding that the company had standing to assert RICO claims for lost profits against its direct competitor whose hiring of illegal immigrants allowed it to submit lower bids); *Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539, 542 (5th Cir. 2001) (reversing dismissal of RICO claims based on defendant's alleged spreading of rumor to lure plaintiff's customers away); *Alexander Grant & Co. v. Tiffany Indus., Inc.*, 770 F.2d 717, 719 (8th Cir. 1985) (holding injury to reputation as national accounting firm compensable under RICO); *Lewis*, 696 F. Supp. at 727 (holding that damages for reputation of telecommunications consultant caused by "smear campaign" recoverable under RICO).

Through the facts above, Plaintiffs have proven how these injuries to reputation, loss of wages, lost income through campaign contributions, and lost votes are traceable directly or indirectly to the actions of the Defendants. It is capable of being redressed by re-activating Ms. Loomer's profile account, by retracting Defendants' claims of her being a "dangerous individual," actual and compensable damages due to the loss of income, and treble damages due to the harm and injuries sustained because of the Defendants' actions.  Thus, Plaintiffs have sufficient constitutional standing to go forward with the suit and deny the motions to dismiss.

### C.  Defendants Jack Dorsey's And Mark Zuckerberg's Individual Actions Are Fairly Traceable To Plaintiffs' Injuries

Separately, Defendants Facebook, Twitter, Jack Dorsey and Mark Zuckerberg violated 18 U.S.C. §1951 by conspiring, attempting, and obstructing, delaying and affecting commerce through extortion by wrongfully using the fear of the public disgrace and economic harm associated with being banned and labeled a dangerous individual. FAC ¶ 364.  Zuckerberg and Dorsey constituted an enterprise in fact and engaged in and whose activities affect interstate commerce with common goals of making money, acquiring influence over other enterprises and entities, and other pecuniary and non-pecuniary interests.  *Id.* ¶ 350.

The evidence that links Dorsey individually to the charges include:

• "[T]he New York Times reported on an investigation which found that governments were successfully using Twitter to promote favorable content, attack critical voices, and otherwise shape what average people found when online." *Id.* ¶ 42.

•       "On or about November 4, 2019, Defendant Twitter's government relations team told candidates seeking verification that Twitter would not give new contenders a 'blue checkmark' until after the contenders won a state primary." *Id*. ¶ 57.

•       "Defendant Twitter's civic integrity policy applies special fact-checking scrutiny to tweets that might interfere with people's participation in democratic processes, a level of scrutiny only shared with the policy of harmful information related to COVID 19." *Id*. ¶ 69.

•       "On or about March 24, 2020, Twitter confirmed that propaganda from Chinese officials that attempts to blame the U.S. for the coronavirus is permitted on the platform." *Id*. ¶ 83.

•       "On or about May 27, 2020, Defendant Dorsey reaffirmed Twitter's commitment to fact-check information related to elections." *Id*. ¶ 91.

•       "On or about May 27, 2020, Defendant Jack Dorsey stated, 'there is someone ultimately accountable for our actions as a company, and that's me.'" *Id*. ¶ 138.

        Additionally, Defendant Zuckerberg has individual standing connected to the claims asserted by Plaintiffs through the statements and facts listed above showing his control over Facebook's censoring and fact-checking.  In addition, Zuckerberg as the CEO, like Dorsey, ultimately had the final say and ability to oversee and take part in the censorship and fraud operation aimed at the Plaintiffs.  *Id*. ¶ 12.  Furthermore, Zuckerberg has been aware of, if not directly involved in, a multitude of Facebook's censoring choices and bias, such as:

•       "On or about September 19, 2019, Defendant Zuckerberg admitted to U.S. Senator Josh Hawley that he was aware Facebook's factcheckers exhibited clear activist bias and have done so for a long time." *Id*. ¶ 89.

•        "On August 25, 2022, Mark Zuckerberg appeared on The Joe Rogan Experience, the largest podcast in the world, hosted by Joe Rogan.  During the interview, he made the stunning admission that Facebook, at the request of the FBI, algorithmically suppressed stories about the Hunter Biden laptop scandal during the weeks leading up to the 2020 Presidential election." *Id*. ¶ 254.

        These are just a few of the statements that Zuckerberg has made in public or under oath before the U.S. Senate Commerce and Judiciary Committees, which demonstrate his direct and personal involvement in decisions that are made by Facebook, including the removal and banning of Plaintiffs' profiles.  *Id*. ¶¶ 309-311.  Thus, a reasonable inference may be drawn from the facts and comments supporting this claim that Zuckerberg and Dorsey

1  were involved in actions that are fairly traceable to Plaintiffs' injuries.  Ultimately, Defendants' motions should be

2  denied since Plaintiffs have shown sufficient proof to meet both the civil RICO and constitutional standing

3  requirements.

4  **III.    Plaintiffs' Claims Are Not Barred By Section 230 Of The CDA**

5  Section 230(c)(1) of the CDA "protects from liability (1) a provider or user of an interactive computer service

6  (2) whom a plaintiff seeks to treat . . . as a publisher or speaker (3) of information provided by another information

7  provider." *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1097 (9th Cir. 2019) (internal citation omitted).

8  **A.    Twitter And Facebook's Content Creation Falls Outside The Scope Of Immunity**

9  Defendants fail to acknowledge that CDA immunity "applies only if the interactive computer service

10  provider is not also an 'information content provider.'" *See Fair Hous. Council of San Fernando Valley v.

11  Roommates.Com, LLC*, 521 F.3d 1157, 1162 (9th Cir. 2008).  An information content provider is defined as "any

12  person or entity that is responsible, in whole or in part, for the creation or development of information provided

13  through the Internet or any other interactive computer service." 47 USC § 230(f)(3).  Here, Facebook is clearly a

14  content provider as well as an interactive computer service provider as evidenced by the fact that "Facebook

15  rearranges text and images provided by members . . . by grouping such content in a particular way with third-party

16  logos, Facebook transformed the character of words, photographs, and actions into a commercial endorsement." *See

17  Asia Econ. Inst. v. Xcentric Ventures LLC*, No. CV 10–01360–SVW (PJW), 2011 WL 2469822, at *6–7 (C.D.Cal.

18  May 4, 2011).  As such, the same argument applies to Twitter as well; Facebook and Twitter are trying to escape

19  liability by hiding behind Section 230 of the CDA.  Immunity is provided to interactive computer service providers

20  only to protect them from liability for content shared on their Platform by third parties.

21  Both the Defendants and Plaintiffs can agree that Twitter is an interactive computer service provider

22  because it is an online messaging board platform.  *See* 47 U.S.C. § 230(f)(2); *Dyroff*, 934 F.3d at 1097 (stating that

23  the "prototypical" example is an "online messaging board"); *Brittain v. Twitter, Inc.*, 2019 WL 2423375, at *2 (N.D.

24  Cal. June 10, 2019) (holding that Twitter is an interactive computer service).  Therefore, Twitter would meet the

25  first prong like Defendants claim, but it will not be satisfied if the Defendant is also an information content provider.

26  Nonetheless, according to *Roomates.com*, even displaying user information such as age, hometown, college, likes,

27

28  PLAINTIFFS' OMNIBUS MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
   DEFENDANTS' MOTION TO DISMISS THE COMPLAINT AS AMENDED - 21

and occupation would make Defendants information content providers as well as interactive computer service providers within the meaning of the statute.  *See Roommates.Com*, 521 F.3d. at 1174.

Besides sharing information about their users, Twitter has also employed fact checkers to flag posts that could be misleading and inform the users viewing the post why it would be misleading and sharing information as a result.

"Like the defendant in *Roommate*, which was alleged to have purposefully designed its website to filter listings in a discriminatory manner, [Facebook and Twitter] defendants are alleged to have purposefully designed their platforms to filter posts and accounts in an anticompetitive manner." *Dangaard v. Instagram, LLC*, No. C 22-01101 WHA, 2022 WL 17342198 (N.D. Cal. Nov. 30, 2022).  Here, Defendants' "filtration tools" are essentially designed to "facilitate anticompetitive conduct."  *See Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1101 n.3 (9th Cir. 2009).  As a result, the first prong in considering Section 230(c)(1) immunity is not met.

**B.   Plaintiffs Do Not Treat Facebook And Twitter As Publishers Or Speakers.**

Next, Plaintiffs treating Defendants as publishers by holding them liable for editorial functions such as removing content or profiles would satisfy the second prong.  However, immunity only extends so far as to minor alterations from Defendants, such as "correcting spelling, removing obscenity or trimming for length."  *See Roommates.com*, 521 F.3d at 1169.  Rather, Defendants' alleged actions go far beyond editing font, graphics, spelling, or removal to the point that through their manipulation of content, promotion of advertisements, and controlling the narrative they have become information content providers, and are treated more like creators than publishers, to which immunity does not extend.

In addition, Defendants will not be entitled to immunity when their Platform, "materially contribut[es] to actionable content."  *Id*. at 1168.  This occurs when a service provider such as Defendants are "directly involved with developing and enforcing a system that subjects subscribers to and directly participates in developing [actionable content]."  *Id*. at 1174; *see also Opperman v. Path, Inc*., 87 F. Supp. 3d 1018, 1043-45 (N.D. Cal. 2014); *Swift v. Zynga Game Network, Inc*., 2010 WL 4569889, at *4-6 (N.D. Cal. Nov. 3, 2010).  In *Zango, Inc. v. Kaspersky Lab, Inc*., 568 F.3d 1169 (9th Cir. 2009), the judge warned of "a web browser configured by its provider to filter third-party search engine results so they would never yield websites critical of the browser company or favorable to its competitors."

PLAINTIFFS' OMNIBUS MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT AS AMENDED - 22

Thus, "filtering practices aimed at suppressing competition" would not satisfy the prong, because they would no longer be treated as publishers, but information providers. Other kinds of actionable content would also include collecting, storing, and using consumers' data, targeted ads, deceptive ads, and subjecting users to scams and counterfeit merchandise. As a result, the second prong in considering Section 230(c)(1) immunity is not met.

### C.  Defendants Are Liable For Content They Create, And Immunity Does Not Extend To The Class Of Claims Brought Forward.

The third prong would not be satisfied due to the actions taken by Defendants beyond just banning Plaintiffs' profiles. Defendants manipulated, filtered, and provided "fact checked information," which resulted in them becoming the suppliers and creators of information and information content providers, rather than publishers of information provided by another information content provider. *See* §230(c)(3).

The Communications Decency Act §230 does not impose "a general immunity from liability deriving from third-party content." *See Barnes*, 570 F.3d 1096 at 1100. Rather, §230 expressly excludes only four classes of claims from its broad grant of immunity: (i) claims involving a "Federal criminal statute," (ii) "any law pertaining to intellectual property," (iii) "any State law that is consistent with this section," and (iv) "the Electronic Communications Privacy Act." § 230(e)(1)-(4). Thus, Plaintiffs' causes of action concerning RICO, racketeering, and terrorism would bar Defendants' claim of general immunity. This would also apply to Jack Dorsey in his capacity as CEO and the actions of the company being attributed to him.

Lastly, it is sufficient to acknowledge that Defendants' online presence and conduct in this case are different from other service providers that have been granted immunity under §230. Defendants fail to satisfy all three prongs of the statute and do not acknowledge their status as information content providers. Defendants are not treated as publishers under the statute due to the significant involvement and manipulation by Defendants on the information shared on their platform, including the ban of Plaintiffs' accounts and fact-checking by them displayed on posts. Thus, because Defendants exhibited such unlawful conduct, their motions to dismiss under CDA §230 should be denied.

IV.     **Plaintiffs' RICO Claim (Count I) Is Supported By Sufficient Facts And A Cognizable Legal Theory For Relief.**

To plead a civil RICO claim under 18 U.S.C. § 1962(c), Plaintiffs must allege the following elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to plaintiff's business or property." *Bronner v. San Francisco Sup. Ct.*, No. C 09-5001 SI, 2010 U.S. Dist. LEXIS 20486, at *13 (N.D. Cal. Mar. 8, 2010) (quoting *Grimmett v. Brown*, 75 F.3d 506, 510 (9th Cir. 1996)).  As a preliminary matter, Plaintiffs have addressed the fifth element above in section II, which demonstrated that Plaintiffs have standing to bring a RICO claim against Defendants.

A.   **Defendants Engaged In Conduct Befitting A RICO Claim.**

Plaintiffs have established that Defendants engaged in the conduct required to satisfy § 1962(c).  "The conduct requirement under § 1962(c) means that '[i]n order to "participate, directly or indirectly, in the conduct of such enterprise's affairs," one must have some part in directing those affairs.'"  *Mitsui O.S.K. Lines, Ltd. v. Seamaster Logistics, Inc.*, 913 F. Supp. 2d 780, 791 (N.D. Cal. 2012) (quoting *Eclectic Props. East, LLC v. Marcus & Millichap Co.*, No. C-09-00511 RMW, 2012 U.S. Dist. LEXIS 28865, at *6 (N.D. Cal. Mar. 5, 2012) (alteration in original)).  "Simply performing services for the enterprise does not rise to the level of direction, whether one is 'inside' or 'outside.'"  *Walter v. Drayson*, 538 F.3d 1244, 1249 (9th Cir. 2008).

Defendants Twitter and Dorsey argue that Plaintiffs "do[] not allege that the Twitter Defendants did anything other than direct Twitter's own affairs by moderating content on and access to its platform."  Mot. to Dismiss 27, ECF No. 79.  However, Plaintiffs have indeed shown that Twitter directed the affairs of the enterprise by illegally conspiring with "individuals within the FBI and other parts of the Executive Branch of the United States government" to ban certain individuals from the Platform in attempt to suppress their speech across digital platforms and by engaging in fraudulent schemes.  FAC ¶¶ 2, 37, 42, 83, 91, 96-98, 103, 247, 259, 264, 305.  Defendants Facebook, Zuckerberg, and P&G similarly directed the affairs of the enterprise by coordinating which individuals should be banned from Platforms to suppress those individuals' speech and online presence.  *Id.* ¶¶ 50, 63-65, 72-74, 89, 92, 108, 110, 117, 125, 128, 131, 143-144, 146, 159-168, 177-178, 180-182.

**B.  Defendants Formed An Enterprise.**

Plaintiffs have established that Defendants formed an enterprise that performed the aforesaid conduct.  "An 'enterprise' is statutorily defined as 'any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.'"  *Bunnett & Co. v. Gearheart*, No. 17-cv-01475-RS, 2018 U.S. Dist. LEXIS 31873, at *7 (N.D. Cal. Feb. 27, 2018) (quoting 18 U.S.C. § 1961(4)).  "For purposes of a Section 1962(c) claim, an enterprise is 'an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct.'"  *Id*. at *7-8 (quoting *United States v. Turkette*, 452 U.S. 576, 583, 101 S. Ct. 2524, 69 L. Ed. 2d 246 (1981)).  To establish such an enterprise, "a plaintiff must provide both evidence of an ongoing organization, formal or informal, and evidence that the various associates function as a continuing unit."  *Id*. at *8 (quoting *Turkette*, 452 U.S. at 583).  Further, "[t]he Ninth Circuit has expressly rejected that a plaintiff need show or allege 'any particular organizational structure, separate or otherwise.'"  *Id*. (quoting *Odom v. Microsoft Corp*., 486 F.3d 541, 551 (9th Cir. 2007)).  "The Supreme Court has clarified that an enterprise must be 'separate and apart from the pattern of activity in which it engages.'"  *Id*. (quoting *Turkette*, 452 U.S. at 683).  Therefore, to adequately plead that an enterprise exists, "Plaintiffs need to allege (1) a common purpose among defendants, (2) ongoing organization, formal or informal, and (3) a continuing unit."  *Id*.

Defendants argue that Plaintiffs have not plausibly alleged that Defendants had a relationship, association, or contact with one another, nor that Defendants knew the purpose and nature of an enterprise.  Mot. to Dismiss 13-14, ECF No. 79; Mot. to Dismiss 9-10, ECF No. 80; P&G's Mot. to Dismiss 1 (Oct. 27, 2022), ECF No. 81.  Defendants further argue that Plaintiffs' allegations regarding a common purpose among Defendants do not plausibly allege a RICO enterprise because the Platforms' content moderation is "lawful parallel conduct."  Mot. to Dismiss 10, ECF No. 80; Mot. to Dismiss 1, 3, ECF No. 81.  Moreover, Defendants argue that Plaintiffs did not plausibly allege that Defendants coordinated their activities nor worked as a cohesive unit.  Mot. to Dismiss 10, ECF No. 80; Mot. to Dismiss 2-3, ECF No. 81.

However, Plaintiffs have first established that Defendants had the common purpose of suppressing speech, censoring news coverage, defrauding Plaintiffs and others, and undermining elections.  FAC ¶¶ 1, 3, 304, 359-360.  Contrary to Defendants claiming they had no knowledge of a common purpose and that their content moderation

PLAINTIFFS' OMNIBUS MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT AS AMENDED - 25

was "lawful parallel conduct," Plaintiffs have demonstrated that Defendants colluded with one another and with

individuals within the FBI and other parts of the Executive Branch to determine which individuals to ban from their

Platforms. *Id*. ¶ 37. They acted together to ensure that these banned individuals would have no ability to share their

political views nor promote their campaigns on any major internet Platforms, and to shape public narrative of

politicians, political ideologies, and political events. *Id*. ¶¶ 35, 42, 48, 50, 57-69, 72-74, 89, 91-98, 108, 110, 117,

125, 128, 131, 143-144, 146, 149-150, 159-215.

Next, Plaintiffs have established that Defendants formed an ongoing organization. Under the direction of

the FBI, Defendants Facebook and Zuckerberg algorithmically suppressed stories about the Hunter Biden laptop

scandal leading up to the 2020 election in an effort to influence the 2020 presidential election in Joe Biden's favor.

*Id*. ¶¶ 254-58. Further, White House officials and the current Biden administration directed Defendants Twitter and

Dorsey to ban certain individuals from the platform to suppress criticisms against the government. *Id*. ¶ 259.

Moreover, Defendant P&G required Defendants Facebook and Zuckerberg to ban certain individuals from Facebook

unless those individuals disavowed the Proud Boys. *Id*. ¶ 234-239. In this way, Defendants comprised an

organization acting with the common purpose of suppressing speech and influencing elections.[3]

Finally, Plaintiffs have demonstrated that Defendants' organization is a continuing unit. As of August 23,

2022, when Candidate Loomer lost the Republican primary election for U.S. House Florida District 11 by less than

6,000 votes, her campaign was the only de-platformed campaign in the United States. *Id*. ¶ 251. If Defendants had

not continued their organization with the common purpose of suppressing Plaintiffs' speech, then Candidate Loomer

could have shared her political ideologies to a wider audience of voters – an opportunity which was afforded to her

opponent. *Id*.

---

[3] Further, when President Donald Trump recently sued Twitter and Dorsey alleging that they violated the First Amendment by banning his account while he was still a sitting United States President, Defendants Twitter and Dorsey were represented by Wilmer Cutler Pickering Hale and Dorr LLP, the law firm that currently represents Defendants Facebook and Zuckerberg in this RICO case. *See Mot. to Appear* Pro Hac Vice, ECF No. 40 (Sept. 1, 2021), *Donald Trump, et al. v. Twitter, Inc. & Dorsey*, No. 1:21-cv-22441. This exemplifies that Defendants are involved in an organization which retains the same law firms for the same purposes – violating freedom of speech, coordinating and sharing legal resources, keeping valuable information concealed from the public, and interfering in elections.

PLAINTIFFS' OMNIBUS MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT AS AMENDED - 26

Therefore, Plaintiffs have established that Defendants had (1) a common purpose, (2) an ongoing organization, and (3) a continuing unit, such that Defendants should be considered an enterprise under 18 U.S.C. § 1962(c).

### C. Defendants Displayed A Pattern Of Racketeering Activity.

Plaintiffs have adequately alleged that Defendants displayed a pattern of racketeering activity.  A pattern of racketeering activity requires two or more acts of racketeering and "requires the showing of a relationship between predicates [] and of the threat of continuing activity . . . ."  *Gidding v. Anderson*, No. C 07-04755 JSW, 2009 U.S. Dist. LEXIS 24351, at *23 (N.D. Cal. Mar. 13, 2009) (quoting *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 232, 238 (1989) (alteration in original)).  "Predicate acts are related if they have 'the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'"  *Id.* (quoting *H.J. Inc.*, 492 U.S. at 240).  Continuity "refer[s] either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition."  *Id.* (quoting *H.J. Inc.*, 492 U.S. 241).  When a RICO claim is brought alleging open-ended continuity, as Plaintiffs bring in this action, "liability depends on whether the threat of continuity is demonstrated."  *Id.* at *24 (quoting *H.J. Inc.*, 492 U.S. at 242).

Defendants first argue that Plaintiffs do not allege that the predicate acts were related to one another.  Mot. to Dismiss 16, ECF No. 79; Mot. to Dismiss 12, ECF No. 80.  However, Plaintiffs have demonstrated that the predicate acts alleged are related because these acts were performed with similar methods of commission, by banning certain individuals and ideas from social media Platforms, and with similar purposes of suppressing speech, controlling public narrative, and undermining American elections.

Defendants then argue that Plaintiffs have not demonstrated a threat of continuing activity.  Mot. to Dismiss 16, ECF No. 79; Mot. to Dismiss 12, ECF No. 80.  However, Defendants admit that their banning Plaintiffs and other conservative individuals while allowing terrorists, dictators, and foreign propagandists to remain on such Platforms were done in accordance with their regular business practices.  Mot. to Dismiss 16, ECF No. 79; Mot. to Dismiss 12, ECF No. 80.  While Defendants Twitter and Dorsey argue that Plaintiffs "incorporate[] facts demonstrating that Twitter changed its policy relating to foreign terrorist organizations years ago," Plaintiffs rather explained that, as recently as August of 2021, "the Taliban in Afghanistan and its terrorist affiliates used Twitter and

PLAINTIFFS' OMNIBUS MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT AS AMENDED - 27

1    Facebook applications to organize, implement, and procure substantial resources necessary to achieve the defeat of

2    the United States and its allies in Afghanistan." FAC ¶ 344.  Therefore, because Defendants regularly coordinate

3    with the government and other paying entities to determine which individuals and groups to permit on their

4    Platforms, their predicate acts have a threat of continuing.  Therefore, Defendants have demonstrated an ongoing

5    pattern of racketeering activity.

6                **D.  Defendants Engaged In Racketeering Activity.**

7             Plaintiffs have adequately alleged that Defendants engaged in racketeering activity (predicate acts).

8    "Racketeering activity is defined to include a number of generically-specified criminal acts, as well as the

9    commission of one of a number of listed predicate offenses." *Zapata v. Wells Fargo Bank, N.A.*, No. C 13-04288

10   WHA, 2013 U.S. Dist. LEXIS 173187, at * (N.D. Cal. Dec. 10, 2013) (citing 18 U.S.C. § 1961(1)).  Included in this

11   list are indictable acts under 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1951 (interference with commerce by

12   threats or violence), and 18 U.S.C. § 1952 (interstate and foreign transportation in aid of racketeering enterprise).

13            **1.  Defendants Engaged In Racketeering Activity By Violating 18 U.S.C. § 1343.**

14            Under 18 U.S.C. § 1343, "[a] wire fraud violation consists of (1) the formation of a scheme or artifice to

15   defraud; (2) use of the United States wires or causing a use of the United States wires in furtherance of the scheme;

16   and (3) specific intent to deceive or defraud." *Bonner v. Select Portfolio Servicing, Inc.*, No. 10-00609 CW, 2010

17   U.S. Dist. LEXIS 84857, at *20 (N.D. Cal. July 26, 2010) (quoting *Odom*, 486 F.3d at 554).  Wire fraud requires the

18   intent "to deprive the victim of money or property by means of deception." *RJ v. Cigna Health & Life Ins. Co.*, No.

19   5:20-cv-02255-EJD, 2022 U.S. Dist. LEXIS 159152, at *14 (N.D. Cal. Sept. 2, 2022) (quoting *United States v.*

20   *Miller*, 953 F.3d 1095, 1102 (9th Cir. 2020)).  "Allegations of predicate acts of mail and wire fraud in RICO claims

21   must be pled with specificity and satisfy the requirement of Rule 9(b) that the plaintiff 'state with particularly the

22   circumstances constituting fraud.'" *Fraser v. Team Health Holdings, Inc.*, No. 20-cv-04600-JSW, 2022 U.S. Dist.

23   LEXIS 60544, at *26 (N.D. Cal. Mar. 31, 2022) (quoting *Alan Neuman Prods., Inc. v. Albright*, 862 F.2d 1388,

24   1392 (9th Cir. 1988); Fed. R. Civ. P. 9(b)).  "However, the particularity requirement does not apply to allegations of

25   fraudulent intent, which only must be 'alleged generally.'" *Id.* (quoting *Eclectic Props. E., LLC*, 751 F.3d at 997).

26   "To be pleaded with particularity, allegations of fraud must 'be specific enough to give defendants notice of the

27   particular misconduct . . . so that they can defend against the charge and not just deny that they have done nothing

28   PLAINTIFFS' OMNIBUS MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
     DEFENDANTS' MOTION TO DISMISS THE COMPLAINT AS AMENDED - 28

1  wrong.'"  *Id.* (quoting *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003)).  "This includes alleging

2  '"the who, what, when, where, and how" of the misconduct charged.'"  *Id.* (quoting *Vess*, 317 F.3d at 1106).

3           First, Plaintiffs have pleaded allegations of wire fraud with particularity.  Each allegation of fraud –

4  including that Defendants banned Plaintiffs, that Defendants coordinated with one another to de-platform Plaintiffs,

5  and that Defendants intentionally deceived the public by making statements proclaiming that the public had a right

6  to hear what politicians have to say before changing policies to de-platform Plaintiffs – have been stated with the

7  date such conduct occurred, the location or meeting at which fraudulent statements were made, and the parties

8  present or involved in the fraudulent actions.  *See* FAC ¶¶ 223, 226, 230, 233-236, 238-239, 241, 242-244.

9  Therefore, these allegations have been stated with such particularity that Defendants were put on notice of particular

10  misconduct.

11           Next, Plaintiffs have demonstrated that Defendants formed a "scheme or artifice [to defraud] by depriv[ing]

12  another of the intangible right of honest services."  FAC ¶ 290 (quoting *United States v. Rybicki*, 354 F.3d 124 (2d

13  Cir. 2003)).  The scope of 18 U.S.C. § 1343 previously "encompassed only schemes to defraud another of money or

14  other property rights, but not schemes to defraud another of intangible rights."  *United States v. deVegter*, 198 F.3d

15  1324, 1327 (11th Cir. 1999).  However, "'Congress passed [18 U.S.C. § 1346] to' . . . extend[] wire fraud liability to

16  schemes to defraud another of intangible rights, including an intangible right of honest services."  *Id.*  While

17  Congress has not expressly defined "honest services," courts have interpreted the doctrine to apply to "[1]

18  government officials who defraud the public of their own honest services; [2] elected officials and campaign

19  workers who falsify votes and thereby defraud the electorate of the right to an honest election; [3] private actors who

20  abuse fiduciary duties by, for example, taking bribes; and [4] private actors who defraud others of certain intangible

21  rights, such as privacy."  *Rybicki*, 354 F.3d at 133 (quoting *United States v. Handakas*, 286 F.3d 92, 101 (2d Cir.),

22  *cert. denied*, 537 U.S. 894, 123 S. Ct. 168, 154 L.Ed.2d 160 (2002)).  Further, an honest services scheme or artifice

23  is one which "use[s] the mails or wires to enable an officer or employee of a private entity (or a person in a

24  relationship that gives rise to a duty of loyalty comparable to that owed by employees to employers) purporting to

25  act for and in the interests of his or her employer (or of the person to whom the duty of loyalty is owed) secretly to

26  act in his or her or the defendant's own interests instead, accompanied by a material misrepresentation made or

27  omission of information disclosed to the employer or other person."  *Id.* at 127.  In this way, Defendants Facebook

28  PLAINTIFFS' OMNIBUS MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE COMPLAINT AS AMENDED - 29

and P&G schemed to deprive Ms. Loomer of her honest services because, when P&G provided a list of users for Facebook to ban and Facebook obliged, Ms. Loomer was deprived of her intangible right not to have her reputation damaged by being labeled a "Dangerous Individual" and de-platformed. *Id.* ¶¶ 234, 291-292.

Next, Plaintiffs have shown that Defendants used the United States wires, or caused a use of the United States wires, in furtherance of the scheme. From October 2019 through June 2020, Defendant Facebook used television and electronic communications to deliver promises that political candidates would be permitted to use its Platform without worry that their speech would be suppressed. *See* FAC ¶¶ 297-299, 302.

Finally, Plaintiffs have shown that Defendants had the specific intent to deceive or defraud Plaintiffs by depriving Plaintiffs of their property of honest services they would have had as users of Platforms after publicly stating that political candidates would have the ability to use Facebook as a method of communicating their political ideas. FAC ¶ 291, 297-299, 302, 305.

Therefore, Plaintiffs have adequately alleged that Defendants engaged in racketeering activity by violating 18 U.S.C. § 1343.

### 2. Defendants Facebook, Twitter, Dorsey, and Zuckerberg Engaged In Racketeering Activity By Violating 18 U.S.C. § 1951.

Plaintiffs have shown that Defendants committed extortion in violation of 18 U.S.C. § 1951. Extortion is "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. 1951(b)(2).

Defendants argue that Plaintiffs have not alleged that Defendants acted wrongfully, obtained Plaintiffs' property, nor that Defendants used force, violence, or fear to do so. Mot. to Dismiss 19, ECF No. 79; Mot. to Dismiss 29-31, ECF No. 80. However, Plaintiffs have alleged that Defendant Facebook commits extortion by obtaining contractual, speech, and other rights and intellectual property from its users by threatening that it will ban its users, label them as dangerous individuals, label them as users of hate speech, or label their content as false information. *See* FAC ¶ 273, 276. Furthermore, Plaintiffs have alleged that Defendants Facebook, Twitter, Dorsey, and Zuckerberg committed extortion through their conspiring, attempting, and obstructing, delaying and affecting commerce by wrongfully using the fear of public disgrace and economic harm associated with being banned and

labeled a dangerous individual or group, under the color of official right, to obtain intangible property from Ms. Loomer, her associates, followers, and those similarly situated, with their consent. *Id.* ¶ 364.

While Defendants Facebook and Zuckerberg argue that Plaintiffs did not allege any "preexisting legal right to access Facebook while violating its policies or to use Facebook without being deemed a dangerous individual under its Community Standards," Plaintiffs have indeed shown that Facebook was acting as a State Actor in making its decisions to suppress Plaintiffs' and others' speech and to interfere in Ms. Loomer's congressional elections. *See id.* ¶¶ 1-3. As a State Actor, Defendant Facebook was required not to violate its users' First Amendment rights. *See id.* ¶¶ 27; *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (1921). Therefore, Plaintiffs had the preexisting legal right to use the Platform, which Defendants wrongfully removed.

Defendants Facebook and Zuckerberg then argue that Plaintiffs' speech rights are not items of value that Defendants "could possibly obtain in order to 'exercise, transfer, or sell.'" Mot. to Dismiss 19-20, ECF No. 80 (quoting *Scheidler v. Nat'l Org. of Women, Inc.*, 537 U.S. 393, 404 (2003)). Defendants then state that Plaintiffs cannot adequately plead extortion by alleging that Defendants "gain[ed] some speculative benefit" by restricting Plaintiffs' activities, and that Defendants "must actually appropriate (or attempt to appropriate) the victim's property." *Id.* at 20 (quoting *United States v. McFall*, 558 F.3d 951, 957-58 (9th Cir. 2009)). However, Plaintiffs have demonstrated that, by Defendants Facebook and Zuckerberg suppressing Plaintiffs' speech rights, Defendants gained the valuable benefit of P&G advertising on the Platform. FAC ¶¶ 233-234. In this way, Defendants obtained valuable property from Plaintiffs.

Therefore, Plaintiffs have adequately alleged that Defendants committed extortion by obtaining property from Plaintiffs by wrongfully threatening users and causing them to fear being de-platformed and labeled as dangerous individuals. In doing so, Defendants engaged in racketeering activity by violating 18 U.S.C. § 1951.

### 3. Defendants Engaged In Racketeering Activity By Violating 18 U.S.C. § 1952.

18 U.S.C. § 1952 prohibits "us[ing] the mail or any facility in interstate or foreign commerce, with the intent to . . . promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to perform" any unlawful activity including extortion in violation of the laws of the State in which committed or of the United States.

PLAINTIFFS' OMNIBUS MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT AS AMENDED - 31

1          Defendants Twitter and Dorsey argue that Plaintiffs' allegations regarding 18 U.S.C. § 1952 "do not

2    mention Twitter" and "cannot suffice to demonstrate that Twitter used 'the mail or any facility in interstate or

3    foreign commerce' to carry out any 'unlawful activity.'" Mot. to Dismiss 19, ECF No. 79.  However, when

4    Plaintiffs raised RICO as a cause of action and discussed interference with commerce by threats or violence,

5    Plaintiffs repeated and re-averred every statement that was contained in paragraphs 216-261 and 279-287.  FAC ¶

6    363.  In those paragraphs, Plaintiffs established that Defendants, including Twitter, committed extortion in violation

7    of the laws of Florida, California, and the United States by using the mail, email, the internet, social media, and

8    other facilities in interstate commerce to injure Plaintiffs' reputation and to disgrace Plaintiffs by banning them from

9    Defendants' Platforms for "hateful" conduct and labeling Ms. Loomer as a dangerous individual.  *See id.* ¶¶ 216-

10   220, 367-370.

11                    **4.   Defendants Violated 18 U.S.C. § 2339B.**

12         18 U.S.C. § 2339B prohibits "knowingly provid[ing] material support or resources to a foreign terrorist

13   organization, or attempt[ing] or conspir[ing] to do so," with the "knowledge that the organization is a designated

14   terrorist organization . . . , that the organization has engaged or engages in terrorist activity . . . , or that the

15   organization has engaged or engages in terrorism."  Defendants Facebook and Zuckerberg argue that Plaintiffs have

16   not plausibly alleged that Defendants Facebook and Zuckerberg "knew that any particular account was affiliated

17   with an FTO and failed to remove it."  Mot. to Dismiss 20, ECF No. 80.  Further, Defendants Facebook and

18   Zuckerberg claim that they actively remove terrorist content from Facebook, and that any remaining terrorist content

19   has simply been undetected by Defendants.  *Id.*  Defendants Twitter and Dorsey similarly argue that Plaintiffs have

20   alleged that members of the Taliban remain on Twitter, but that the Taliban is not a "designated foreign terrorist

21   organization."  Mot. to Dismiss 18, ECF No. 79.  Defendants Twitter and Dorsey further state that they terminate

22   accounts affiliated with Hamas or Hezbollah.  *Id.*

23         However, Plaintiffs have explained that Hezbollah and HAMAS maintained a widespread presence on

24   Facebook, YouTube, and Twitter, and that Al Aqsa and many of its leaders have Twitter feeds and Facebook pages.

25   FAC ¶ 312.  It is unlikely that these feeds and pages remained undetected by Facebook and Twitter because

26   Defendant Facebook has automatically generated hundreds of business pages promoting ISIS and Al Qaida, allowed

27   them to be searchable and accessible for up to six weeks, and allowed users to like their pages, and because

28   PLAINTIFFS' OMNIBUS MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
     DEFENDANTS' MOTION TO DISMISS THE COMPLAINT AS AMENDED - 32

1   Defendant Twitter permits accounts associated with political arms of Hamas, Hezbollah, and the Taliban to maintain

2   Twitter accounts.  *Id.* ¶¶313-314.  While the Taliban in Afghanistan have not been officially designated as a Foreign

3   Terrorist Organization by the United States, it has been listed as a terrorist organization by other government

4   departments.  *Id.* ¶ 315.  Therefore, Plaintiffs have properly alleged that Defendants knowingly provided material

5   support to foreign terrorist organizations by allowing such organizations to use the Platforms.

6              **5.   Defendants Violated 18 U.S.C. § 2385.**

7        18 U.S.C. § 2385 prohibits "knowingly or willfully abet[ting] or teach[ing] the desirability or propriety of

8   overthrowing or destroying the government of the United States of the government of any State, Territory, District,

9   or Possession thereof, or the government of any political subdivision therein, by force or violence, or by the

10  assassination of any officer of any such government."  Further, it prohibits "whoever, with intent to cause the

11  overthrow or destruction of any such government attempts to publish, edit, issue, circulate, distribute, or publicly

12  display any written matter advocating, advising, or teaching the desirability or propriety of overthrowing or

13  destroying any government in the United States by force or violence."  Lastly, it prohibits "attempt[ing] to organize

14  or help any society, group, or assembly of persons who teach, advocate, or encourage the overthrow or destruction

15  of any such government by force or violence – or . . . knowingly affiliat[ing] or conspir[ing] with any such group."

16       Defendants argue that Plaintiffs do not allege that Defendants advocated concrete violent action to

17  overthrow the United States government or that Defendants' actions could cause an imminent rebellion.  Mot. to

18  Dismiss 17-18, ECF No. 79.  However, Plaintiffs have clearly demonstrated that Defendants attempted to overthrow

19  the government by silencing President Donald Trump while he was in office, despite Defendant Zuckerberg's prior

20  statements that he would not censor President Trump nor other politicians.  FAC ¶ 299, 326.  Defendant Facebook's

21  Chief Product Officer Chris Cox, reportedly one of the most powerful people at Facebook, even publicly stated that

22  "[Donald] Trump should not be our President" and that a campaign to spend millions on digital messaging to oppose

23  Donald Trump in the 2020 presidential election was "something I have wanted to work on for a while."  *Id.* ¶ 300.

24  Most recently, new Twitter owner and CEO Elon Musk publicly released internal Twitter documents exposing how,

25  in his own words, "Under pressure from hundreds of activist employees, Twitter deplatforms Trump, a sitting US

26  President, even though they themselves acknowledge that he didn't violate the rules." Elon Musk, Twitter (Dec. 12,

27  2022).  Defendants engaged in this censoring of the President of the United States, while also advocating for the

28  PLAINTIFFS' OMNIBUS MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
    DEFENDANTS' MOTION TO DISMISS THE COMPLAINT AS AMENDED - 33

violent overthrow of the government by permitting Iranian threats to assassinate Donald Trump, permitting thousands of tweets calling for Donald Trump's assassination, and assisting in the violent Arab Spring revolution.[4]

Further, Plaintiffs state that Defendant Facebook facilitated the group Abolish ICE Denver and other Communist groups to organize gatherings outside the home of ICE warden Johnny Choate to harass and disrupt the lives of government officials and post direct threats, such as "FIRE TO THE PRISON" on these groups' official Facebook pages and labeling the event "Confront La Migra Where They Live." FAC ¶ 320.  Defendant Facebook also refused to remove a page celebrating "dead cops" that was titled "The Only Good Cops Are Dead Cops" and that openly incited violence against police officers. *Id.* ¶ 322.  Defendant Facebook subsequently deleted a Facebook events page of a group planning to hold a pro-police rally in Long Island, New York. *Id.* ¶ 324.  In this way, Defendant Facebook published and circulated written material which advocated for the destruction of ICE and government law enforcement, and Defendant Facebook did so with the intent to cause the destruction of ICE and law enforcement.

Defendants Twitter and Dorsey permitted the Taliban, specifically Zabihullah Mujahid, to use Twitter accounts to provide updates and propaganda messaging in furtherance and support of the Taliban overthrow of the United States governmental entities and interests in Afghanistan. *Id.* ¶ 329-330.  By allowing the Taliban to promote such views on Twitter, Defendants Twitter and Dorsey advocated concrete violent action against the government, and the Taliban could have committed an imminent rebellion based on the Taliban's message.

Therefore, because Defendants permitted and promoted the aforementioned pages and feeds, they intended to cause destruction of government entities and published and circulated written information in furtherance of this intent.

---

[4] If Plaintiffs are permitted leave to amend their complaint, they will provide further evidence that Defendants advocated for and encouraged violent overthrow of the government.  Adam Kredo, *Twitter Allows Iranian Threats To Assassinate Former President Trump*, THE WASHINGTON FREE BEACON (Jan. 11, 2022), https://freebeacon.com/culture/twitter-allows-iranian-threats-to-assassinate-former-president-trump/; Sasha Lekach, *Over 12,000 Tweets Are Calling For Trump's Assassination.  Here's How The Secret Service Handles It*, MASHABLE (Feb. 2, 2017), https://mashable.com/article/threatening-posts-secret-service; Saleem Kassim, *Twitter Revolution: How The Arab Spring Was Helped By Social Media*, MIC (July 3, 2012), https://www.mic.com/articles/10642/twitter-revolution-how-the-arab-spring-was-helped-by-social-media.
PLAINTIFFS' OMNIBUS MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT AS AMENDED - 34

V.      **Plaintiffs' RICO Conspiracy Claim (Count II) Is Supported By Sufficient Facts And A Cognizable Legal Theory For Relief.**

Federal RICO conspiracy may be established under 18 U.S.C. § 1962(d) and 18 U.S.C. § 1964(c) by showing either (1) "that the defendant agreed to the overall objective of the conspiracy," or (2) "that the defendant agreed to commit two predicate acts." *Magnifico v. Villaneuva*, 783 F. Supp. 2d 1217 (S.D. Fla. 2011).  "Direct evidence of a RICO agreement is not required; rather it may be inferred from the conduct of the participants." *Id*.

Defendants argue that Plaintiffs have not stated a § 1962(d) conspiracy claim because they believe that Plaintiffs' § 1962(c) claim fails.  Mot. to Dismiss 20, ECF No. 79; Mot. to Dismiss 22, ECF No. 80.  Defendants also claim that Plaintiffs did not allege that Defendants agreed to participate in a scheme, that they operated or managed a RICO enterprise, or that Plaintiffs were injured by the predicate acts.  Mot. to Dismiss 20, ECF No. 79; Mot. to Dismiss 22, ECF No. 80.

However, Plaintiffs have adequately alleged in the Complaint, and stated in the arguments above, that Defendants injured Plaintiffs by committing the predicate acts alleged.  *See* FAC ¶¶ 216-253, 387.  Plaintiffs have also shown in the Complaint and above that Defendants agreed and conspired to violate 18 U.S.C. § 1962(c) by participating in the conduct of the affairs of the Community Media Enterprise.  *Id*. ¶¶ 383-385.  Through this Enterprise, Defendants operated and managed a RICO enterprise by directing other members of the Enterprise to censor and ban certain speech and individuals.  *Id*. ¶¶ 47-105, 386.

Therefore, Plaintiffs have shown that Defendants participated in a RICO conspiracy to violate 18 U.S.C. § 1962(c).

### Conclusion

For the foregoing reasons, Defendants' motions to dismiss should be denied.  Furthermore, if the Court denies Defendants' motions to dismiss, Plaintiffs intend to file a motion seeking leave to amend their complaint to include newly revealed information from the recently released "Twitter Files" that are relevant and pertain to this action.

PLAINTIFFS' OMNIBUS MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT AS AMENDED - 35

Dated December 12, 2022.                    Respectfully submitted,


                                            /s/ John M. Pierce
                                            John M. Pierce
                                            John Pierce Law, P.C.
                                            jpierce@johnpiercelaw.com
                                            21550 Oxnard St., 3rd Fl PMB 172
                                            Woodland Hills, CA 91367
                                            (213) 349-0054

PLAINTIFFS' OMNIBUS MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE COMPLAINT AS AMENDED - 36

1

**CERTIFICATE OF SERVICE**

2          I hereby certify that, on December 12, 2022, the foregoing document was filed via the Court's electronic

3     filing system, which constitutes service upon all counsel of record.

4                                                                    /s/ John M. Pierce
                                                                     John M. Pierce
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28     PLAINTIFFS' OMNIBUS MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
       DEFENDANTS' MOTION TO DISMISS THE COMPLAINT AS AMENDED - 37