**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| Laura Loomer, as an individual, Laura Loomer, in her capacity as a Candidate for United States Congress, and LAURA LOOMER FOR CONGRESS, INC., | : : : : : : | Case No.: 3:22-cv-02646-LB **SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** |
| Plaintiffs, | : : : | |
| v. | : : | 1.  Civil RICO 2.  Civil RICO Conspiracy |
| META PLATFORMS, INC. d/b/a META f/k/a FACEBOOK, INC., Mark Zuckerberg, in his capacity as CEO of FACEBOOK, INC. and as an individual, TWITTER, INC., and Jack Dorsey, in his capacity as former CEO of Twitter, Inc. and as an individual, THE PROCTOR & GAMBLE COMPANY, Does 1-100, Individuals, | : : : : : : : : : | **JURY TRIAL DEMANDED** |
| Defendants. | : : : : : | |
| _____ | : | |

0

## TABLE OF CONTENTS

INTRODUCTION………………………………………………………….2

PARTIES…………………………………………………………………...8

JURISDICTION AND VENUE…………………………………………..10

PROCEDURAL HISTORY………………………………………………11

BACKGROUND

    *Social Media Platforms*……………………………………………13

        *SCHEMES AND GOALS OF COMMUNITY MEDIA ENTERPRISE*…………………………………………………..16

        *PROMISES OF COMMUNITY MEDIA ENTERPRISE*

        *a. Community Guidelines*…………………………………...25

        *b. Fact Checkers*……………………………………………32

        *c. Authoritative Sources*……………………………………34

        *HATE SPEECH POLICY*……………………………………37

        *a. Algorithms*………………………………………………..42

        *b. Moderators*………………………………………………44

        *HATE SPEECH STATISTICS*………………………………50

        *DANGEROUS INDIVIDUALS POLICY*…………………….53

        *BANNED AND CENSORED*………………………………...56

        *COMMUNITY EFFECTS OF BANNING & CENSORING*…………68

*RECENT REVELATIONS ABOUT FBI AGENTS AND WHITE HOUSE STAFF CONSPIRING WITH META AND TWITTER TO INTERFERE WITH ELECTIONS*

*The Zuckerberg Joe Rogan Interview*…………………………..71

*The Berenson Settlement*……………………………………...73

*The Twitter Files*……………………………………………...75

*The February 8, 2023 Twitter House Oversight Hearing*……80

*Elon Musk's Admissions*………………………………………...89

*LOOMER BACKGROUND & INJURY*……………………………..90

*PREDICATE ACT – 18 U.S.C. §1951*
*Interference with commerce by threats or violence*……………………………...108

*PREDICATE ACT – 18 U.S.C. §1952*
*Interstate and Foreign Transportation in Aid of Racketeering Enterprises*…….112

*PREDICATE ACT – 18 U.S.C. §1343*
*Fraud by Wire, Radio, or Television*……………………………………………...115

*PREDICATE ACT – 18 U.S.C. §2339B*
*Providing material support or resources to designated*
*Foreign terrorist organizations*……………………………………………...123

*PREDICATE ACT - 18 U.S.C. §2385*
*Advocating Overthrow of Government*…………………………………………...129

*ONGOING IMMEDIATE THREAT*……………………………………………...134

COUNT I
*18 U.S.C. § 1962(c) ("FEDERAL RICO") & 18 U.S.C. § 1964(c)*
*RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS*……………138

*Wire Fraud*……………………………………………………………………..142

*Interference with Commerce by Threats or Violence*…………………..142

*Interstate and Foreign Transportation in Aid of Racketeering Enterprise*………………………………………………………………143

*Providing Material Support or Resources to Designated Foreign Terrorist Organizations*……………………………145

*Advocating Overthrow of Government*………………………………...145

COUNT II
*18 U.S.C. § 1962(d) & 18 U.S.C. § 1964(c)*
*FEDERAL RICO CONSPIRACY* …………………………………………..148

PRAYER FOR RELIEF………………………………………………………150

## INTRODUCTION

1.

On October 27, 2022, Elon Musk became the CEO and owner of Twitter after purchasing the social media giant for forty-four billion dollars. Shortly after purchasing it, on December 10, 2022, Musk tweeted "Twitter is both a social media company and a crime scene."

2.

The revelations that occurred in the months that would follow have shown decisively and unequivocally that Twitter, Meta, agents of the federal government, including the FBI, and other entities were involved in one of the most brazen criminal conspiracies in American history – a concerted and coordinated conspiracy to censor millions of Americans and interfere with the most sacred of our civil rights: the right to free and fair elections.

3.

Musk provided numerous independent journalists with access to the internal Twitter files relating to Twitter's coordination with federal government agents (primarily the Federal Bureau of Investigation) to fraudulently censor core political speech protected by the 1st Amendment (including Plaintiffs) and defraud hundreds of millions of American (including Plaintiffs) by interfering in multiple elections,

including the 2020 Presidential election. The subsequent analysis of this information was publicly released and became known as the "Twitter Files."

4.

Following the 2022 mid-term elections, the 118th Congress immediately commenced investigations into this conspiracy.

5.

On February 8, 2023, the House Committee on Oversight and Accountability held a hearing entitled "Protecting Speech from Government Interference and Social Media Bias, Part 1: Twitter's Role in Suppressing the Biden Laptop Story."

6.

There were four witnesses at the February 8th hearing: Twitter Chief Legal Officer Vijaya Gadde, former Twitter Deputy General Counsel (and former FBI General Counsel) James Baker, former Twitter Global Head of Trust & Safety Yoel Roth and whistleblower Annika Collier Navaroli, who was Twitter's most senior expert on Twitter's U.S. safety policy team.

7.

At the hearing, it was revealed that defendant Twitter and other social media companies had indeed worked in coordination for years with agents of the federal government, and law enforcement and intelligence communities to illegally and

fraudulently silence users and interfere in American elections, and engaged in other illegal activities such as providing material support to known terrorist organizations.

8.

The coordinated nature of this vast conspiracy was brought into sharp focus by the revelation, during Congresswoman Anna Paulina Luna's questioning during the hearing, that the members of this racketeering enterprise were secretly communicating with each other on an Atlassian software platform called JIRA. JIRA is a communications platform that is used for issue or "bug" tracking during the process of software development, and relatedly as a project management tool. Here, the conspirators were using JIRA as a project management tool to eliminate the "bugs" of unwanted political speech and manage the "project" of interfering with free and fair elections.

9.

This flow chart was shown by Congresswoman Luna during her presentation:



It is now known that Meta (Facebook) was one of the other social media companies coordinating with Twitter, agents of the federal government and other entities on the JIRA platform.

10.

Also during the hearing, Congressman Clay Higgins of Louisiana stated that "[y]ou, ladies and gentlemen, interfered with the United States of America 2020 presidential election, knowingly and willingly. This is the investigation part, later comes the arrest part."

11.

In addition, as set forth below, in late August 2022, Mark Zuckerberg appeared on the *Joe Rogan Experience*.  In a stunning admission,, Zuckerberg admitted what many Americans have long suspected – that the decision by social media companies to censor news coverage about the Hunter Biden laptop scandal for the crucial weeks prior to the 2020 Presidential election – was prompted by agents from the Federal Bureau of Investigation warning them about "Russian disinformation." This confirmed what has become one of the worst-kept secrets in modern American political history: that individuals within the United States government's federal law enforcement agencies and the U.S. intelligence apparatus conspired with the big-tech giants to illegally interfere with the 2020 Presidential election.

12.

Also as set forth below, in late summer 2022, prominent COVID-19 vaccine skeptic Alex Berenson revealed that members of President Joe Biden's administration illegally conspired with Twitter to ensure that he was banned from its platform. This was revealed from internal Twitter Slack messages and came to light only because Mr. Berenson brought suit against Twitter. In a rare move, Twitter settled the suit with Mr. Berenson and allowed him back on the platform, presumably to avoid additional harmful discovery proving misconduct and direct

coordination and conspiracy to ban conservative individuals by Big Tech companies and the U.S. government coming to light.

13.

These developments have shown unequivocally that Plaintiff Laura Loomer is correct – Big Tech tyrants with monopolistic power have engaged in a pattern of racketeering activity that has largely destroyed her life, prevented her from being elected to the United States House of Representatives, eviscerated her earning capacity and constitutes one of the most direct threats to American liberty in the history of the republic. Loomer was the first federal candidate in American history to be de-platformed and deliberately denied access by Twitter and Meta to create social media accounts for her campaign, and she is the only federal candidate to be de-platformed and denied access even after winning her primary election and being a candidate on the ballot for the general election. With this new evidence, this Second Amended Complaint tells the true story of how the most banned woman in the world was victimized by the most powerful forces imaginable and had both of her US Congressional campaigns interfered in by Big Tech and the agents within the Federal government. She deserves to engage in the discovery process and have her day in Court at trial to prove her claims.

## **PARTIES**

14.

Plaintiff Laura Loomer (Ms. Loomer) is an individual and a citizen and resident of the State of Florida.

15.

Plaintiff Laura Loomer (Candidate Loomer) was the Republican Party nominee for U.S. House Florida District 21 for the 2020 General Election of the United States of America.

16.

Plaintiff Candidate Loomer was a federal candidate for the Republican Party nomination for U.S. House Florida District 11 for the 2022 Primary Election in the State of Florida.

17.

Plaintiff Laura Loomer for Congress, Inc. is a Florida corporation that operates under the registered trade name, Laura Loomer for Congress, Inc.

18.

Plaintiffs Laura Loomer and Laura Loomer for Congress, Inc. are entities engaged in activities that affect interstate and foreign commerce.

19.

Ms. Loomer is the Chief Executive Officer of Laura Loomer for Congress, Inc.

20.

Defendant Meta Platforms, Inc., d/b/a Meta, f/k/a Facebook, Inc. (Meta) is incorporated in the state of Delaware with its principal place of business located at 1601 Willow Road, Menlo Park, California. Meta does substantial business in all 50 states including the Northern District of California and the state of Florida.

21.

Defendant Mark Zuckerberg is the Chairman and CEO of Meta and a resident of the State of California.

22.

Defendant Twitter, Inc. is incorporated in the state of Delaware with its principal place of business located at 1355 Market Street, Suite 900, San Francisco, California. Twitter does substantial business in all 50 states, including the Northern District of California and the State of Florida.

23.

Defendant Jack Dorsey is the former CEO of Twitter, Inc. and a resident of the State of California.

24.

Defendant The Proctor & Gamble Company is incorporated in the state of Ohio with its principal place of business located at 1 Proctor & Gamble Plaza,

Cincinnati, Ohio, 45202. Proctor & Gamble does substantial business in all 50 states, including the Northern District of California and the State of Florida.

25.

Defendants Does 1-100 are persons within the Federal Bureau of Investigation, and potentially others within the Executive Branch of the United States government and corporate America, including executives and advertising officials at Proctor & Gamble, who conspired with other Defendants to commit the unlawful acts described herein.

## JURISDICTION AND VENUE

26.

Defendants are subject to the jurisdiction of this court pursuant to California Code of Civil Procedure 410.10 and Federal Rule of Civil Procedure 4, because Defendants are domiciled, have transacted business, continue to transact business, and have caused injury within the state and elsewhere.

27.

Venue is proper in this court pursuant to 28 U.S. Code § 1391 because this is a judicial district in which a Defendant resides, and all Defendants are residents of the State in which the district is located.

28.

This Court's jurisdiction and venue are proper pursuant to 18 U.S.C. § 1965 and 28

U.S.C. §1332 because the matter in controversy violates RICO statutes,[1] exceeds the

value of $75,000, and is between citizens and corporations of different states,

specifically Florida and California.[2]


## PROCEDURAL HISTORY

29.

Plaintiff Loomer has sued Defendant Meta and Defendant Twitter multiple times in

multiple venues including the Northern District of California and the Southern

District of Florida.

30.

On August 29, 2018, Plaintiff Loomer along with Freedom Watch, Inc. sued Apple

Inc., Google Inc., Facebook Inc., and Twitter Inc. in the U.S. District Court for the

District of Columbia for (1) Violation of Sections 1 & 2 of the Sherman Act – Illegal

Agreement in Restraint of Trade, (2) Discrimination in Violation of D.C. Code § 2-

1403.16, and (3) violation of the First Amendment to the Constitution and 42 U.S.C.

§ 1983, and the Supreme Court denied certiorari but with substantial commentary

---

[1] 18 U.S.C. § 1961 – 1968
[2] 28 U.S.C. § 1332 (2020)

relevant to the instant matter regarding the Defendants herein, provided by Justice

Thomas in a related concurring opinion.[3]

31.

On July 8, 2019, Plaintiff Loomer sued Facebook Inc. in the Southern District of

Florida for Defamation, and the court transferred the case to this Court where

Plaintiff Loomer's Voluntary Motion to Dismiss was granted on August 14, 2020.[4]

32.

On August 22, 2019, Plaintiff Ms. Loomer along with Illoominate Media, Inc. sued

CAIR Foundation, Twitter, Inc., John Does 1-5, and CAIR Florida, Inc. in the

Southern District of Florida for (1) Breach of Contract, (2) Tortious Interference

with Advantageous Business Relationship, (3) Unlawful Agreement in Restraint of

Trade, (4) Civil Conspiracy, and (5) violating Florida Deceptive and Unfair Trade

Practices Act, though Defendant Twitter was never served and was dismissed from

the case, and the 11th Circuit Court of Appeals found in favor of CAIR Foundation.

33.

While this action is maintained between some of the same parties as these prior

lawsuits, this action does not replicate any claims from prior lawsuits, and the acts

giving rise to the causes of action herein overlap with those in these prior lawsuits

---

[3] _Biden v. Knight First Amendment Institute at Columbia Univ._, 593 U.S. _____ (2021) (Thomas, J. concurring).
[4] _Loomer v. Facebook, Inc._, 4:20-cv-03154 (2020).

only to the extent to which Defendants' regular course of business engaged in the commission of predicate acts of racketeering.

## BACKGROUND

### *Social Media Platforms*

34.

"Social media platforms have transformed into the new public town square."[5]

35.

"Social media platforms have become as important for conveying public opinion as public utilities are for supporting modern society."[6]

36.

"Social media platforms hold a unique place in preserving first amendment protections for all Floridians and should be treated similarly to common carriers."[7]

37.

"Social media platforms that unfairly censor, shadow ban, deplatform, or apply post-prioritization algorithms to Florida candidates, Florida users, or Florida residents are not acting in good faith."[8]

---

[5] Section 1.4., FL. S.B. 7072. 2021 Legislature. On May 24, 2021, Florida Governor Ron DeSantis and the Florida Legislature signed Florida Senate Bill 7072 into law.
[6] Section 1.5., FL. S.B. 7072. 2021 Legislature.
[7] Section 1.6., FL. S.B. 7072. 2021 Legislature.
[8] Section 1.7., FL. S.B. 7072. 2021 Legislature.

38.

"Social media platforms have unfairly censored, shadow banned, deplatformed, and applied post-prioritization algorithms to Floridians."[9]

39.

"The state has a substantial interest in protecting its residents from inconsistent and unfair actions by social media platforms."[10]

40.

Defendants Meta and Twitter "are at bottom communications networks and they 'carry' information from one user to another."[11]

41.

Defendants Meta and Twitter are digital platforms that "hold themselves out as organizations that focus on distributing the speech of the broader public" that "cannot be treated as the publisher or speaker of the information they merely distribute."[12]

---

[9] Section 1.9., FL. S.B. 7072. 2021 Legislature.
[10] Section 1.10., FL. S.B. 7072. 2021 Legislature.
[11] *Biden v. Knight First Amendment Institute at Columbia Univ.* 593 U.S. _____ (2021) (Thomas, J. concurring).
[12] *Biden v. Knight First Amendment Institute at Columbia Univ.* 593 U.S. _____ (2021) (Thomas, J. concurring).

42.

"When a user does not already know exactly where to find something on the Internet – and users rarely do – Google is the gatekeeper between the user and the speech of the others 90% of the time."[13]

43.

The U.S. Department of Justice claims Google has long broken the law in its quest to remain "the gateway to the internet" and has disadvantaged competitors in an effort to sell more online search ads, and in December 2021, more than 200 newspapers filed suit against Facebook and Google, who were accused of unfairly manipulating the advertising market and siphoning away their revenue.[14]

44.

"Facebook and Twitter can greatly narrow a person's information flow through similar means."[15]

45.

"Some courts have misconstrued [47 U.S.C. §230] to give digital platforms immunity for bad faith removal of third-party content."[16]

---

[13] _Biden v. Knight First Amendment Institute at Columbia Univ._ 593 U.S. _____ (2021) (Thomas, J. concurring).
[14] Zilber, Ariel. "Facebook and Google accused of 'secret deal' to carve up ad empire," _New York Post._ January 14, 2022; Steigrad, Alexandra. "Over 200 newspapers are suing Facebook and Google for killing their advertising," _New York Post._ December 8, 2021.
[15] _Biden v. Knight First Amendment Institute at Columbia Univ._ 593 U.S. _____ (2021) (Thomas, J. concurring).
[16] _Malwarebytes, Inc. v. Enigma Software Group USA, LLC._ 592 U.S. _____ (2020) (Thomas, J., statement respecting denial of certiorari) (slip op., at 7-8).

## *SCHEMES AND GOALS OF COMMUNITY MEDIA ENTERPRISE*

46.

Meta, Twitter, and other social media companies, including but not limited to Instagram, Google Inc. and YouTube, along with other members of corporate America including Proctor & Gamble, as well as individuals within the FBI and other parts of the Executive Branch of the United States government are members of an enterprise which has used and continues to fraudulently use the pretext of "hate speech" as cover for committing and continuing to commit illegal predicate acts under the RICO statutes against Ms. Loomer, Candidate Loomer, Loomer Campaign, and many others, including their subscriber base as a whole as a distinct group of victims, in order to further multiple fraudulent schemes, including but not limited to schemes involving extortion, wire fraud, racketeering, and advocating the overthrow of government.

47.

The Procter & Gamble Company (P&G) is an American multinational consumer goods corporation headquartered in Cincinnati, Ohio, and incorporated in Ohio, that engages in activities affecting interstate and foreign commerce and is one of Meta's largest corporate advertisement purchasers.[17]

---

[17] "Procter & Gamble to stay silent on ad decisions as Facebook boycott grows," *Reuters*. July 1, 2020. https://nypost.com/2020/07/01/procter-gamble-to-stay-silent-on-ads-amid-facebook-boycott/.

48.

Google Inc. is incorporated in Delaware with its principal place of business located at 650 Page Mill Rd., Palo Alto, California.

49.

In 2018, according to the attorneys general for Texas, fourteen (14) other states, and Puerto Rico, Defendant Zuckerberg and his counterpart at Google, CEO Sundar Pichai, secretly conspired and acted along with Meta CFO Sheryl Sandberg to guarantee Meta would both bid in and win a fixed percentage of ad auctions.[18]

50.

These fifteen (15) state attorneys general also claim that Google intentionally misled publishers and advertisers for years about how it prices and executes its ad auctions by creating secret algorithms that increased prices for buyers while deflating revenue for some advertisers.[19]

---

[18] Zilber, Ariel. "Facebook and Google accused of 'secret deal' to carve up ad empire," *New York Post.* January 14, 2022; *see also In Re: Google Digital Advertising Antitrust Litigation*. Civil Action No.: 1:21-md-03010 Second Amended Complaint, (SDNY 2021).
[19] Zilber, Ariel. "Facebook and Google accused of 'secret deal' to carve up ad empire," *New York Post.* January 14, 2022; *see also In Re: Google Digital Advertising Antitrust Litigation*. Civil Action No.: 1:21-md-03010, Second Amended Complaint, (SDNY 2021).

51.

In October 2018, the *New York Times* reported on an investigation which found that governments were successfully using Twitter to promote favorable content, attack critical voices, and otherwise shape what average people found when online.[20]

52.

On or about October 15, 2019, Defendant Facebook paid five billion dollars ($5,000,000,000) in fines after the United States government discovered it engaged in a previous fraudulent pretextual scheme perpetuated against its subscriber base as a whole.[21]

53.

On or about November 8, 2019, Defendant Facebook was reported to have engaged in another fraudulent scheme called "The Switcharoo Plan," wherein Facebook executives intentionally misled its partnering developers to rely on its services to then undermine them under the false pretext of promoting privacy.[22]

---

[20] Hubbard, Ben. "Why Spy on Twitter? For Saudi Arabia, It's the Town Square," *The New York Times*. November 7, 2019.

[21] Gardner, Eriq. "Judge Urged to Reject "Broad Immunity" for Facebook," *The Hollywood Reporter.* October 15, 2019.

[22] Paul, Katie and Hosenball, Mark. "Facebook executives planned 'switcharoo' on data policy change: court filings," *Reuters.* November 6, 2019; Schechner, Sam and Olson, Parmy. "Facebook Feared WhatsApp Threat Ahead of 2014 Purchase, Documents Show: Internal emails could serve as fodder for regulators studying social network's business practices," *The Wall Street Journal.* November 6, 2019; Newton, Casey. "How leaked court documents reveal Facebook's fundamental paranoia: The company's anticompetitive behavior is rooted in a deep sense of fear that it's vulnerable to rivals," *The Verge.* November 8, 2019.

54.

On June 25, 2021, the Supreme Court of Texas ruled that Defendant Facebook was potentially civilly liable for human trafficking violations which would constitute predicate acts under civil RICO statutes.[23]

55.

Meta[24], the company formerly known as Facebook Inc., privately announced on January 31, 2022, that users can use its platforms to solicit human smugglers.[25]

## PROMISES OF COMMUNITY MEDIA ENTERPRISE

56.

On or about September 5, 2018, Defendant Dorsey testified before Congress, "We believe strongly in being impartial, and we strive to enforce our rules impartially. We do not shadowban anyone based on political ideology."[26]

57.

On or about September 12, 2019, Google announced it would alter its algorithms to boost articles containing original reporting from sources with positive reputations that have received awards.[27]

---

[23] *In Re Facebook, Inc. and Facebook, Inc. d/b/a Instagram, Relators*, 20-0434 (Tex. 2021).
[24] On October 28, 2021, Defendant Zuckerberg changed the name of Facebook Inc. to Meta.
[25] Simonson, Joseph. "Meta Will Allow Solicitation of Human Smuggling on Its Platforms - Policy comes amid surge in Facebook groups devoted to human smuggling," *Washington Free Beacon.* February 1, 2022.
[26] Harper, Cindy. "Senator Hawley wants Twitter to explain its blacklists: Twitter told Congress it doesn't shadowban," *Reclaim The Net.* July 19, 2020.
[27] Neidig, Harper. "Google to boost articles with 'original reporting' in search results," *The Hill.* September 12, 2019.

58.

On or about September 21, 2019, Nick Clegg, Facebook VP of Global Affairs and Communication, announced that Facebook would not submit speech by politicians to its new "independent" fact checkers, and "generally allow it on the platform even when it would otherwise breach our normal content rules."[28]

59.

On September 21, 2019, Clegg announced an exception to this policy, namely that, "when a politician shares previously debunked content including links, videos and photos, we plan to demote that content, display related information from fact-checkers, and reject its inclusion in advertisements."[29]

60.

On September 21, 2019, Clegg announced that there remained a second exemption for newsworthiness, which Facebook has had in place since 2016.[30]

61.

On September 24, 2019, Clegg announced, "I know some people will say we should go further that we are wrong to allow politicians to use our platform to say nasty things or make false claims. But imagine the reverse. Would it be acceptable to

---

[28] Lemieux, Melissa. "Facebook Announces It Will Not Be Submitting Content From Politicians To Independent Fact Checking," *Newsweek*. September 24, 2019.
[29] Lemieux, Melissa. "Facebook Announces It Will Not Be Submitting Content From Politicians To Independent Fact Checking," *Newsweek*. September 24, 2019.
[30] Lemieux, Melissa. "Facebook Announces It Will Not Be Submitting Content From Politicians To Independent Fact Checking," *Newsweek*. September 24, 2019.

society at large to have a private company in effect become a self-appointed referee for everything that politicians say? I don't believe it would be. In open democracies, voters rightly believe that, as a general rule, they should be able to judge what politicians say themselves."[31]

62.

On or about September 24, 2019, Defendant Facebook stated that it determines whether content from politicians is allowed on its site based upon a country and situational specific balancing test evaluating the public interest value of the piece of speech against the risk of harm, reliant on such factors as whether the country is at war or involved in an election.[32]

63.

On or about October 5, 2019, Defendant Facebook's Vice President of Global Affairs and Communication Nick Clegg stated "[Facebook] can't be a policeman on the internet saying what is acceptable or what is absolutely true. The freedom to say stupid things is the freedom of an open society."[33]

---

[31] Robertson, Adi. "Facebook Announces It Will Not Be Submitting Content From Politicians To Independent Fact Checking," *The Verge*. September 24, 2019.
[32] Robertson, Adi. "Facebook Announces It Will Not Be Submitting Content From Politicians To Independent Fact Checking," *The Verge*. September 24, 2019.
[33] Rankovic, Didi. "Contradicting their recent history, Facebook VP Nick Clegg says they don't want to police the internet," *Reclaim The Net*. October 5, 2019.

64.

On or about October 7, 2019, Vijaya Gadde, Twitter's global lead for legal, policy, and trust and safety, stated that Twitter's fundamental mission is to serve the public conversation and permit "as many people in the world as possible for engaging on a public platform and it means that we need to be open to as many viewpoints as possible."[34]

65.

On October 17, 2019, Defendant Mark Zuckerberg said, "People worry, and I worry deeply, too, about an erosion of truth. At the same time, I don't think people want to live in a world where you can only say things that tech companies decide are 100 percent true."[35]

66.

On or about November 4, 2019, Defendant Twitter's government relations team told candidates seeking verification that Twitter would not give new contenders a "blue checkmark" until after the contenders won a state primary.[36]

---

[34] Koebler, Jason. "How Twitter Sees Itself: Multiple current and former Twitter employees, including executives, explain how Twitter really positions itself and its responsibilities around moderating speech." *Motherboard: Tech by Vice.* October 7, 2019.

[35] Romm, Tony. "Facebook CEO Mark Zuckerberg says in interview he fears 'erosion of truth' but defends allowing politicians to lie in ads," *The Washington Post.* October 17, 2019.

[36] Ahuja, Siddak. "Twitter censors anti-establishment views," *The Post Millennial.* November 4, 2019.

67.

On or about November 15, 2019, in a U.S. House Veterans Affairs Committee Hearing, Twitter Public Policy manager Kevin Kane denied any type of censorship on Twitter and stated, "Twitter was born to serve the entire public conversation." [37]

68.

On or about December 12, 2019, Defendant Twitter announced it would verify all candidates running for House, Senate, or governor.[38]

69.

On or about December 14, 2019, Defendant Twitter announced its Trust and Safety Council will cover specific real-world harm concerns, such as safety, online harassment, human and digital rights, child sexual exploitation, suicide prevention, mental health, and "broaden our interpretation of dehumanization."[39]

70.

On or about May 27, 2020, U.S. Representative Matt Gaetz stated that Twitter is "not merely going to provide a place for people to share their ideas, they're going to add their analysis to those ideas." [40]

[37] Bulleri, Fabrizio. "Rep. Jim Banks questions Twitter on why it allows scams but censors political speech," *Reclaim The Net*. November 15, 2019.
[38] Birnbaum, Emily. "Twitter to start verifying candidates when they qualify for primary election," *The Hill*. December 12, 2019.
[39] Rankovic, Didi. "Twitter to expand its "Trust and Safety Council"," *Reclaim The Net*. December 14, 2019.
[40] Crisp, Elizabeth. "Donald Trump to Issue Social Media Executive Order After Twitter Fact-Checks Tweets," *Newsweek*. May 27, 2020.

71.

On or about May 28, 2020, Brandon Borrman, Twitter's vice president of global communications, stated that Twitter's policy violation review system is set up to keep enforcement decisions independent from the teams responsible for public and government relations.[41]

72.

On July 29, 2020, Defendant Zuckerberg said, "We're very focused on fighting against election interference, and we're also very focused on fighting against hate speech."[42]

73.

On July 29, 2020, Facebook provided $500,000 in funding to create the "Global Network Against Hate."

74.

The publicly stated purpose of the "Global Network Against Hate" is to counter emerging trends in online extremism and unapproved COVID-19 content by developing strategies, policies, and tools.[43]

---

[41] Oremus, Will. "Inside Twitter's Decision to Fact-Check Trump's Tweets," *OneZero.* May 28, 2020.

[42] Czachor, Emily. "Facebook Removes Most Hate Speech Before People See It, Zuckerberg Tells Congress," *Newsweek.* July 29, 2020; Note also that the US Supreme Court has declined to recognize a hate speech exception to protected speech, e.g. <u>Matal v Tam,</u> 137 S. Ct. 1744 (2017).

[43] Parker, Tom. "Facebook gives $500,000 to Ontario university project that says coronavirus will drive online hate: The money is meant to help create a knowledge hub on "hate and violent extremism." *Reclaim The Net.* July 29, 2020**.**

75.

On June 5, 2021, Defendant Twitter stated that access to its platform "is an essential human right in modern society."[44]

### d. *Community Guidelines*

76.

Shadow banning is the practice of banning a user's content such that it is difficult or impossible for others on a social media platform to discover or view it, while the user is unaware that the banning is occurring.

77.

Defendant Twitter's "Civic Integrity Policy" bars users from "manipulating or interfering in elections or other civic processes," such as by posting misleading information that could dissuade people from participating in an election.[45]

78.

Defendant Twitter's civic integrity policy applies special fact-checking scrutiny to tweets that might interfere with people's participation in democratic processes, a level of scrutiny only shared with the policy of harmful information related to COVID 19.[46]

---

[44] See Twitter Public Policy @*Policy*, The voice of Twitter's Global Public Policy team, 8:17 am, June 5, 2021.
[45] "Twitter labels Trump's false claims with warning for first time," *The Guardian*. May 26, 2020.
https://www.theguardian.com/us-news/2020/may/26/trump-twitter-fact-check-warning-label
[46] Oremus, Will. "Inside Twitter's Decision to Fact-Check Trump's Tweets," *OneZero.* May 28, 2020.

79.

According to Twitter's Sensitive Media Policy, sharing "graphic violence, adult content, and hateful imagery" results in content potentially being hidden behind a "sensitive media" warning.[47]

80.

According to Facebook's Bullying Policy on March 30, 2022, which expressly "does not apply to individuals who are part of designated organizations under the Dangerous Organizations and Individuals policy," comparing any private individual to an animal considered "culturally inferior" is a violation that does not require reporting to be removed.[48]

81.

On or about October 21, 2019, Defendant Facebook announced that it removes accounts based on behavior regardless of content pursuant to its "inauthentic behavior policy".[49]

---

[47] Parker, Tom. "Twitter hides James O'Keefe tweet about CNN investigative report behind "sensitive media" notice:  O'Keefe's previous investigative reports have been censored by other tech giants after they responded to questionable privacy complaints," *Reclaim The Net.* October 14, 2019.
[48] https://transparency.fb.com/policies/community-standards/bullying-harassment/ on March 30, 2022.
[49] Miller, Maggie. "Facebook takes down Russian, Iranian accounts trying to interfere in 2020," *The Hill.* October 21, 2019.

82.

On or about October 26, 2019, Defendant Facebook reported that speech content from political action groups, rather than the politicians themselves, was subject to third-party content review.[50]

83.

As of October 31, 2019, Defendant Facebook's policy was to count any ad that advocates for or against a social issue as a political ad, and it defined social issues to include topics like education, crime, and health. A political health ad was defined to include any "discussion, debate, and/or advocacy for or against topics including but not limited to healthcare reform and access to healthcare."[51]

84.

On or about November 4, 2019, Carlos Monje, Jr., U.S. policy director for Twitter, stated that Twitter allows extremist groups engaged in active peace resolution processes and groups elected to public office to remain online.[52]

85.

On or about November 9, 2019, Defendant Facebook announced that its "coordinating harm policy" prohibited any content that might disclose the identity

---

[50] "Facebook removes false ad from Pac claiming Graham backs Green New Deal," *The Guardian.* October 26, 2019. https://www.theguardian.com/technology/2019/oct/26/facebook-lindsey-graham-green-new-deal-ad
[51] "Facebook under fire after ads for anti-HIV drug PrEP deemed political," *The Guardian.* October 31, 2019. https://www.theguardian.com/technology/2019/oct/31/facebook-prep-ads-instagram-political
[52] Birnbaum, Emily. "Twitter takes down Hamas, Hezbollah-affiliated accounts after lawmaker pressure," *The Hill.* November 4, 2019.

of a potential witness, informant, or activist related to a whistleblower matter and subsequently removed content discussing whether the individuals should be publicly identified as "coordinating harm and promoting crime."[53]

86.

On or about November 27, 2019, Defendant Facebook stated that an advertisement for a book about historical military headwear "is about social issues, elections or politics, based on the definition we're using for enforcement."[54]

87.

On or about December 14, 2019, Defendant Twitter announced a series of actions that would trigger "enforcement action for any account," including promoting terrorism, clear and direct threats of violence against an individual, posting private information, sharing intimate photos or videos of a person without their consent, material involving child sexual exploitation, and any message encouraging or promoting self-harm. [55]

88.

On or about January 1, 2020, Twitter updated its terms of service to grant itself the right to "limit distribution or visibility of any content on the service," in addition to

---

[53] Harper, Cindy. "Facebook is deleting journalism in real-time: This is unprecedented," *Reclaim The Net.* November 9, 2019.
[54] Suciu, Peter. "A Military History Book Is Too Political," *Forbes.* November 27, 2019.
[55] Rankovic, Didi. "Twitter to expand its 'Trust and Safety Council'," *Reclaim The Net.* December 14, 2019.

removing or refusing to distribute any content, suspending or terminate users and reclaiming their usernames without liability.[56]

89.

On or about January 17, 2020, Defendant Facebook had taken down pages for engaging in "inauthentic behavior," which it defines as working together to mislead people about who they are and what they are doing.[57]

90.

On or about January 21, 2020, Defendant Facebook announced it would remove false claims and conspiracy theories about the coronavirus if it risks causing harm to people who believe them. The policy applied across both Instagram and Facebook, and included misinformation about fake cures or prevention methods, or any claim that could confuse people about what health resources are available.  Hashtags used to spread misinformation on Instagram were also blocked or restricted.[58]

91.

On or about March 2, 2020, Defendant Facebook used the term of art "coordinated inauthentic behavior" (CIB) to refer to networks of fake accounts and pages aimed at manipulating public conversations.[59]

---

[56] Nolan, Lucas, "Twitter's shadow-banning practices are now official," *Breitbart.* January 1, 2020.
[57] Ballhaus, Rebecca. "Coordinated Posts Defend Connecticut Man Who Exchanged Ukraine Texts," *Wall Street Journal.* January 17, 2020.
[58] Porter, Jon. "Facebook and Instagram to remove coronavirus misinformation," *The Verge.* January 31, 2020.
[59] Birnbaum, Emily. "Facebook says it removed five foreign influence campaigns in February," *The Hill.* March 2, 2020.

92.

On or about March 24, 2020, Twitter confirmed that propaganda from Chinese officials that attempts to blame the U.S. for the coronavirus is permitted on the platform.[60]

93.

On or about April 20, 2020, Defendant Mark Zuckerberg told *ABC*'s George Stephanopoulos that protests of stay-at-home orders that violate state social distancing rules organized through his social media platform qualify as "harmful misinformation" and will be taken down.[61]

94.

On or about June 2, 2020, Defendant Meta alerted its staff that it would be be changing its policies relating to the moderation of posts by politicians.[62]

95.

On or about June 15, 2020, Google announced, "we have strict publisher policies that govern the content ads can run on and explicitly prohibit derogatory content that promotes hatred, intolerance, violence or discrimination based on race from

---

[60] Parker, Tom. "Twitter Suspends Popular News Account Breaking911," *Reclaim The Net*. March 24, 2020.
[61] Concha, Joe, "Zuckerberg: Some stay-at-home protests organized on Facebook could qualify as 'harmful misinformation'," *The Hill*. April 20, 2020; Bokhari, Allum, **"**Mark Zuckerberg: Lockdown Protests are 'Misinformation', Facebook will ban Organizers," *Breitbart*. April 20, 2020.
[62] Nolan, Lucas. "Mark Zuckerberg Tells Angry Facebook Employees He May Change Censorship Policy on Trump and Other World Leaders," *Breitbart*. June 2, 2020.

monetizing. When a page or site violates our policies, we take action. In this case, we've removed both sites' ability to monetize with Google." [63]

96.

In an internal announcement of Meta's "human smuggling policy" obtained by the *Washington Free Beacon*, Defendant Meta's parent company concluded that a crackdown on human smuggling solicitations would hamper the ability for people to use the platform "to seek safety or exercise their human rights," and therefore Defendant Meta will maintain its current policy which prohibits users from offering human smuggling but allows them to solicit smuggling services. [64]

97.

Defendant Twitter's terms of service update does not disclose how or why users may trigger its new right to "limit distribution or visibility of any content on the service," in addition to removing or refusing to distribute any content, suspending or terminating users and reclaiming their usernames without liability, or whether these decisions will be made by algorithms, directly by humans, or some combination of the two. [65]

---

[63] Fraser, Adele-Momoko, "Google bans website ZeroHedge from its ad platform over comments on protest articles," *NBC News*. June 16, 2020.

[64] Simonson, Joseph. "Meta Will Allow Solicitation of Human Smuggling on Its Platforms - Policy comes amid surge in Facebook groups devoted to human smuggling," *Washington Free Beacon.* February 1, 2022.

[65] Nolan, Lucas. "Twitter Makes Shadow Banning Official Part of Terms of Service," *Breitbart*. January 2, 2020; Rankovic, Didi. "Twitter's shadow-banning practices are now official," *Reclaim the Net*. January 1, 2020.

### e. *Fact Checkers*

98.

On or about September 19, 2019, Defendant Zuckerberg admitted to U.S. Senator Josh Hawley that he was aware Facebook's factcheckers exhibited clear activist bias and have done so for a long time.[66]

99.

On or about May 27, 2020, U.S. Representative Matt Gaetz announced he supports an effort to prevent social media giants like Twitter from fact-checking content on their platforms.[67]

100.

On or about May 27, 2020, Defendant Dorsey reaffirmed Twitter's commitment to fact-check information related to elections.

101.

On or about May 27, 2020, Defendant Zuckerberg stated that adding fact-check warnings to content that is deemed to be "misinformation" reduces clicks through to the content by 95%.[68]

---

[66] Bokhari, Allum. "Report: Mark Zuckerberg admits Facebook's 'clear bias,' dependence on 'activist' fact checkers," *Breitbart*. September 19, 2019; Parker, Tom. "Mark Zuckerberg agrees there 'clearly was bias; in Facebook fact-check' of pro-life non-profit Live Action," *Reclaim the Net*. September 19, 2019.
[67] Crisp, Elizabeth. "Donald Trump to Issue Social Media Executive Order After Twitter Fact-Checks Tweets," *Newsweek*. May 27, 2020.
[68] Parker, Tom. "Facebook soft-censors The Babylon Bee, starts forcing users to confirm that they actually want to share posts," *Reclaim The Net*. May 27, 2020.

102.

As of May 27, 2020, fact checking for Twitter is performed by the "Moments Team," a group of experts on compiling social media posts and arranging them into a narrative.[69]

103.

On or about May 27, 2020, Defendant Twitter said there was no way for even the President of the United States to appeal a fact-check.[70]

104.

Defendant Twitter did not fact check the false claim made by media organizations that President Trump went golfing on Memorial Day 2020.[71]

105.

Defendant Twitter did not fact check the false claim made by Candidate Joe Biden in May 2020 and other Democrats that Joe Biden called for lockdowns one week before President Trump.[72]

106.

Defendant Twitter did not fact check the false claim made by Joe Biden on May 26, 2020 that President Donald Trump had no comprehensive plan for COVID 19 or the economy.[73]

---

[69] Edelman, Gilad. "Twitter Finally Fact-Checked Trump. It's a Bit of a Mess," *Wired*. May 27, 2020.
[70] Bokhari, Allum. "8 Lies by Joe Biden and the Left that Twitter Didn't Fact Check," *Breitbart*. May 27, 2020.
[71] Bokhari, Allum. "8 Lies by Joe Biden and the Left that Twitter Didn't Fact Check," *Breitbart*. May 27, 2020.
[72] Bokhari, Allum. "8 Lies by Joe Biden and the Left that Twitter Didn't Fact Check," *Breitbart*. May 27, 2020.
[73] Bokhari, Allum. "8 Lies by Joe Biden and the Left that Twitter Didn't Fact Check," *Breitbart*. May 27, 2020.

107.

Defendant Twitter did not fact check the false claim by the World Health Organization on January 14, 2020 that there was "no evidence of human-to-human transmission of the coronavirus."[74]

### f. *Authoritative Sources*

108.

On or about September 12, 2019, Google announced it would begin promoting news articles that feature original reporting in its search results in an effort to push users to more "authoritative" sources.[75]

109.

On or about March 18, 2020, Defendant Twitter began applying a broader definition of "harm" to address content that "goes directly against guidance from authoritative sources of global and local health information."[76]

110.

On or about March 18, 2020, Defendant Twitter announced that the following previously allowed content would be removed, such as: (1) Denial of health authority recommendations; (2) Description of treatments, even in jest, that are not

---

[74] Bokhari, Allum. "8 Lies by Joe Biden and the Left that Twitter Didn't Fact Check," *Breitbart*. May 27, 2020.

[75] Neidig, Harper. "Google to boost articles with 'original reporting' in search results," *The Hill*. September 12, 2019.

[76] Hern, Alex. "Twitter to remove harmful fake news about coronavirus," *The Guardian*. March 18, 2020; Parker, Tom. "Twitter will force users to delete tweets that deny "expert guidance" about coronavirus," *Reclaim The Net*. March 18, 2020.

immediately harmful but are known to be ineffective; (3) Description of harmful treatments; (4) Specific and unverified claims that incite people to action and cause widespread panic; (5) Claims that specific groups or nationalities are never susceptible, or are more susceptible, to COVID-19; or (6) False or misleading claims on how to differentiate between COVID-19 and a different disease.[77]

## 111.

On or about March 18, 2020, Defendant Twitter announced, "if an account holder sees information on the service that is directly against guidance from authoritative sources of global and local public health information – report it to us and we will assess under our new expanded rule. Reports made under any of [the existing] categories will be assessed under the updated rule – regardless."[78]

## 112.

On or about March 18, 2020, Defendant Twitter announced it would be enforcing the new rules "in close coordination with trusted partners, including public health authorities and governments, and continue to use and consult with information from those sources when reviewing content." [79]

---

[77] Hern, Alex. "Twitter to remove harmful fake news about coronavirus," *The Guardian*, March 18, 2020; Parker, Tom. "Twitter will force users to delete tweets that deny 'expert guidance' about coronavirus," *Reclaim The Net*. March 18, 2020.

[78] Hern, Alex. "Twitter to remove harmful fake news about coronavirus", *The Guardian*. March 18, 2020; Parker, Tom. "Twitter will force users to delete tweets that deny 'expert guidance' about coronavirus," *Reclaim The Net*. March 18, 2020.

[79] Hern, Alex. "Twitter to remove harmful fake news about coronavirus," *The Guardian*. March 18, 2020; Parker, Tom. "Twitter will force users to delete tweets that deny "expert guidance" about coronavirus," *Reclaim The Net*. March 18, 2020.

113.

On or about April 17, 2020, Defendant Meta's list of "authoritative sources" included CBS, which used videos from Italian hospitals when reporting about the situation in U.S. hospitals; *ABC*, which reported that President Trump knew about COVID-19 in November 2019 which was later debunked by the National Center for Medical Intelligence; and *Huffington Post* and *New York Times* which claimed President Trump was profiting from the use of the Hydroxychloroquine to treat COVID-19 patients which was later rated as "mostly false" by *Snopes*, a fact checking site.[80]

114.

On or about April 20, 2020, Defendant Facebook began censoring any information about COVID-19 treatments not verified by its selected "authoritative sources" and any statements that discourage or "events that defy government's guidance on social distancing."[81]

---

[80] Rankovic, Didi. "Facebook will send you a warning if you've liked any 'misinformation' but mainstream media goes unchecked," *Reclaim The Net.* April 17, 2020.

[81] Krayden, David. "Facebook Censoring Anti-Lockdown protesters. Donald Trump Jr. Calls It 'Chilling & Disturbing'," *Daily Caller.* April 20, 2020; Wong, Julie Carrie. "Facebook bans some anti-lockdown protest pages," *The Guardian.* April 20, 2020; Robertson, Adi. "Facebook is banning protest events that violate social distancing rules," *The Verge.* April 20, 2020.

## ***HATE SPEECH POLICY***

### 115.

Defendant Facebook's Community Standards on hate speech rules apply to "protected characteristics" which it defines as "race, ethnicity, national origin, religious affiliation, sexual orientation, caste, sex, gender, gender identity, and serious disease or disability," with punishments for violations ranging from a warning to an outright ban depending on the severity of the violation and the person's history on the platform.[82]

### 116.

Defendant Facebook defines hate speech as an attack on people based on race, ethnicity, national origin, religion, orientation, sex, gender identity, and serious disease or disability.[83]

### 117.

On or about June 13, 2019, Defendant Facebook was discovered to be monitoring off-site behavior to determine whether or not certain users get banned, monitoring the on-platform and off-platform activities of prominent political individuals on an internal file called "Hate Agent policy review."[84]

---

[82] Parker, Tom. "Facebook now says it's 'hate speech' to deny that someone's 'gender identity' exists," *Reclaim the Net*. January 10, 2020.
[83] Murdock, Jason. "Facebook Acts Faster on Hate Speech Than Twitter and YouTube, Report Shows," *Newsweek*. June 24, 2020.
[84] Bokhari, Allum. "Facebook Claims it didn't defame Laura Loomer with 'dangerous individual' label," *Breitbart*. April 13, 2020; Parker, Tom. "Facebook defends calling congressional candidate Laura Loomer 'dangerous'," *Reclaim the Net*. April 13, 2020.

118.

On or about December 19, 2019, Defendant Facebook changed its Community Standards on "hate speech" to prohibit "statements denying existence" based on "gender identity," meaning that denying the existence of a potentially unlimited number of gender identities could now result in a permanent account ban. [85]

119.

On or about June 18, 2020, Defendant Facebook's head of security policy, Nathaniel Gleicher, confirmed to a U.S. House Intelligence Committee that it removed campaign ads by President Donald Trump about the left-wing militant group Antifa that contained an upside-down red triangle, a symbol currently used by Antifa and once used by Nazis to designate political prisoners, communists and others in concentration camps, because of its connection with "hateful ideology."[86]

120.

On or about June 26, 2020, Facebook announced an expansion to its ad policy prohibiting claims that specific races, ethnicities, religious affiliations, sexual orientations, and gender identities are a "threat" to others. [87]

---

[85] Parker, Tom. "Facebook now says it's 'hate speech' to deny that someone's 'gender identity' exists," *Reclaim the Net*. January 10, 2020.

[86] Glazer, Emily. "Facebook Removes Trump Campaign Ads for Violating Policy on Use of Hate Symbol," *The Wall Street Journal*. June 19, 2020; Wong, Julie Carrie. "Facebook removes Trump re-election ads that feature a Nazi symbol," *Guardian*. June 18, 2020.

[87] Burch, Sean. "Facebook Expands Hate Speech Policy, Will Add Notifications to 'Newsworthy' Posts That Break Rules,", *The Wrap*. June 26, 2020; Vranica, Suzanne and Seetharaman, Deepa. "Facebook Tightens Controls on Speech as Ad Boycott Grows," *The Wall Street Journal*. June 26, 2020.

121.

On or about June 26, 2020, Defendant Zuckerberg announced, "We're also expanding our policies to better protect immigrants, migrants, refugees and asylum seekers from ads suggesting these groups are inferior or expressing contempt, dismissal or disgust directed at them."[88]

122.

On or about June 26, 2020, Facebook executives also vowed to invest more to tackle hate on the platform, including continuing the development of artificial-intelligence technology that can detect hate speech, according to an email.[89]

123.

On or about July 10, 2020, Facebook changed its hate speech policy to include a ban on any content that directly promotes conversion therapy, as an attack against people based on sexual orientation or gender identity.[90]

124.

On or about July 28, 2020, Twitter announced it would begin blocking links that violate its "hateful conduct" rules on July 30, 2020.[91]

[88] Burch, Sean. "Facebook Expands Hate Speech Policy, Will Add Notifications to 'Newsworthy' Posts That Break Rules,", *The Wrap*. June 26, 2020; Vranica, Suzanne and Seetharaman, Deepa. "Facebook Tightens Controls on Speech as Ad Boycott Grows," *The Wall Street Journal*. June 26, 2020.
[89] Vranica, Suzanne. "Facebook Tries to Contain Damage as Verizon Joins Ad Boycott," *The Wall Street Journal*. June 26, 2020.
[90] Statt, Nick. "Facebook and Instagram ban all posts promoting conversion therapy," *The Verge*. July 10, 2020.
[91] Parker, Tom. "Twitter says it will start blocking some links for "hateful conduct," *Reclaim The Net*. July 28, 2020.

125.

On or about July 28, 2020, Twitter's hateful conduct policy began prohibiting links

to a wide range of alleged content, including:

1. "content that degrades someone,"

2. "dehumanizing speech" against groups of people based on four "protected" categories (age, disability, religion, or serious disease),

3. "inciting fear" against these protected categories,

4. "asserting that protected categories are more likely to take part in dangerous or illegal activities,"

5. reinforcing "negative or harmful stereotypes about a protected category,"

    and

6. "targeted misgendering or deadnaming of transgender individuals." [92]

126.

Former Facebook-Cognizant content moderator Ryan Hartwig ("Hartwig") has

confirmed that Defendant Facebook expressly allows the comparing of supporters

of President Donald Trump to members of the Ku Klux Klan.

---

[92] Parker, Tom. "Twitter says it will start blocking some links for "hateful conduct," *Reclaim The Net.* July 28, 2020.

127.

On August 10, 2020, Facebook defined religious affiliation as a "protected characteristic," meaning that any violent or dehumanizing speech towards it violates "community guidelines."[93]

128.

Facebook explicitly lists dehumanizing comparisons referring to Jewish people as hate speech that is banned from the platform.[94]

129.

Facebook also maintains a more narrowly defined list of "tiers" of hate speech, ranging from Tier 1 (e.g., "content targeting a person on the basis of their aforementioned protected characteristic with dehumanizing speech or imagery in the form of comparisons to insects"), to Tier 3 (e.g., "content targeting a person on the basis of their protected characteristic with calls for segregation").[95]

---

[93] Nichols, Benjamin. "More Than 120 International Nonprofits Ask Facebook To Create Anti-Semitism Policy," *Daily Caller*. August 10, 2020.
[94] Nichols, Benjamin. "More Than 120 International Nonprofits Ask Facebook To Create Anti-Semitism Policy," *Daily Caller*. August 10, 2020
[95] Kastrenakes, Jacob. "Facebook bans blackface and anti-Semitic stereotypes in hate speech update," *The Verge*, August 11, 2020; Hern, Alex. "Facebook and Instagram ban antisemitic conspiracy theories and blackface," *The Guardian*. August 12, 2020; Chaffary, Shirin. "Facebook bans blackface and certain anti-Semitic conspiracy theories," *VOX*. August 11, 2020.

130.

A 2020 European Commission Report said 88 percent of content violating Facebook's hate speech policy was found by algorithms before being seen by general users.[96]

c. *Algorithms*

131.

Google has worked with the Southern Poverty Law Center on content moderation, has blacklisted conservative news websites, and has adjusted search results on YouTube to downrank content critical of abortion, David Hogg, Maxine Waters, and the Federal Reserve.[97]

132.

Google routinely adjusts its search algorithms in a way that dramatically impacts the bottom line of businesses that rely on Google search results to drive traffic.[98]

133.

On or about May 26, 2020, *The Wall Street Journal* reported that an internal Facebook report presented to Defendant Facebook's executives in 2018 found that

---

[96] Murdock, Jason. "Facebook Acts Faster on Hate Speech Than Twitter and YouTube, Report Shows," *Newsweek*. June 24, 2020.
[97] Bokhari, Allum. "Google CEO Sundar Pichai Praises Company's 'Strong Ethical Foundation'," *Breitbart*. September 20, 2019.
[98] Bokhari, Allum. "WSJ Investigation Further Debunks Google's Claim of No Manual Intervention in Searches," *Breitbart*. November 18, 2019.

the company was well aware that its product, specifically its recommendation engine algorithms, stoked divisiveness and polarization.[99]

134.

Former Facebook-Cognizant content moderator Zack McElroy said that there is stark contrast between Democrat-leaning content and posts by Republican and conservative politicians, journalists, and supporters that ends up "flagged," a process performed by algorithms, and put in what moderators call "Civic Harassment Cue."[100]

135.

On or about June 23, 2020, in testimony before the U.S. House Energy and Commerce Committee, Defendant Zuckerberg said that algorithms produced by his company to determine which content was allowed and which was banned on the giant platform, were not "directed" in any way to enforce political or other bias. [101]

136.

Former Meta/Cognizant moderator Zack McElroy said that 75% to 80% of flagged content comes from Republican pages and noted that while algorithms are not

---

[99] Statt, Nick. "Facebook reportedly ignored its own research showing algorithms divided users," *The Verge*. May 26, 2020.

[100] Rankovic, Didi. "Facebook moderator whistleblower raises the alarm on biased algorithms, *Reclaim The Net*. June 23, 2020.

[101] Rankovic, Didi. "Facebook moderator whistleblower raises the alarm on biased algorithms," *Reclaim The Net*. June 23, 2020.

human, they are programmed by humans, that is, somebody at Meta has to write them to single out content the way they do.[102]

### d. *__Moderators__*

137.

Defendant Meta's third-party content moderator Cognizant was hired to remove content related to hate speech, terrorism, and other purported inappropriate content from platforms including Meta, Google, and Twitter. [103]

138.

Hartwig has confirmed that Defendant Meta directs content moderators to delete content using the words: "Troll," "Attention Whore," "Ignorant," "Internet Whore," "Gender Confused," "Fucktard," "Libtard," "Trumptard," "Feminazi," and "Snowflake."

139.

Similarly, Defendant Meta directs content moderators to ignore content using the words: "Pedofile," "Nazi," "Trumphumper," "Racist," "Sexist," and "Bigot."

---

[102] Rankovic, Didi. "Facebook moderator whistleblower raises the alarm on biased algorithms," *Reclaim The Net*. June 23, 2020.
[103] Newton, Casey. "A Facebook content moderation vendor is quitting the business after two Verge investigations Moderators complained of filthy offices and severe mental health strain," *The Verge*. October 30, 2019.

140.

An inside Meta/Cognizant video shows Defendant Meta's content moderators discussing censoring conservatives, and reveals exceptions being given to Don Lemon from CNN for violations of "hate speech policy".[104]

141.

On or about September 23, 2019, a content moderator for Defendant Meta reported that the implementation of Defendant Meta's content moderation policies, including hate speech, are left to the interpretation of third-party contractors by design.[105]

142.

On or about October 30, 2019, Defendant Meta's third-party content moderator Cognizant announced, after hiring thousands of moderators around the world, that it had "determined that certain content work [focused on determining whether certain content violates client standards] in our Digital Operations practice is not in line with our strategic vision for the company and we intend to exit this work over-time."[106]

143.

On or about May 7, 2020, Defendant Meta created an oversight board with the power to control bans and censorship actions, made up of 20 members including:

---

[104] Hasson, Peter. "Project Veritas Video Shows Facebook Content Moderators Discussing Censoring Conservatives, Reveals 'Exception Given To Don Lemon For Hate Speech," *Daily Caller*. June 23, 2020; Rankovic, Didi. "Facebook mods were told not to censor Don Lemon's 'hate speech'," *Reclaim the Net*. June 23, 2020.

[105] Notopoulos, Katie. "Burt's Bush And XXXTentacion's Death: Why Facebook Moderators Fail," *BuzzFeed*. September 23, 2019.

[106] Castro, Alex. "A Facebook content moderation vendor is quitting the business after two Verge investigations," *The Verge*, October 30, 2019.

Pamela Karlan, who before the U.S. House of Representatives Committee on the Judiciary on December 4, 2019, testified to impeach President Trump and has been called a "full-throated, unapologetic liberal torchbearer" by the *New York Times*; Tawakkol Karman, a Soros-funded activist and a publicly acknowledged member of the Muslim Brotherhood; the former editor-in-chief of *The Guardian*; the former left wing prime minister of Denmark; and an academic who once praised a *Teen Vogue* article comparing President Trump to Hitler.[107]

144.

On or about May 16, 2020, Hungarian Prime Minister Viktor Orbán and the Hungarian Government called Defendant Meta's "oversight board" not some neutral expert body, but a "Soros Oversight Board" intended to placate the billionaire activist because three of its four co-chairs include Catalina Botero Marino, "a  board member of the pro-abortion Center for Reproductive Rights, funded by Open Society Foundations" — Soros's flagship NGO — and Helle Thorning-Schmidt,  former Prime Minister of Denmark, who is "unequivocally and vocally anti- Trump" and serves alongside Soros and his son Alexander as trustee of another  NGO, and a

---

[107] Bokhari, Allum. "FCC Commissioner Slams Facebook Supreme Court: 'New Speech Police'," *Breitbart*. May 7, 2020; Rankovic, Didi. "FCC commissioner isn't happy with Facebook's new 'speech police'," *Reclaim The Net*. May 7, 2020.

Columbia University professor Jamal Greene who served as an aide to Senator Kamala Harris (D-CA) during Justice Kavanaugh's 2018 confirmation Hearings. [108]

145.

Even if content moderation is protected speech, making misrepresentations about content moderation policies is not.[109]

146.

On or about May 27, 2020, Twitter spokesman stated, "no person at Twitter is responsible for our policies or enforcement actions, and it's unfortunate to see individual employees targeted for company decisions."[110]

147.

On or about May 27, 2020, Defendant Jack Dorsey stated, "there is someone ultimately accountable for our actions as a company, and that's me."[111]

---

[108] Hoff, Jim. "Hungarian Politician: Facebook Appoints "Soros Oversight Board" to Police Acceptable Online Speech in America," *The Gateway Pundit*. May 16, 2020; Montgomery, Jack. "Hungary's Conservative Govt Sounds Alarm On Facebook's New 'Soros Oversight Board'," *Breitbart*. May 16, 2020.

[109] *Twitter, Inc. v. Paxton*, No. 21-15869, 9 (9th Cir. Mar. 2, 2022); *See Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc*., 425 U.S. 748, 772 (1976) (misleading commercial speech is not protected).

[110] Statt, Nick. "White House organizes harassment of Twitter employee as Trump threatens company," *The Verge*. May 27, 2020; Broderick, Ryan. "Trump's Campaign and Fox News Are Attacking a Twitter Employee Because They Think He Fact-Checked The President.  They Have The Wrong Guy.", *BuzzFeed*. May 27, 2020.

[111] Rahman, Abid. "Twitter CEO Responds to Trump: "We'll Continue to Point Out Incorrect or Disputed Information About Elections," *The Hollywood Reporter*. May 27, 2020.

148.

"In Twitter's view, its content moderation decisions are protected speech because it is a publisher, and it has a First Amendment right to choose what content to publish."[112]

149.

If Defendant Twitter's statements are misleading commercial speech, and thus unprotected, then Defendant Twitter's content moderation decisions would be a proper cause for the investigation, because they would be the very acts that make its speech misleading.[113]

150.

"Although both companies are public, one person controls Facebook (Mark Zuckerberg), and just two control Google (Larry Page and Sergey Brin)."[114]

151.

Ryan Hartwig, a former Cognizant content moderator for Meta, stated that Meta's content moderation policies became more biased between 2018 and 2020, with exceptions in Meta's policy being made for left-wing users who use the platform to demonize the police or white males. [115]

---

[112] *Twitter, Inc. v. Paxton*, No. 21-15869, 4 (9th Cir. Mar. 2, 2022).
[113] *Twitter, Inc. v. Paxton*, No. 21-15869, 10 (9th Cir. Mar. 2, 2022).
[114] *Biden v. Knight First Amendment Institute at Columbia Univ.* 593 U.S. _____ (2021) (Thomas, J. concurring)
[115] Bokhari, Allum. "Facebook Insider Ryan Hartwig: The Company Allowed Users to Demonize Whites, Men, Cops," *Breitbart*. June 26, 2020.

152.

Hartwig stated, "There's definitely a lot of bias, [and] it wasn't just the content moderators, it's the policy itself that's biased and rigged against conservatives." [116]

153.

Hartwig stated, "Even if I report that [anti-conservative] post, it would still stay on the platform." [117]

154.

Whether a social media company's statements are misrepresentations is "not solely a legal issue because it depends on further factual amplification," and therefore a social media company's "statements can be investigated as misleading just like the statements of any other business."[118]

155.

In June 2018, Meta made an exception to its hate speech policy prohibiting attacks based on gender entities, to expressly allow attacking straight white males and calling "them 'filth' if it's in the context of attacking them for not supporting LGBT."[119]

---

[116] Bokhari, Allum. "Facebook Insider Ryan Hartwig: The Company Allowed Users to Demonize Whites, Men, Cops," *Breitbart*. June 26, 2020.

[117] Bokhari, Allum. "Facebook Insider Ryan Hartwig: The Company Allowed Users to Demonize Whites, Men, Cops," *Breitbart*. June 26, 2020.

[118] *Twitter, Inc. v. Paxton*, No. 21-15869, 10, 12 (9th Cir. Mar. 2, 2022); *United States v. Lazarenko*, 476 F.3d 642, 652 (9th Cir. 2007).

[119] Bokhari, Allum. "Facebook Insider Ryan Hartwig: The Company Allowed Users to Demonize Whites, Men, Cops," *Breitbart*. June 26, 2020.

156.

On July 23, 2020, Defendant Meta reported that its hate speech policies treat attacks on white people or men in exactly the same way as it treats comments about Black people or women.[120]

157.

A reasonable person could think that a social media company's statements about content moderation were true.[121]


## *HATE SPEECH STATISTICS*

158.

According to researcher Richard Hanania of Columbia University, between 2015 and 2019, the monthly suspension of important political accounts increased ninefold.[122]

159.

According to researcher Richard Hanania of Columbia University, between 2015 and 2019, conservative and Republican politicians were approximately four times more likely to be censored and lose their accounts than liberals. [123]

---

[120] Solon, Olivia. "Facebook ignored racial bias research, employees say," *NBC*. July 23, 2020.
[121] *Twitter, Inc. v. Paxton*, No. 21-15869, 13 (9th Cir. Mar. 2, 2022).
[122] Bulleri, Fabrizio. "Rep. Jim Banks questions Twitter on why it allows scams but censors political speech," *Reclaim The Net*. November 15, 2019.
[123] Bulleri, Fabrizio. "Rep. Jim Banks questions Twitter on why it allows scams but censors political speech," *Reclaim The Net*. November 15, 2019.

160.

On or about October 24, 2019, Defendant Twitter announced it removed over half of its abusive tweets prior to being reported by users.[124]

161.

On or about October 31, 2019, Defendant Twitter reported it locked or suspended a total of 1,254,226 unique accounts for violating its rules in the first half of 2019 – a 105% increase compared with the second half of 2018.[125]

162.

On or about November 30, 2019, Defendant Meta stated that it removed 11.4 million pieces of "hate speech" between April and September 2019 but does not provide a database for the posts that are removed on these grounds, making it impossible to know the types of posts Meta is censoring.[126]

163.

On or about May 12, 2020, Defendant Meta announced it removed 9.6 million pieces of content that contained hate speech in the first quarter of 2020, up from 5.7 million during the fourth quarter of 2019.

---

[124] Kastrenakes, Jacob. "Twitter says it now removes half of all abusive tweets before users report them," *The Verge*. October 24, 2019.
[125] Parker, Tom. "Twitter says it locked and suspended 105% more accounts in 2019," *Reclaim The Net*. October 31, 2019.
[126] Harper, Cindy. "Facebook deletes post of First Lady Melania Trump, calls it 'Hate Speech'," *Reclaim The Net*. November 30, 2019.

164.

On or about May 12, 2020, Meta announced it removed around 4.7 million pieces of content originating from organized hate groups in the first months of 2020, 96.7% prior to someone reporting it, an increase of more than 3 million from the last quarter of 2019.[127]

165.

On or about August 11, 2020, Meta announced it removed about 8.7 million pieces of "terrorist" content (i.e., content from nonstate actors that engage in or advocate for violence to achieve political, religious or ideological aims) in the second quarter of 2020, up from 6.3 million in the first quarter of that same year. [128]

166.

On or about August 11, 2020, Meta announced it removed about 4 million pieces of content from "organized hate" groups, a separate category, down from 4.7 million in the first quarter.[129]

---

[127] Johnson, Marty. "Facebook sees jump in posts removed for promoting violence, hate speech," *The Hill*. May 12, 2020.

[128] Levy, Rachael. "Facebook Removed Nearly 40% More Terrorist Content in Second Quarter," *The Wall Street Journal*. August 11, 2020.

[129] Levy, Rachael. "Facebook Removed Nearly 40% More Terrorist Content in Second Quarter," *The Wall Street Journal*. August 11, 2020.

167.

On or about August 11, 2020, Facebook announced it removed 22.5 million pieces of content from Facebook and 3.3 million from Instagram[130] for hate speech violations, still another separate category, in the second quarter of 2020.[131]

## *DANGEROUS INDIVIDUALS POLICY*

168.

In February 2019, Defendant Meta labeled UK activist Tommy Robinson as a dangerous individual and a "hate preacher," banned him from the platform, and began punishing users for mentioning him in their posts.[132]

169.

On or about May 2, 2019, Defendant Meta banned a number of prominent media figures, including Ms. Loomer, that it chose to designate as "dangerous individuals" for their alleged off-platform associations with affiliates of the Proud Boys.[133]

170.

As of June 13, 2019, Defendant Meta maintained a list of high-profile political figures who it monitored for potential designation as "hate agents," which serves as

---

[130] A doubling and tripling from the previous quarter, respectively.
[131] Levy, Rachael. **"**Facebook Removed Nearly 40% More Terrorist Content in Second Quarter," *The Wall Street Journal*. August 11, 2020.
[132] Pramod, Naga. "Facebook says you can only mention Tommy Robinson if you're criticizing him or saying 'he's an idiot'," *Reclaim The Net*. September 30, 2019.
[133] Lee, Dave. "Facebook bans 'dangerous individuals'," *BBC News,* May 3, 2019.

a pre-cursor for labeling someone as a Dangerous Individual, including conservative activist Candace Owens, author and think tank founder Brigitte Gabriel, and British politicians Carl Benjamin and Anne-Marie Waters.[134]

171.

In Summer of 2019, Defendant Meta updated its policy on "violence and incitement" to ban death threats and incitement to violence *unless* the threat was aimed at someone labeled, as defined *by* Defendant Facebook, as a Dangerous Individual or Organization.[135]

172.

On or about September 16, 2019, Defendant Meta admitted to maintaining a "Dangerous Individuals and Organizations" policy that is activated by amplifying or trafficking hate.[136]

173.

On September 23, 2019, Meta instructed Cognizant to allow mocking the death of rapper XXXTentacion because, as a "violent criminal," he was exempt from the rule that otherwise forbids mocking death.[137]

---

[134] Bokhari, Allum. "Facebook's Process to Label You a 'Hate Agent' Revealed," *Breitbart,* June 13, 2019.

[135] Bokhari, Allum. "Facebook Sanctions Violent Threats Against 'Dangerous Individuals'," *Breitbart*, July 9, 2019.

[136] Rankovic, Didi. "Facebook says it's a publisher, invokes First Amendment rights to call Laura Loomer a 'dangerous individual'," *Reclaim The Net.* September 17, 2019.

[137] Notopoulos, Katie. "Burt's Bush and XXXTentacion's Death: Why Facebook Moderators Fai," *BuzzFeed*. September 23, 2019.

174.

On or about September 30, 2019, Meta said, "Our rules don't explicitly forbid talking about Tommy Robinson – you are allowed to write that you don't like him, or that he's an idiot."[138]

175.

On or about April 27, 2020, Defendant Meta threatened to ban users who shared the image bearing the legend "Proud to Be English" and two crossed flagpoles carrying the English St. George's Cross and the white lion on a red field — a banner associated with Anglo-Saxons — in celebration of St. George's Day because they had posted content which "goes against our Community Standards on dangerous individuals and organizations." After receiving many complaints, Defendant Meta removed the restrictions placed on the impacted accounts.[139]

176.

On June 23, 2021, Defendant Meta updated its Dangerous Individuals and Organizations Standard to create "three tiers of dangerous organizations, levels that are tied primarily to the degree of harm the company attributes to each, with violence

---

[138] Pramod, Naga. "Facebook says you can only mention Tommy Robinson if you're criticizing him or saying 'he's an idiot'," *Reclaim The Net*. September 30, 2019.

[139] Montgomery, Jack. "Facebook Admits Banning Users for Saying They Are 'Proud to Be English'," *Breitbart.* April 27, 2020.

as the touchstone and greater restrictions placed on groups that engage in actual offline violence."[140]

## *BANNED AND CENSORED*

### 177.

On or about September 17, 2019, Defendant Meta shut down the Israeli Prime Minister's communications to his supporters pursuant to its policies regarding election integrity. [141]

### 178.

On or about November 18, 2019, Google banned certain conservative websites from its search results, including The Gateway Pundit and the United West.[142]

### 179.

On or about November 25, 2019, Defendant Twitter suspended the account of *The Post Millennial* journalist Andy Ngo for violating its rules against hateful conduct for tweeting, "The US is one of the safest countries for trans people. The murder rate

---

[140] Dwyer, Mary and Patel, Faiza. "Facebook's New 'Dangerous Individuals and Organizations' Policy Brings More Questions Than Answers," *Brennan Center for Justice*, July 21, 2021.
[141] Frazin, Rachel. "Netanyahu: Facebook caved to 'pressure of the Left' by suspending chatbot over illegal polls," *The Hill.* September 17, 2019.
[142] Bokhari, Allum. "WSJ Investigation Further Debunks Google's Claim of No Manual Intervention in Searches," *Breitbart.* November 18, 2019.

of trans victims is actually lower than that for cis population. Also, who is behind the murders? Mostly black men."[143]

180.

On or about November 28, 2019, Defendant Twitter permanently suspended a campaign account belonging to Minnesota Republican congressional candidate Danielle Stella for violations of Twitter rules, for tweeting that her opponent should be tried and executed if, as was being reported, she had passed sensitive information to Iran.[144]

181.

On or about December 8, 2019, Defendant Twitter suspended the accounts of *Fox News* Host Pete Hegseth, journalist Andy Ngo, and filmmaker Mike Cernovich for referring to the manifesto and social media posts of Mohammed Alshamrami, a Saudi Air Force officer and student of Naval Aviation Schools Command killed by police after shooting three U.S. sailors dead and injuring eight others.[145]

---

[143] Wakerell-Cruz, Roberto. "Twitter suspends journalist Andy Ngo," *The Post Millennial*. November 25, 2019; Parker, Tom. "Twitter suspends journalist Andy Ngo for tweeting about transgender violence statistics," *Reclaim The Net*. November 25, 2019.

[144] Folley, Aris. "Omar challenger banned from Twitter over post saying she 'should be tried for treason and hanged'," *The Hill*. November 28, 2019; Tayor, Derrick Bryson. "Twitter Permanently Suspends Accounts of Ilhan Omar's Potential Challenger," *The New York Times*. November 30, 2019; Bekiempis, Victoria. "Ilhan Omar's Republican opponent in Twitter ban over 'hanging' posts," *The Guardian*. November 28, 2019.

[145] Rankovic, Didi. "Twitter suspends journalists for reporting on the Pensacola shooter's motives," Reclaim The Net. December 9, 2019; Slatz, Anna. "Journalists suspended from Twitter for reporting on Pensacola Shooter's motivation," *The Post Millennial*. December 8, 2019.

182.

On or about January 4, 2020, Defendant Twitter banned David Marcus, Senior Contributor to *The Federalist* and *New York Post* columnist, for supporting the bombing of Iran if Iran retaliated for the killing of Qasem Soleimani.[146]

183.

On or about January 29, 2020, Defendant Twitter forced Nevada GOP congressional primary candidate Mindy Robinson, columnist Anna Slatz, *Newsmax* host John Cardillo, and the pro-Bernie Sanders YouTuber "shoe0nhead," to delete a satirical image deemed to violate its Election Integrity Policy in order to regain access to their accounts.[147]

184.

On or about January 30, 2020, Twitter temporarily suspended Katie Hopkins' account after attending a meeting organized by the Center for Countering Digital Hate. [148]

---

[146]Emmons, Libby. "Federalist writer banned from Twitter for speaking out against Iran," *The Post Millennial*. January 4, 2020.

[147] Pramod, Naga. "Katie Hopkins temporarily suspended from Twitter after activists call for censorship," *Reclaim The Net*. January 30, 2020; Bokhari, Allum. "Twitter Blacklist Katie Hopkins After Pressure From 'Anti-Hate'" Group," *Breitbart*. January 30, 2020; "Katie Hopkins' Twitter account suspended," *The Guardian*, January 30, 2020. https://www.theguardian.com/media/2020/jan/31/katie-hopkins-twitter-account-suspended.

[148] Pramod, Naga. "Katie Hopkins temporarily suspended from Twitter after activists call for censorship," *Reclaim The Net*. January 30, 2020; Bokhari, Allum. "Twitter Blacklist Katie Hopkins After Pressure From 'Anti-Hate'" Group," *Breitbart*. January 30, 2020; "Katie Hopkins' Twitter account suspended," *The Guardian*, January 30, 2020. https://www.theguardian.com/media/2020/jan/31/katie-hopkins-twitter-account-suspended.

185.

On or about February 4, 2020, Google censored a video of a speech on the floor of the United States Senate by U.S. Senator Rand Paul discussing matters of President Donald Trump's first impeachment and Eric Ciaramella.[149]

186.

On or about March 7, 2020, Defendant Meta banned advertisements for medical face masks after public health officials encouraged the public to avoid buying medical face masks, claiming masks do little to protect average civilians, but a shortage could put medical professionals at risk. [150]

187.

On or about March 7, 2020, Defendant Meta stated, "[w]e already prohibit people from making health or medical claims related to the coronavirus in product listings on commerce surfaces, including those listings that guarantee a product will prevent someone from contracting it."[151]

[149] Bokhari, Allum. "Google Censors the Congressional Record," *Breitbart*. February 4, 2020.
[150] Moreno, J. Edward. "Facebook to ban ads for medical masks," *The Hill*. March 7, 2020.
[151] Moreno, J. Edward. "Facebook to ban ads for medical masks," *The Hill*. March 7, 2020.

188.

On or about March 17, 2020, Samuel Finkelstein was suspended from Twitter for encouraging senior citizens to vote by mail in Florida to prevent the spread of coronavirus.[152]

189.

On or about March 31, 2020, Defendant Meta censored Brazilian President Jair Bolsonaro regarding Hydroxychloroquine treatment for COVID19 to prevent the spread of "misinformation that could lead to physical harm," pursuant to its policy specifically prohibiting false claims relating to cures, treatments, the availability of essential services, and outbreak locations.[153]

190.

Defendant Meta allows instructions on how to perform back-alley abortions on its platform.

191.

On or about April 28, 2020, Defendant Meta deleted the event page for "Rally on the State Capitol Lawn," an April 30, 2020 protest against extending Michigan's state of Emergency, as well as posts on anti-stay-at-home protests in California, New

---

[152] Parker, Tom. "Political activist Samuel Finkelstein suspended from Twitter after warning about coronavirus risks for seniors," *Reclaim The Net.* March 17, 2020.
[153] Nolan, Lucas. "Coronavirus: Facebook Removes Post by Brazilian President Jair Bolsonaro," *Breitbart*. March 31, 2020; Constine, Josh. "Facebook deletes Brazil president's coronavirus misinfo post," *TechCrunch*. March 30, 2020.

Jersey and Nebraska, for defying the government's guidance on social distancing because the event page did not include clear calls for social distancing.[154]

192.

On or about May 17, 2020, Google removed the app Podcast Addict from its marketplace, with over nine million app downloads and two billion podcast downloads, on the grounds that some of the podcasts it indexes reference COVID-19 without the approval of government entities or public health organizations.[155]

193.

On or about May 17, 2020, Google told Xavier Guillemane, the developer of Podcast Addict, that the app had been removed from the marketplace due to its references to COVID-19 : "Pursuant to Section 8.3 of the Developer Distribution Agreement and the Enforcement policy, apps referencing COVID-19, or related terms, in any form will only be approved for distribution on Google Play if they are published, commissioned, or authorized by official government entities or public health organizations."[156]

---

[154] Hicks, Justin P. **"**Facebook deletes event for stay-at-home protest in Michigan," *Michigan Live*. April 28, 2020.
[155] Parker, Tom. "Google bans Podcast Addict app after 9 years for letting users play podcasts that reference COVID-19," *Reclaim The Net*. May 17, 2020.
[156] Parker, Tom. "Google bans Podcast Addict app after 9 years for letting users play podcasts that reference COVID-19," *Reclaim The Net*. May 17, 2020.

194.

On or about May 17, 2020, Google demanded Xavier Guillemane remove references to COVID-19 and keywords related to COVID-19 from the app in order to get the app returned to the marketplace.[157]

195.

On or about May 23, 2020, Defendant Twitter banned Imam Tawhidi, The Imam of Peace, after he refused to remove a satirical image referencing a widely reported link between COVID-19 spread and an Indian extremist group tied to Al Qaeda.[158]

196.

On or about May 25, 2020, Josh Lekach lost his verified status on Twitter after posting an interview with Plaintiff Candidate Loomer.[159]

197.

On or about May 27, 2020, Defendant Twitter censored President Donald Trump's tweet which read, "There is NO WAY (ZERO!) that Mail-In Ballots will be anything less than substantially fraudulent. Mailboxes will be robbed, ballots will be forged & even illegally printed out & fraudulently signed."[160]

---

[157] Parker, Tom. "Google bans Podcast Addict app after 9 years for letting users play podcasts that reference COVID-19," *Reclaim The Net*. May 17, 2020.

[158] Emmons, Libby. "Popular activist Imam of Peace suspended from Twitter for sharing anti-terrorist meme," *The Post Millennial*. May 23, 2020.

[159] Pramod, Naga. "Twitter accused of retaliating against journalists by removing verified status," *Reclaim The Net.* May 25, 2020.

[160] Walker, James. **"**After Twitter Fact-Checks Donald Trump's Tweet, President Threatens to Close Down Social Media Platforms," *Newsweek*. May 27, 2020.

198.

On or about May 28, 2020, President Donald Trump's tweet was censored by an undisclosed third-party non-profit for violating Twitter's civic integrity policy.[161]

199.

On or about May 29, 2020, tweets justifying George Floyd riots as a form of protest or defending them as a reasonable response were not censored or otherwise removed as a violation of Twitter policy.[162]

200.

On or about May 29, 2020, Defendant Twitter announced its policy regarding the Glorification of Violence was violated by a statement from the President of the United States for its "connection to violence and the risk it could inspire similar actions today."[163]

201.

On or about June 1, 2020, Defendant Twitter censored U.S. Representative Matt Gaetz for violating its Glorification of Violence policy for tweeting "Now that we

---

[161] Oremus, Will. "Inside Twitter's Decision to Fact-Check Trump's Tweets," *OneZero*. May 28, 2020.
[162] Conger, Kate. "Twitter Places Warning on Congressman's Tweet for Glorifying Violence," *The New York Times*. June 1, 2020; Kelly, Makena. "Twitter takes action against Rep. Matt Gaetz for glorifying violence," *The Verge*, June 1, 2020; Coleman, Justine. "Twitter restricts tweet from Gaetz for glorifying violence," *The Hill*. June 1, 2020.
[163] Montgomery, Jack. "Twitter Censors Trump Minneapolis Tweet, Accuses Him of 'Glorifying Violence'," *Breitbart*. May 29, 2020; Porter, Jon. "Twitter restricts Trump Tweet for 'glorifying violence'," *The Verge*, May 29, 2020.

clearly see Antifa as terrorists, can we hunt them down like we do those in the Middle East?"[164]

202.

On or about June 3, 2020, Defendant Twitter locked Michelle Malkin out of her account for violating its "Violent Threats Policy" until she deleted her tweet, "In case I wasn't clear: violent criminal looters should be shot."[165]

203.

On or about June 10, 2020, Defendant Meta partially lifted its advertising ban on face masks to allow third-party businesses to advertise cloth masks and other non-medical face coverings like bandanas.[166]

204.

On or about June 15, 2020, a Google spokesperson said that Google had demonetized the websites for *The Federalists* and *Zero Hedge* after determining they violated its policies on content related to race.[167]

---

[164] Conger, Kate. "Twitter Places Warning on Congressman's Tweet for Glorifying Violence," *The New York Times*. June 1, 2020; Kelly, Makena. "Twitter takes action against Rep. Matt Gaetz for glorifying violence," *The Verge*, June 1, 2020; Coleman, Justine. "Twitter restricts tweet from Gaetz for glorifying violence," *The Hill*. June 1, 2020.

[165] Bokhari, Allum. "Michelle Malkin Censored by Twitter for Supporting the Use of Force Against Violent Criminals," Breitbart. June 3, 2020.

[166] Statt, Nick. "Facebook lifts ad ban on non-medical face masks," *The Verge*. June 10,2020.

[167] Robertson, Adi. "Google Ads bans Zero Hedge for racist content, but reverses decision on The Federalist," *The Verge*. June 16, 2020; Ross, Chuck. "Google to Ban Ads on The Federalist After NBC News Raises Concerns About George Floyd Protest Articles," *Daily Caller*. June 16, 2020; Fraser, Adele-Momoko. "Google bans website ZeroHedge from its ad platform over comments on protest articles," *NBC News*. June 16, 2020.

205.

On or about June 16, 2020, Google banned *Zero Hedge*, a conservative website, from its advertising platform over policy violations found in the comments section of stories about Black Lives Matter protests.[168]

206.

On or about June 16, 2020, Google announced *The Federalist* had been warned about policy violations but still had three (3) days to remove the violations before a ban would go into effect.[169]

207.

Google's announcements about *Zero Hedge* and *The Federalist* occurred shortly after the Center for Countering Digital Hate reported that these websites published racist articles about the George Floyd protests – *Zero Hedge* published an article claiming that protests were fake, and *The Federalist* published an article claiming the media had been lying about looting and violence during the protests – and projected that the websites would make millions of dollars through Google Ads.[170]

---

[168] Robertson, Adi. "Google Ads bans Zero Hedge for racist content, but reverses decision on The Federalist," *The Verge*. June 16, 2020; Ross, Chuck. "Google to Ban Ads on The Federalist After NBC News Raises Concerns About George Floyd Protest Articles," *Daily Caller*. June 16, 2020; Fraser, Adele-Momoko. "Google bans website ZeroHedge from its ad platform over comments on protest articles," *NBC News*. June 16, 2020.

[169] Robertson, Adi. "Google Ads bans Zero Hedge for racist content, but reverses decision on The Federalist," *The Verge*. June 16, 2020; Ross, Chuck. "Google to Ban Ads on The Federalist After NBC News Raises Concerns About George Floyd Protest Articles," *Daily Caller*. June 16, 2020; Fraser, Adele-Momoko. "Google bans website ZeroHedge from its ad platform over comments on protest articles," *NBC News*. June 16, 2020.

[170] Robertson, Adi. "Google Ads bans Zero Hedge for racist content, but reverses decision on The Federalist," *The Verge*. June 16, 2020; Ross, Chuck. "Google to Ban Ads on The Federalist After NBC News Raises Concerns About George Floyd Protest Articles," *Daily Caller*. June 16, 2020; Fraser, Adele-Momoko. "Google bans website ZeroHedge from its ad platform over comments on protest articles," *NBC News*. June 16, 2020.

208.

On or about June 17, 2020, Google announced that *The Federalist* had removed the comments that violated its policies and that it would take no further action.[171]

209.

On or about June 19, 2020, Katie Hopkins' Twitter account had over one million followers and had been retweeted by the President of the United States.[172]

210.

On or about June 19, 2020, Katie Hopkins was permanently banned from Twitter for violating its Hateful Conduct Policy shortly after her verified status was removed.[173]

211.

On or about June 19, 2020, Defendant Twitter did not specify which tweets of Katie Hopkins violated its policies but pointed to their rules surrounding comments "based on a wide range of personal characteristics such as race, gender or sexual orientation."[174]

---

[171] Robertson, Adi. "Google Ads bans Zero Hedge for racist content, but reverses decision on The Federalist," *The Verge*. June 16, 2020; Ross, Chuck. "Google to Ban Ads on The Federalist After NBC News Raises Concerns About George Floyd Protest Articles," *Daily Caller*. June 16, 2020; Fraser, Adele-Momoko. "Google bans website ZeroHedge from its ad platform over comments on protest articles," *NBC News*. June 16, 2020.

[172] Slawson, Nicola and Waterson, Jim. "Katie Hopkins permanently removed from Twitter," *The Guardian*. June 19, 2020; Pramond, Naga. "Katie Hopkins banned from Twitter," *Reclaim The Net*. June 19, 2020.

[173] Slawson, Nicola and Waterson, Jim. "Katie Hopkins permanently removed from Twitter," *The Guardian*. June 19, 2020; Pramond, Naga. "Katie Hopkins banned from Twitter," *Reclaim The Net*. June 19, 2020.

[174] Slawson, Nicola and Waterson, Jim. "Katie Hopkins permanently removed from Twitter," *The Guardian*. June 19, 2020; Pramond, Naga. "Katie Hopkins banned from Twitter," *Reclaim The Net*. June 19, 2020.

212.

On or about June 19, 2020, the "Center for Countering Digital Hate" announced,
"We celebrate [Katie Hopkins] losing her privileged platform but regret it took so
long."[175]

213.

On or about June 23, 2020, Defendant Twitter censored President Donald Trump for
violating its abusive behavior policy for threatening harm against an identifiable
group when he tweeted that force would be used to prevent the establishment of an
autonomous zone in Washington, D.C.[176]

214.

On July 20, 2021, U.S. Senator Josh Hawley called the Center for Countering Digital
Hate a "foreign dark money group" that is "attempting to influence American
democracy."[177]

---

[175] Slawson, Nicola and Waterson, Jim. "Katie Hopkins permanently removed from Twitter," *The Guardian*. June 19,
2020; Pramond, Naga. "Katie Hopkins banned from Twitter," *Reclaim The Net*. June 19, 2020.
[176] Samuels, Brett. "Twitter flags Trump tweet on protesters for including 'threat of harm'," *The Hill*. June 23, 2020;
Robertson, Adi. "Twitter restricts Trump threat of serious force against protesters," *The Verge*. June 23, 2020.
[177] Colton, Emma. "Hawley says Biden claim 12 people responsible for COVID misinformation comes from 'foreign
dark money group': Hawley wants answers on who funds the Center for Countering Digital Hate," *FOXBusiness*
July 20, 2021.

### *COMMUNITY EFFECTS OF BANNING & CENSORING*

### 215.

Prior to 2017, Defendant Twitter's blue check-mark verification was a way for users to ensure that they were communicating with the correct account – not a different account that was a clone, parody or scam. [178]

### 216.

Defendant Twitter changed its blue check-mark verification process in 2017 from a public verification process to a system that operates at Twitter's discretion. [179]

### 217.

Twitter has been accused of withholding verification from public figure journalists whose accounts it knows to be genuine such as Project Veritas reporter James O'Keefe. [180]

### 218.

Twitter's "sensitive media" warning hides content from anyone not logged in to their Twitter account and from some users who are logged in. [181]

---

[178] Harper, Cindy. "Epic Games CEO Tim Sweeney criticizes Twitter's practice of revoking verification badges as punishment," Reclaim *The Net*. February 22, 2020.
[179] Harper, Cindy. "Epic Games CEO Tim Sweeney criticizes Twitter's practice of revoking verification badges as punishment," Reclaim *The Net*. February 22, 2020.
[180] Harper, Cindy. "Epic Games CEO Tim Sweeney criticizes Twitter's practice of revoking verification badges as punishment," Reclaim *The Net*. February 22, 2020.
[181] Parker, Tom. "Twitter hides James O'Keefe tweet about CNN investigative report behind "sensitive media" notice," *Reclaim The Net*. October 14, 2019.

219.

On October 20, 2019, Defendant Zuckerberg personally defended Defendant Meta's announced policy at Georgetown University in Washington, D.C., saying that he does not "think it's right for a private company to censor politicians or the news in a democracy … Political ads can be an important part of voice, especially for local candidates and up and coming challengers that the media might not otherwise cover, … Banning political ads favors incumbents and whoever the media chooses to cover."[182]

220.

On or about February 22, 2020, according to Twitter's rules, "Twitter reserves the right to remove verification at any time without notice – Reasons for removal may reflect behaviors on and off Twitter that include:

● Intentionally misleading people on Twitter by changing one's display name or bio.

● Promoting hate and/or violence against, or directly attacking or threatening other people on the basis of race, ethnicity, national origin, sexual orientation, gender, gender identity, religious affiliation, age, disability, or disease. Supporting organizations or individuals that promote the above." [183]

---

[182] Rodrigo, Chris Mills. "Zuckerberg launches public defense of Facebook as attacks mount," *The Hill*, October 20/2019.

[183] Harper, Cindy. "Epic Games CEO Tim Sweeney criticizes Twitter's practice of revoking verification badges as punishment," *Reclaim The Net*, February 22, 2020.

221.

During March 2020, Meta applied warning labels on about 40 million posts related to the pandemic, based on roughly 4,000 articles reviewed by its third-party fact checkers. When posts including those labels appeared on the news feed, users did not go on to view the original content in 95 percent of cases.[184]

222.

On or about April 16, 2020, Defendant Meta Vice President of Integrity, Guy Rosen, announced Meta sends users a message in their newsfeed notifying them they have seen a since-deleted post and connecting them to a list of COVID-19 myths that have been debunked by the World Health Organization (WHO) and other "authoritative sources."[185]

223.

On or about May 12, 2020, Defendant Twitter banned former NY-11 Republican Congressional primary candidate and celebrity podcaster Joe Saladino, aka Joey Salads, stopping his ability to reach voters and supporters and discouraging him from running for office again.[186]

---

[184] Rodrigo, Chris Mills. **"**Facebook to alert users exposed to coronavirus misinformation," *The Hill*, April 16, 2020; Dixit, Pranav. "If You Interacted With A Coronavirus Hoax on Facebook, You'll Soon Get An Alert," *BuzzFeed*, April 16, 2020.
[185] Rodrigo, Chris Mills**. "**Facebook to alert users exposed to coronavirus misinformation," *The Hill*, April 16, 2020; Dixit, Pranav. "If You Interacted With A Coronavirus Hoax on Facebook, You'll Soon Get An Alert," *BuzzFeed*, April 16, 2020.
[186] Bokhari, Allum. "GOP Politician and YouTube Star Joey Salads Banned by Twitter," *Breitbart*, May 13, 2020.

224.

On or about June 8, 2020, impressions and engagements for the Price of Reason's Twitter account dropped in growth by 94% and 93%, respectively, after being shadowbanned.[187]

## *RECENT REVELATIONS ABOUT FBI AGENTS AND WHITE HOUSE STAFF CONSPIRING WITH META AND TWITTER TO INTERFERE WITH ELECTIONS*

### *The Zuckerberg Joe Rogan Interview*

225.

On August 25, 2022, Mark Zuckerberg appeared on *The Joe Rogan Experience*, the largest podcast in the world, hosted by Joe Rogan. During the interview, he made the stunning admission that Facebook, at the request of the FBI, algorithmically suppressed stories about the Hunter Biden laptop scandal during the weeks leading up to the 2020 Presidential election.

226.

Zuckerberg stated "[t]he FBI basically came to us and spoke to some folks on our team and was like 'Hey, just so you know, you should be on high alert. We thought that there was a lot of Russian propaganda on the 2016 election. We have it on notice that basically there's about to be some kind of dump similar to that."

---

[187] Parker, Tom. "Twitter shadowbans viral tweets," *Reclaim The Net*, June 8, 2020.

227.

In October of 2020, *The New York Post* published content from the laptop revealing that Joe Biden was lying when he said never spoke about family business with his relatives. Emails on the hard drive also showed that that Biden stood to profit from his son's business dealings and close ties with the Chinese Communist Party.

228.

Within moments of the *Post* story being published, Facebook announced through a spokesperson (a former Democrat Party operative) that the social media giant would be "reducing its distribution on our platform" pending verification by third-party fact-checkers.

229.

This action was consistent with whistleblower reports from inside the FBI made to U.S. Senators Ron Johnson and Chuck Grassley that individuals within the FBI leadership were instructing agents to not investigate the contents of the Hunter Biden laptop. These whistleblowers also reported that the FBI did not even begin to examine the contents of the laptop until after the 2020 election, more than a year after they had received it. Admissions by FBI whistleblowers and Mark Zuckerberg indicate that these decisions and the direct coordination with Meta were carried out in an effort to influence the results of the 2020 election.

*The Berenson Settlement*

230.

On August 12, 2022, prominent writer and critic of the United States' response to the COVID-19 pandemic, Alex Berenson, revealed that he had been banned from Twitter at the urging of White House officials in the current Biden administration. This was revealed from internal Slack communications Berenson obtained during litigation against Twitter. In a rare move in litigations against social media giants, Twitter settled the lawsuit and allowed Berenson back on the platform.

231.

These admissions[188] are yet two more indications of a wide-ranging, illegal and fraudulent conspiracy among big-tech, other elements within corporate America and individuals within the Executive Branch of the United States government to silence dissenting and conservative voices, and thus interfere with the fair administration of American elections. This has led to a collapse of public confidence in these institutions, as demonstrated for example by recent polling showing a plurality of independent voters no longer trust the FBI and the DOJ. By any measure, this is an extremely troubling sign for the social and political cohesion of the American republic, as well as trust in the concept of free and fair elections in America.

---

[188] These acts by employees of United States agency employees to interfere in elections are in violation of 18 U.S.C. 595.

232.

Given the fact that the FBI has been exposed by Mark Zuckerberg in a personal admission of working with Meta to target individuals on a political basis, their de-platforming of Ms. Loomer on a personal level and on a political level in her capacity as a federal candidate for Congress takes on a whole new light with regard to how big-tech bans are now impacting Ms. Loomer's Second Amendment right. In 2019, Facebook designated Ms. Loomer as a "dangerous individual" with zero due process, for which they justified her bans. And in 2019, Ms. Loomer was illegally red-flagged by the FBI in its secretive NICS database. Ms. Loomer was never notified that she was federally prohibited and banned from being able to own or possess a firearm despite not having a criminal record and never being deemed mentally unfit by a judge. This prompted U.S. Congressman Paul Gosar (R-AZ) to write a letter of inquiry to FBI Director Christopher Wray and Attorney General Merrick Garland about the FBI's political targeting of Ms. Loomer and their secret NICS database, which they are using to strip American citizens of their Second Amendment rights.[189] Following the release of the Twitter Files and the February 8th House Oversight hearing, in which the coordination between social media companies and the FBI came into stark relief as set forth below, it now appears

---

[189] https://www.thegatewaypundit.com/2021/10/biden-gang-reportedly-running-two-secret-lists-used-prevent-conservatives-owning-guns-laura-loomer-speaks-injustice/

highly likely that the illegal and unconstitutional red flagging of Ms. Loomer was related to Ms. Loomer's de-platforming, and channels of communication between the FBI and the Big Tech social media companies that we now know existed in the form of both direct communications, but also on a private cloud server via JIRA, as was revealed in the February 2023 House Oversight Committee hearing.

*The Twitter Files*

233.

Beginning in December of 2022, Twitter's new owner and CEO, Elon Musk, selected certain journalists and authors to release internal Twitter documents, termed the "Twitter Files," in order to reform Twitter into a platform that promotes free speech.  Mr. Musk explained, "This is a battle for the future of civilization.  If free speech is lost even in America, tyranny is all that lies ahead."

234.

Twitter began as a place to give its users "the power to create and share ideas and information instantly, without barriers," but, "[b]y 2020, requests from connected actors to delete tweets were routine.  One executive would write to another: 'More to review from the Biden team.' The reply would come back: 'Handled.'" In this way, "[c]elebrities and unknowns alike could be removed or reviewed at the behest of a political party." Both parties could utilize this feature, but, "[b]ecause Twitter was and is overwhelmingly staffed by people of one political orientation, there were

more channels, more ways to complain, open to the left (well, Democrats) than the right."

235.

The Twitter Files demonstrated how censorship of the *New York Post*'s exposé of Hunter Biden's abandoned laptop interfered in the 2020 Presidential election, "revealed Twitter's deep entanglement with numerous federal government agencies and how those agencies used Twitter to censor speech that they themselves could not," and displayed "Twitter's internal conversations about censorship and complete disregard for free speech."

236.

The first installment of the Twitter Files revealed the extraordinary measures that Twitter implemented to suppress the Hunter Biden laptop scandal, including "removing links and posting warnings that it may be 'unsafe'" and "block[ing] its transmission via direct message, a tool hitherto reserved for extreme cases, e.g. child pornography." This extensive censorship interfered in the 2020 Presidential election, because, as a 2020 MRC poll found, "9.4 percent of Biden voters would have abandoned him [if they had been fully aware of the scandal], flipping all six of the swing states he won to former President Donald Trump, giving Trump a victorious 311 electoral votes." Americans were not fully aware of the scandal "precisely because the media and Big Tech whitewashed it."

237.

As revealed in the eleventh installment of the Twitter Files, this censorship of Hunter Biden's laptop "began in 2017 when the platform changed its content moderation policy to appease leftists hunting for alleged Russian propaganda." "Publicly, Twitter claimed it censored accounts at its 'sole discretion.'   But internally, employees were told to censor 'any user identified by the U.S. intelligence community as a state-sponsored entity conducting operations associated with U.S. or other elections.'" "Three years later, the FBI would benefit from that policy when it framed the *New York Post* Hunter Biden laptop story as a Russian election interference operation."

238.

"From 2018 to 2020 Twitter Trust and Safety chief Yoel Roth met **weekly** with the FBI, according to Roth's 2020 sworn declaration." (Emphasis added). While Roth "wasn't immediately comfortable removing the content" regarding the Hunter Biden laptop scandal from Twitter, "[a]t the consistent prompting of Twitter special counsel and former FBI agent James Baker, Roth ordered that the article be censored on the basis of 'consensus from experts . . . that this looks a lot like a hack-and-leak.'"

239.

Moreover, "[t]he Twitter Files also demonstrate how easily outside forces could manipulate Twitter to censor content on the platform." For instance, "[t]he more recent [Twitter] files have shown that the FBI was not only involved in censoring the Hunter Biden laptop story but the agency had a history of working with Twitter to censor users." The sixth installment of the Twitter Files shows that "the FBI had 'constant and pervasive' contact with Twitter 'as if it were a subsidiary.'" The FBI and Roth exchanged more than 150 emails from January 2020 until November 2022. Many of these emails were "requests by the FBI for Twitter to take action on election misinformation, even involving joke tweets from low-follower accounts." The ninth installment "highlighted that federal agencies 'overwhelmed Twitter with requests, sending lists of hundreds of problem accounts' and content identified as 'possible terms of service violation[s].' It soon became obvious to Twitter employees that the FBI was specifically looking for possible violations that Twitter could censor." "The FBI even reportedly paid Twitter $3,415,323 'for its staff time' used servicing the federal government."

240.

Furthermore, agents of the Department of Homeland Security, Department of Justice, FBI, Central Intelligence Agency, and the Office of the Director of National Intelligence met frequently with other executives at Twitter to discuss "election

threats." The eighth installment revealed that Twitter "allowed the Department of Defense's 'vast network of fake accounts & covert propaganda' and even 'assisted' in the Pentagon's '[c]overt [o]nline [p]syop [c]ampaign.'" In 2017, "a U.S. Central Command (CENTCOM) official 'sent Twitter a list of 52 Arab language accounts "we use to amplify certain messages." The official asked for priority service for six accounts, verification for one & "'whitelist' abilities for the others."

241.

The second installment revealed that, although "Twitter executives for years publicly claimed that Twitter did not shadowban user content, . . . the platform simply renamed shadowbanning 'visibility filtering' (VF)." Twitter "used VF to block searches of individual users; to limit the scope of a particular tweet's discoverability; to block select users' posts from ever appearing on the 'trending' page; and from inclusion in hashtag searches. . . . All without users' knowledge." Many of the decisions to filter visibility "were made manually by the platform's Strategic Response Team – Global Escalation Team, which, . . . handled as many as 200 'cases' daily." "The platform used these tools to blacklist prominent conservatives like radio host Dan Bongino, the popular account Libs of TikTok and Turning Point USA Founder Charlie Kirk . . . ." While Ms. Loomer was not specifically named in the Twitter Files as being one of these prominent conservatives who were blacklisted, it is extremely likely that her account was also blacklisted in

the same manner.   Even "former President Trump also experienced visibility filtering, or shadow banning, 'as late as a week before the election.'" When asked whether "any political candidates – either in the US or elsewhere – subject to shadow banning while they were running for office or seeking re-election?"   Mr. Musk simply responded: "Yes." However, Ms. Loomer appears to be the only candidate in the nation who was denied account access while campaigning in both 2020 and 2022, making Twitter's political censorship of Ms. Loomer and Twitter's illegal election interference of her campaign deliberate and targeted.

*The February 8, 2023 Twitter House Oversight Hearing*

242.

In a February 8, 2023, hearing before the House Oversight and Accountability Committee, Congresswoman Anna Paulina Luna (R-FL) revealed she had evidence of federal agents, social media companies, and other entities utilizing the Atlassian software platform JIRA to coordinate their activities with respect to censorship and election interference.

243.

Luna had the following exchange with Yoel Roth, former Twitter Global Head of Trust and Safety, and Vijaya Gadde, former Twitter Chief Legal Counsel:

**Rep. Anna Luna (R-FL):**

Thank you chair. This flow chart shows the following Federal agency's social media companies, Twitter, leftist, nonprofits, and organizations communicating regarding their version of misinformation using JIRA, a private cloud server. On this chart, I wanna annotate that the Department of Homeland Security, which has a following branches, cybersecurity and infrastructure security agency, also known as CISA Countering Foreign Intelligence Task Force, now known as the Misinfo, Disinfo and Mal-information, MDM, this was again, used against the American people. The Election Partnership Institute or Election Integrity Partnership, EIP, which includes the following, Stanford Internet Observatory, University of Washington Center for Informed Public, Graphika and Atlantic Council's Digital Forensic Research Lab. And potentially according to what we found on the final report by EIP, the DNC, the Center for Internet Security, CISA- a nonprofit funded by DHS, the National Association of Secretaries of State, also known as NASS and the National Association of State Election Directors, NASED.

And in this case, because there are other social media companies involved, Twitter, what do all of these groups though, have in common? And I'm going to refresh your memory. They were all communicating on a private cloud server known as JIRA. Now, the screenshot behind me, which is an example of one of thousands shows on November 3rd, 2020, that you, Mr. Roth, a Twitter employee, were exchanging communications on JIRA, a private cloud server with CISA, NASS, NASED, and Alex Stamos, who now works at Stanford and is a former security officer at Facebook to remove a posting. Do you now remember communicating on a private cloud server to remove a posting? Yes or no?

**Yoel Roth:**

I wouldn't agree with the characteristics.

**Rep. Anna Luna (R-FL):**

I don't care if you agree. Do you, this is, this is your stuff, yes or no? Did you communicate with a private entity, the government agency on a private cloud server? Yes or no?

**Yoel Roth:**

The question was, if I…

**Rep. Anna Luna (R-FL):**

Yes or no? Yeah, I'm on time. Yes or no?

**Yoel Roth:**

Ma'am, I don't believe I can give you a yes or no.

**Rep. Anna Luna (R-FL):**

Well, I'm gonna tell you right now that you did and we have proof of it. This ladies and gentlemen, is joint action between the federal government and a private company to censor and violate the First Amendment. This is also known, and I'm so glad that there's many attorneys on this panel, joint state actors, it's highly illegal. You are all engaged in this action, and I want you to know that you will be all held accountable. Ms. Gadde, are you still on CISA's Cybersecurity Advisory Council? Yes or no?

**Vijaya Gadde:**

Yes, I am.

**Rep. Anna Luna (R-FL):**

Okay. For those who have said that this is a pointless hearing, and I just wanna let you guys all know, we found that Twitter was indeed communicating with the federal government to censor Americans. I'd

like to remind you that this was all in place before January 6th. So, to say that these mechanisms weren't in place, and to make it about January 6th, I wanna let you know that you guys were actually in control of all of the content and clearly have proof of that. Now, if you don't think that this is important to your constituents and the American people from those saying that this was a pointless hearing, I suggest you find other jobs. Chairman, I yield my time.

244.

Prior to Congresswoman Luna's revelations, Congressman Clay Higgins pinpointed the criminal nature of the conspiracy:

**Rep. Clay Higgins (R-LA):**

Thank you, Mr. Chairman. I'm gonna be yielding some time to my colleague, Mr. Jordan, here momentarily. But for the record, Mr. Baker, Ms. Gadde, Mr. Roth. Mr. Navaroli, are you here under the advice of counsel? And do you have counsel present?

**James Baker:**

Yes, sir.

**Rep. Clay Higgins (R-LA):**

That was a yes.

**Vijaya Gadde:**

Yes, sir.

**Yoel Roth:**

Yes, sir.

**Anika Collier Navaroli:**

Yes, I do. Yes, I was subpoenaed.

**Rep. Clay Higgins (R-LA):**

Good, good. No, I'm glad y'all have counsel present, Mr. Chairman, for the submission. For the record, I'd like consent to submit the Twitter files dated December the eighth posts about a New York Post regarding this suppression of conservative commentators like that submitted.

**Rep. James Comer (R-KY):**

Without objection so ordered.

**Rep. Clay Higgins (R-LA):**

Mr. Chairman. Thank you. I'd like to also submit for the record a timeline of events with cited sources outline in strong evidence of the Biden family. Organized criminal actions would certainly indicate that we've crossed the threshold of reasonable suspicion. I'd like this timeline submitted for the record.

**Rep. Jamie Raskin (D-MD):**

Excuse, Mr. Truman. just, where is that from? That timeline?

**Rep. Clay Higgins (R-LA):**

Timeline in my hand, boss? I'll get it to you shortly. Bottom line is that the FBI had the Biden crime family laptop for a year. They knew it was leaking. They knew it would hurt the Biden campaign. So the FBI used its relationship with Twitter to suppress criminal evidence being revealed about Joe Biden. One month before the 2020 elections, you ladies and gentlemen, interfered with the United States of America 2020 presidential election, knowingly and willingly. That's the bad news. *It's gonna get worse because this is the investigation part. Later comes the arrest part. Your attorneys are familiar with that, Mr.*

*Chairman, I'd like to spend five hours with these ladies and gentlemen during depositions, surely yet to come.* But for right now, I'll yield the balance of my time to my colleague, Mr. Jordan.

(Emphasis added).

245.

In addition, upon questioning of Roth by Committee Chairman, Congressman Jim Jordan, it came out that Twitter was algorithmically censoring speech by elected officials, and that Twitter's practice was *not* to notify users when this occurred:

**Rep. Jim Jordan (R-OH):**

Thank gentlemen for yielding. I think he made the right point. And I would just respond to my colleague from New York. You know, who knew the laptop was real, was the FBI they had it for, or, or maybe they had it for a year and just said, you know, what we're gonna put on the shelf. We're not gonna look at it. But if anyone knew it was real, it's them. That's why I asked the question. Again, back to my colleague from New York when he was talking about, that's why I asked the question earlier. I said, did anyone at the FBI, Mr. Baker know, did Mr. Baker talk to any of those 51 former Intel officials who sent the letter saying, this has all the classic earmarks of a Russian misinformation operation. Maybe they could have checked with the FBI because the FBI had the actual laptop in their possession.

So I appreciate the gentleman from Louisiana. I think it's a great point that he made. Mr. Roth, I'm gonna come back to you in something we were at a few hours ago, and we're talking about this visibility filtering, which in my mind I understand to be something short of, of suspending and blocking the account, which the user then knows has happened because there's a notification in a public way like you did to Ms. Green when you suspended her account. But there's other things, this search blacklist, this do not amplify that are some kind of filtering that account that the user doesn't know about. And I asked the question earlier, was there any bit of this visibility filtering that was hard coded by Twitter

85

employees into the account of, of specific users? And you said you hesitated for a while and you said, well, you wouldn't use the term hardcoded, but it seemed to me like something like that went on. Can you elaborate?

**Yoel Roth:**

Thank you for the question. Twitter's visibility filtering system, as has been reported in the Twitter Files, is based on applying labels to user accounts. And so in that sense, if the application of a label is what you meant by coded, yes, Twitter systems did apply those designations to those accounts, but it was seldom the case that Twitter staff would manually, individually go in and apply those labels

**Rep. Jim Jordan (R-OH):**

Directly. Were any government officials were those labels and therefore that filtering done to any government officials, any elected officials that where the user wouldn't know about?

**Yoel Roth:**

I don't know, sir. I didn't have access to my Twitter computer, to any Twitter systems to prepare me to answer that question.

**Rep. Jim Jordan (R-OH):**

So I'm just talking about your time there. In your, your experience there. Do you know if that happened?

**Yoel Roth:**

It would not surprise me to know that visibility filtering labels had been applied to the accounts of elected officials.

**Rep. Jim Jordan (R-OH):**

So visibility filtered labels applied to the accounts, but the user doesn't know.

**Yoel Roth:**

Yes, it was not Twitter's practice to notify users' accounts.

246.

Also during the questioning, Congressman Gary Palmer highlighted the fact that Twitter had long allowed terrorist organizations, such as the Taliban, to have Twitter accounts while banning conservative voices in America and profiting off of the practice. This included during timeframe of the United States' catastrophic military withdrawal from Afghanistan:

**Rep. Gary Palmer (R-AL):**

Thank you, Mr. Chairman. I'd like to submit a June 22 study conducted by Princeton University called, powered by Twitter, the Taliban's takeover of Afghanistan.

**Rep. James Comer (R-KY):**

Without objections ordered.

**Rep. Gary Palmer (R-AL):**

This study covers the timeframe of April to September of 2021, which is a four to five month period between President Biden's official announcement of America's intentions to withdraw in the chaotic end of the American Troop presence in Afghanistan. The study found that the Taliban weaponized Twitter and that Twitter's moderation policies failed. There were more than 126,000 accounts in the Taliban support

network, and 83% of these Taliban associated accounts were created before 2021. Well before Twitter could claim that these accounts represented a government, these accounts shared graphic images and videos depicting dead and decomposing bodies in rampantly spread disinformation about the facts on the ground in direct violation of Twitter's public policies. Taliban tweets were shared millions of times in the summer of 2020. The study also found that three quarters of Taliban content was produced by only 20 accounts, which suggestively straightforward. By the way, the US government classifies the Taliban as an insurgent group in case some of my colleagues don't understand what real insurgencies are. Mr. Roth, why wasn't Twitter more effective at curtailing the clearcut content violations by Taliban Twitter accounts?

**Yoel Roth:**

Thank you for the question, sir. At the time that you referenced, I wasn't responsible for Twitter's work on counterterrorism,

**Rep. Gary Palmer (R-AL):**

Do you have any idea why Twitter would allow clear cut violations by an insurgent group? And by the way, they carried out multiple suicide attacks during the timeframe they were sending out these tweets, killing dozens and, and injuring hundreds. Imagine that.

**Yoel Roth:**

It's my understanding that Twitter's policies at the time distinguished between some of the more violent portions of the Taliban and some of the more political portions of it.

**Rep. Gary Palmer (R-AL):**

I'm not rendering judgment on that. Stuff's still up on Twitter, and I just wonder how many content moderators were assigned, if any, to check on these accounts. Additionally, it appears that Twitter was profiting from Taliban's presence on the platform in the lead up to the overthrow of the Afghan government. Twitter placed ads from US

companies, including Amazon, Disney, McDonald's, and on the Twitter accounts of the Taliban News organization. And their spokespersons and their senior leaders, Ms. Gadde, did Twitter make money off placed ads on Taliban Twitter accounts on August 26th, 2021 when 13 US men and women died in a suicide bombing?

**Vijaya Gadde:**

I have no knowledge of this matter.

*Elon Musk's Admissions*

247.

On October 27, 2022, Elon Musk became the CEO and owner of Twitter after purchasing the social media giant for forty-four billion dollars.

248.

Consistent with the allegations of this Second Amended Complaint, on December 10, 2022, in the midst of the analyses of the Twitter Files being publicly released, Musk tweeted he had purchased "both a social media company *and a crime scene*." (Emphasis added).

249.

The day before, on December 9, 2022, Musk admitted in a responsive tweet that Twitter had interfered in the 2020 election and that the evidence was overwhelming. Tom Fitton of Judicial Watch had tweeted: "Breaking: @ElonMusk @Twitter Files show Twitter activist employees, without basis, suppressed and censored the President of the United States, @realDonaldTrump in the days before the 2020

election. This is damning evidence of election interference." Musk replied: "Unequivocally true. The evidence is clear and voluminous."

250.

The same day, Musk acknowledged the obvious when he tweeted that "election interference by social media companies obviously undermines the public's faith in democracy and is wrong."

251.

Also on December 9, 2022, Musk admitted in a responsive tweet that Twitter had shadowbanned political candidates. Journalist Ian Miles Cheong had tweeted "[s]o here's a question for @elonmusk and @bariweiss: were any political candidates – either in the US or elsewhere – subject to shadowbanning while they were running for office or seeking re-election?" Musk replied simply "Yes."

**_LOOMER BACKGROUND & INJURY_**

252.

On or about August 12, 2018, Defendant Facebook temporarily banned Ms. Loomer for 30 days.

90

253.

On November 21, 2018, Defendant Twitter permanently banned Ms. Loomer for "hateful" conduct after she tweeted that Congresswoman Ilhan Omar was "anti-Jewish."[190]

254.

On May 2, 2019, Ms. Loomer was permanently banned from Defendant Facebook's platform for appearing with Gavin McInnes in public and praising Faith Goldy, a Canadian mayoral candidate, both of whom are also conservative commentators who were previously and frivolously designated as "hate figures" by Defendant Facebook.[191]

255.

On August 2, 2019, Ms. Loomer announced her political candidacy for the Republican nomination for the 21st Congressional District of Florida.

---

[190] Harper, Cindy, "Facebook's refusal to run ads for candidate Laura Loomer hints at the need for a modern-day equal-time rule," *Reclaim the Net*, July 4, 2020.
[191] Ortutay, Barbara. "Facebook bans 'dangerous individuals' cited for hate speech," *Associated Press.* May 3, 2019; Lee, Dave. "Facebook bans 'dangerous individuals'," *BBC News,* May 3, 2019.

256.

On or about September 16, 2019, Defendant Meta told the U.S. District Court for the Southern District of Florida that it labeled Ms. Loomer as a "dangerous" person who promotes hate.[192]

257.

On or about September 16, 2019, Defendant Meta admitted to the U.S. District Court for the Southern District of Florida that its labeling of Ms. Loomer as a Dangerous Individual is an opinion that is not capable of being proven true or false.[193]

258.

On or about September 16, 2019, Defendant Meta told the U.S. District Court for the Southern District of Florida that as a *publisher* it has an absolute protection under the First Amendment from liability for failing to publish Ms. Loomer's messages.[194]

259.

In October 2019, Defendant Zuckerberg said, "We think people should be able to hear what politicians have to say. I don't think it's right for tech companies to censor politicians in a democracy."[195]

---

[192] Case 9:19-cv-80893-RS Document 25 Entered on FLSD Docket 09/16/2019
[193] Rankovic, Didi. "Facebook says it's a publisher, invokes First Amendment rights to call Laura Loomer a 'dangerous individual'," *Reclaim the Net*, September 17, 2019.
[194] Smith, Jennifer. "Facebook refers to itself as a publisher and says it can censor ANYONE it wants because it's an 'editorial decision' in new court filing a year after Mark Zuckerberg insisted to congress it was a tech company," *Dailymail.com,* September 20, 2019.
[195] Randkovic, Didi. "Facebook refuses Laura Loomer, weeks after Zuckerberg said they won't censor politicians," *Reclaim the Net*, November 15, 2019; Bokhari, Allum. "Politician's Won't Be Allowed On Facebook If They've Previously Been Banned," *Breitbart*, November 14, 2019.

260.

In reliance upon Defendant Meta's promised access to its networks, Plaintiffs Candidate Loomer and Loomer Campaign raised money and committed significant time and effort in preparation for acting on Defendant Meta's fraudulent representation of such promised access to its network.

261.

On or about November 11, 2019, Loomer Campaign attempted to set up its official campaign page for Candidate Loomer as a candidate for federal office, rather than as a private citizen.[196]

262.

On November 12, 2019, Defendant Meta banned the "Laura Loomer for Congress" page, the official campaign page for Candidate Loomer, from its platform, and subsequently deleted all messages and correspondence with the campaign.

263.

Defendant Meta denied Candidate Loomer and Loomer Campaign access to its networking site under the pretext of violations of its "hate speech policy."

---

[196] Harper, Cindy, "Facebook's refusal to run ads for candidate Laura Loomer hints at the need for a modern-day equal-time rule," *Reclaim the Net*, July 4, 2020.

264.

Candidate Loomer and Loomer Campaign did not exist at the time of any alleged violations of Defendant Meta's "hate speech policy" by Ms. Loomer, and therefore could not be in violation of said policy.

265.

Candidate Loomer and Loomer Campaign did not violate any other known policies of Defendant Facebook, including Coordinated Inauthentic Behavior (CIB) or policies against promoting and glorifying violence.

266.

On November 14, 2019, in response to inquiries regarding Plaintiffs' banning, Defendant Meta changed its publicly stated policy on political candidates to now exclude any candidates who had been banned from its services before running for office, as a way to reconcile Zuckerberg's previous conflicting statement that he would not censor political candidates and politicians.[197]

267.

Political campaigns for national office in 2020 faced unique circumstances due to lockdowns and other restrictions put into effect as a result of the COVID-19 pandemic, which made traditional means of campaigning, such as door knocking,

---

[197] Bokhari, Allum. "Politician's Won't Be Allowed On Facebook If They've Previously Been Banned," *Breitbart*, November 14, 2019.

public events, etc., impossible, thereby mandating reliance on digital and social media to reach and interact with prospective voters.

268.

Meta refused to allow Plaintiff Candidate Loomer to conduct her campaign on its site  even after Plaintiff was formally declared as a Republican candidate for the 2020 general election  with the Federal Elections Commission (FEC) after winning the Republican nomination.[198]

269.

On April 11, 2019, at the annual meeting in Orlando, Florida of the Association of National Advertisers (ANA), P&G's Chief Brand Officer and Chairman of the ANA Board of Directors, Marc Pritchard, announced the creation of a "New Media Supply Chain" wherein P&G would require advertising platforms to "prove" that their content was "under their complete control."[199]

270.

On or about May 2019, an individual named Josh Althouse, who works as a Public Policy Manager for Meta  contacted Ms. Loomer and one of her associates via phone and confirmed that P&G, consistent with and in follow up to the April 11, 2019 public remarks, provided a list of persons who were to be banned from Meta unless

---

[198] Harper, Cindy, "Facebook's refusal to run ads for candidate Laura Loomer hints at the need for a modern-day equal-time rule," *Reclaim the Net*, July 4, 2020.
[199] Keynote address April 11, 2019, at the ANA Media Conference in Orlando, FL.

those persons disavowed the Proud Boys. Althouse told Loomer and her associate that he didn't want to put this in writing because he wasn't supposed to be relaying this information to us, but he encouraged me and my associate to draft a statement disavowing the Proud Boys as a way to placate P&G, who he said was at the time Meta's largest advertiser. Althouse conveyed to Loomer and her associate that P&G was pressuring Meta to ban Loomer and a list of other high profile conservatives if Meta wished to maintain its advertising revenue agreement with P&G.

271.

On or about May 2019, Josh Althouse, an employee of Meta, stated to Loomer and her associate that P&G demanded Meta label Plaintiff Ms. Loomer a "Dangerous Individual" and ban her from using Meta's platform.

272.

On or about June 24, 2020, Defendant Meta said, "It's normal for us to have conversations with advertisers and discuss issues, including policy matters. This is something we do routinely and will keep doing."[200]

---

[200] Rodrigo, Chris Mills. "Facebook executive acknowledges 'trust deficit' to advertisers," *The Hill*, June 24, 2020; Fung, Brian. "Facebook executive acknowledges 'trust deficit' to advertisers Facebook exec admits there is a 'trust deficit' as advertiser boycott accelerates," *CNN Business.* June 24, 2020.

273.

On or about June 24, 2020, Marc Pritchard, vowed that P&G would not advertise "on or near content that we determine is hateful, denigrating or discriminatory."[201]

274.

On or about June 24, 2020, Proctor & Gamble ("P&G") met with civil-rights group Color of Change to discuss Meta's track record of removing content that violates their standards, according to people familiar with the matter.[202]

275.

On or about June 24, 2020, Marc Pritchard, P&G's chief brand officer, said, "Where we determine our standards are not met, we will take action, up to and including stopping spending, just like we've done before."[203]

276.

Plaintiff Candidate Loomer's campaign was run as a separate entity from Loomer as an individual, and Meta's decision to directly prevent Plaintiff Candidate Loomer's campaign from advertising raises questions about election fairness.[204]

---

[201] Rodrigo, Chris Mills. "Facebook executive acknowledges 'trust deficit' to advertisers," *The Hill*, June 24, 2020; Fung, Brian. "Facebook executive acknowledges 'trust deficit' to advertisers Facebook exec admits there is a 'trust deficit' as advertiser boycott accelerates," *CNN Business.* June 24, 2020.

[202] Vranica, Suzanne. "Facebook Tries to Contain Damage as Verizon Joins Ad Boycott," *The Wall Street Journal*, June 26, 2020.

[203] Coleman, Justine. "Most of Facebook's top 100 advertisers have not joined the boycott: analysis," *The Hill*, July 1, 2020; Fung Brian, and Yurieff, Kaya. "Hundreds of brands are pulling ads from Facebook.  Its largest advertisers aren't among them," *CNN Philippines*, July 2, 2020.

[204] Harper, Cindy, "Facebook's refusal to run ads for candidate Laura Loomer hints at the need for a modern-day equal-time rule," *Reclaim the Net*, July 4, 2020.

277.

On or about July 3, 2020, Plaintiff Candidate Loomer was informed that if a Political Action Committee (PAC) attempted to advertise to promote her campaign on Meta, its ads would be taken down.[205]

278.

On or about July 4, 2020, Plaintiff Candidate Laura Loomer's election campaign ads on Meta were prevented, thereby providing her Democrat opponent an unfair advantage during the general election.[206]

279.

On or about July 4, 2020, and thereafter Plaintiff Candidate Loomer's Democrat opponent, Lois Frankel, was running ads on Meta to reach voters and raise money.[207]

280.

On or about July 4, 2020, Defendant Meta said its new policy is that nothing about Laura Loomer is permitted on Meta, and that for the duration of the election cycle the Loomer campaign will not have access to run any of its own ads.[208]

---

[205] Harper, Cindy, "Facebook's refusal to run ads for candidate Laura Loomer hints at the need for a modern-day equal-time rule," *Reclaim the Net*, July 4, 2020.

[206] Harper, Cindy, "Facebook's refusal to run ads for candidate Laura Loomer hints at the need for a modern-day equal-time rule," *Reclaim the Net*, July 4, 2020.

[207] Harper, Cindy. "Facebook's refusal to run ads for candidate Laura Loomer hints at the need for a modern-day equal-time rule," *Reclaim the Net*, July 4, 2020

[208] Harper, Cindy. "Facebook's refusal to run ads for candidate Laura Loomer hints at the need for a modern-day equal-time rule," *Reclaim the Net*, July 4, 2020

281.

On or about, and after July 4, 2020, Plaintiff Candidate Loomer was the only federal candidate in the nation banned from advertising on Meta.[209]

282.

On August 18, 2020, Plaintiff Candidate Loomer won the Republican primary for U.S. House Florida District 21.

283.

On August 19, 2020, Defendant Twitter announced that Plaintiffs would still not be allowed to use Twitter despite winning the Republican primary election.[210]

284.

On November 3, 2020, the general election for U.S. House Florida District 21 was called for Plaintiff Candidate Loomer's Democrat opponent, Lois Frankel.

285.

On February 24, 2021, Plaintiff Candidate Loomer filed and announced her 2022 congressional campaign for Florida's 21st District,[211] telling supporters that she would be switching Congressional districts amid the redistricting of Florida's districts. On September 1, 2021, Loomer filed paperwork with the FEC and switched

---

[209] Harper, Cindy. "Facebook's refusal to run ads for candidate Laura Loomer hints at the need for a modern-day equal-time rule," *Reclaim the Net*, July 4, 2020

[210] Bokhari, Allum. "Twitter Refuses to Reinstate Laura Loomer's Account After Primary Win," *Breitbart*. August 20, 2020.

[211] Manjarres, Javier. "Laura Loomer Announces 2022 Congressional Run," *The Floridian*, February 24, 2021; As a result of state redistricting, Plaintiff Loomer is now running for Florida's 11th District.

her Congressional district to Florida's 11th district to unseat incumbent Republican Congressman Daniel Webster.

286.

For every single fundraising quarter of her candidacy, Loomer proved herself to be the most viable candidate in the race and significantly out-fundraised 40-year incumbent Daniel Webster every single fundraising quarter on the campaign trail.

287.

On August 23, 2022 the Republican primary election for U.S. House Florida District 11 was called for Plaintiff Candidate Loomer's primary opponent and incumbent, Daniel Webster by only 5,210 votes. Loomer refused to concede and, after a legal challenge was denied, is continuing to investigate and challenge the results of the election amidst admissions of misconduct from within multiple Supervisors of Elections offices within her district. Loomer's campaign was also the only de-platformed campaign in the nation denied access to create a Twitter, Meta and Instagram accounts for herself and her campaign. Daniel Webster had the smallest margin for any incumbent who ran for re-election in the State of Florida. With such a small margin between Loomer and Webster, Loomer's blacklisting and bans from social media as a federal candidate cannot be underestimated in the purported results of the election.

288.

Plaintiff Ms. Loomer has suffered significant and continuing damages from Defendant Meta's  violations of Sections 1951, 1952, 1343, 2339, and 2385 of Title 18 of the United States Code, in the form of reputational damage, lost employment opportunities due to employers' fear of being similarly banned for mere association per Defendants' policies, and lost future profits.

289.

Plaintiffs Candidate Loomer and Loomer Campaign have suffered significant and continuing damages from Defendant Facebook's violations of Sections 1951, 1952, 1343, 2339, and 2385 of Title 18 of the United States Code, in the form of reputational damage, deprivation of equal access to voters and campaign donations, and the loss of votes in a federal election.

290.

Ms. Loomer has expended over one million dollars ($1,000,000.00) in legal fees in her endeavors to hold Twitter and other Big Tech corporations responsible for their censorship, collusion with terrorist organizations, and coordination with government agents to illegally influence elections. These efforts have been entirely unrewarded because, until Mr. Musk became owner and CEO of Twitter, Twitter secretly engaged in the above conspiracy outlined in this RICO claim while publicly denying the accusations.

291.

After Twitter banned Ms. Loomer, smear campaigns began spreading falsehoods about Ms. Loomer, including accusations that she is a white supremacist, anti-Muslim, and a Conspiracy theorist.  The defamation has become so ridiculous that Ms. Loomer has even been called a Nazi, even though she is Jewish. These falsehoods rapidly spread among news and media outlets.  There were claims made that Ms. Loomer was "known for spreading hoaxes and feeding false conspiracy theories" and that "[s]he consistently misidentifies suspects during breaking news situations and, during the midterm elections, spread hoaxes about voter fraud."

292.

After Ms. Loomer won the Republican primary in Florida's 21st District in 2020, "Twitter Global Partnership Solutions lead Lara Cohen re-tweeted a post calling Laura Loomer and fellow GOP Congressional nominee Marjorie Taylor Greene of Georgia 'bigots' and 'extremists' while simultaneously defending Democrat presidential nominee Joe Biden for associating with anti-Semitic leftist organizer Linda Sarsour."   Articles reporting on Ms. Loomer's victory referred to Twitter's decision not to allow her campaign to have an account because of Ms. Loomer's use of "hate speech," and the articles referred to Ms. Loomer with phrases such as "proud Islamophobe," "bigot," and "white supremacist."  Headlines touted that "[a] self-

described 'proud Islamophobe' banned from social media just won a GOP nomination."  These articles further caused Florida voters to view Ms. Loomer in a negative light and caused voters to question her credibility as a candidate due to the negative connotation associated with being banned on social media for "hate speech."

293.

Furthermore, despite the evidence collected and reported on by *The Wall Street Journal* showing that CAIR had lobbied Twitter to ban Ms. Loomer, vicious rumors began spreading among media outlets that *The Wall Street Journal* and Ms. Loomer were pranked into believing that Twitter was colluding with CAIR.  These media outlets claimed that Nathan Bernard and Chris Gillen "claimed to be Twitter employees and got in touch with Loomer to '[offer] deadpan confirmations of all conspiracy theories Loomer suggested to them about Muslim groups' responsibility for her suspension.'"  One article claims that "Loomer then apparently took that claim to *The Wall Street Journal*, which by conflating Twitter's normal complaint mechanisms with the advisory capacity enjoyed by some advocacy groups with social media platforms, helped to advance the false narrative that CAIR was the power behind Loomer's ouster from the Twittersphere – despite denials by both CAIR and Twitter that any meetings or lobbying for Loomer's suspension had taken place between the two entities."

103

294.

These claims, which were spouted and repeated by multiple media outlets, are entirely false.  Ms. Loomer had requested anyone with information about her ban send the information to her "tip line" with information.  Nathan Bernard and Chris Gillen did contact the tip line and attempted to trick Ms. Loomer.  However, Ms. Loomer did not rely on this information and did not "[take] the claim to *The Wall Street Journal*."  Rather, Ms. Loomer first found out that CAIR lobbied Twitter to ban her and had definitive proof of CAIR's involvement in Twitter's banning her when *The Wall Street Journal* published its article quoting CAIR's Executive Director, admitting in her own words that CAIR stepped in to lobby Twitter to ban Ms. Loomer's account.  Furthermore, "Oliver Darcy [a CNN employee] double-checked with the *WSJ*, and they stand by their reporting in light of [Jared Holt of Right Wing Watch]'s story.  Twitter's denial to Oliver Darcy is very specific, stating *senior* Twitter staff never met with CAIR, as implied by Bernard's hoax.  Moreover, Zahra Billoo never denied giving that quote to *The Wall Street Journal* for their article."  Nonetheless, Nathan Bernard swore in an affidavit that "[he] and Chris Gillen pulled a prank on Laura Loomer to convince her that her banning was caused by media and advocacy organizations, including CAIR Foundation."

295.

Because of these lies about Ms. Loomer being pranked, Ms. Loomer's extensive experience as an investigative journalist was discredited, even though CAIR's San Francisco Executive Director gave a direct quote to *The Wall Street Journal* admitting that CAIR lobbied Twitter to ban Ms. Loomer.

296.

Even after Ms. Loomer was banned from Twitter, and her campaign was denied access to campaign social media accounts, numerous fake imposter Laura Loomer accounts remained on social media, which caused her reputation to be further tarnished.  Her account had already been stripped of verification, so it was nearly impossible (if not totally impossible) for other Twitter users to tell the difference between Ms. Loomer's account before it was banned and the many fake accounts that used slurs while falsely claiming to be Ms. Loomer in an effort to make her look bad.

297.

At the time that Ms. Loomer's Twitter account was banned, she had roughly 265,000 followers on the platform.

298.

After Twitter banned Ms. Loomer's account, Ms. Loomer attempted to mitigate the damage that Twitter caused by creating an account on "free speech social media platform Parler" on December 10, 2018.  By August 19, 2020, Ms. Loomer had 630,000 followers on Parler, greatly exceeding the number of followers she had on Twitter when she was banned.  By January 6, 2021, Ms. Loomer had 1.6 million followers on Parler, before Parler was deplatformed by the Apple and Google app stores, as well as by Amazon Web Services (AWS) in a conspiracy with the agents of the FBI and other Big Tech Platforms that worked to destroy Parler, which was once a viable competitor to Twitter.  Ms. Loomer's tenacity and ability to use Parler to reach her followers aided her in winning the 2020 Republican primary nomination by double digits.

299.

Ms. Loomer's determination and fight for free speech after she won her primary election in 2020 was praised by conservatives and liberals, including by self-proclaimed left-leaning political commentator Tim Pool.  As mentioned above, she was also congratulated by President Donald Trump on Twitter the night of her primary election, and she was endorsed by Matt Gaetz and Roger Stone.  However, despite being congratulated by President Trump on Twitter, Ms. Loomer was unable

to interact with President Trump or even reply to his congratulatory tweet, which effectively prevented Ms. Loomer from being able to communicate with the leader of the Republican Party, the President of the United States, and one of her constituents, who happened to vote for her.  President Donald Trump voted for Ms. Loomer in both the 2020 primary and general elections, yet she was never able to directly communicate with him on Twitter in the way that many other Republican candidates on Twitter were able to do via their official campaign and personal Twitter accounts.

300.

Unfortunately, Ms. Loomer's ability to mitigate her damages from Twitter's ban came to an end when Amazon stopped providing services to Parler in January of 2021, causing Parler to go offline for one month.  Even after Parler went back online, the vast majority of its previous active users did not return, and Ms. Loomer did not have the ability to reach anywhere near as great an audience as she previously had prior to Parler being effectively destroyed.

301.

If Ms. Loomer had equal access to Twitter for her campaign, she would have won the Republican nomination in Florida's 11th District, and she would currently be in Congress since Florida's 11th District has been classified as a "safe red Republican

seat."  Because she has been denied this opportunity, she has been stripped of the ability to act as a United States Representative for Florida.

## *PREDICATE ACT – 18 U.S.C. §1951*

*Interference with commerce by threats or violence*

### 302.

Whoever in any way attempts to affect any commodity in commerce by extortion, meaning the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, fear, or under color of official right, violates 18 U.S.C. §1951.

### 303.

Under its terms of service, Twitter can remove any person from the platform – including the President of the United States – "at any time for any or no reason."[212]

### 304.

"As Twitter made clear, the right to cut off speech lies most powerfully in the hands of private digital platforms."[213]

---

[212] Twitter Inc., User Agreement (effective June 18, 2020).
[213] *Biden v. Knight First Amendment Institute at Columbia Univ.,* 593 U.S. _____ (2021) (Thomas, J. concurring)

305.

"Any control Mr. Trump exercised over the account greatly paled in comparison to Twitter's authority, dictated in its terms of service, to remove the account at any time for any or no reason."[214]

306.

Twitter verification is recognized as increasing a candidate's visibility and allows a candidate to reach supporters and donors from its over 125 million daily users.[215]

307.

Twitter verification consists of receiving a blue checkmark on a user's profile and thereby obtaining better visibility to its 330 million users.[216]

308.

Twitter verification is widely recognized as a vital asset to political candidates, especially those challenging incumbent politicians.[217]

309.

Google maintains a monopoly over the website advertising market. [218]

---

[214] _Biden v. Knight First Amendment Institute at Columbia Univ._, 593 U.S. _____ (2021) (Thomas, J. concurring)
[215] Birnbaum, Emily.  "Twitter to start verifying candidates when they qualify for primary election," _The Hill_, December 12, 2019.
[216] Scola, Nancy. "Twitter to verify all congressional and gubernatorial primary hopefuls," _Politico_. December 12, 2019.
[217] Birnbaum, Emily and Rodrigo, Chris Mills. "Twitter falling short on pledge to verify primary candidates," _The Hill_, February 25, 2020.
[218] "As of October 2020, Google was responsible for almost 90 percent of global desktop search traffic. The company holds a market share of around 90 percent in a wide range of digital markets, having little to no domestic competition in many of them. China, Russia, and to a certain extent, Japan, are some of the few notable exceptions, where local products are more preferred." https://www.statista.com/statistics/266249/advertising-revenue-of-google/

310.

"Google search – at 90% of the market share – is valuable relative to other search engines because more people use it, creating data that Google's algorithm uses to refine and improve search results."[219]

311.

"The Facebook suite of apps is valuable largely because 3 billion people use it."[220]

312.

"It changes nothing that these platforms are not the sole means for distributing speech or information … in assessing whether a company exercises substantial market power, what matters is whether the alternatives are comparable."[221]

313.

Meta attempts and conspires to obtain contractual, speech and other rights and intellectual property consensually from its members induced by the threat of banning and labeling.

314.

On or about September 23, 2019, Meta attempted to undermine Snapchat's business by discouraging popular figures and influencers from referencing their Snapchat accounts, and Instagram (which is owned and controlled by Meta) threatened to

---

[219] _Biden v. Knight First Amendment Institute at Columbia Univ.,_ 593 U.S. _____ (2021) (Thomas, J. concurring)
[220] _Biden v. Knight First Amendment Institute at Columbia Univ.,_ 593 U.S. _____ (2021) (Thomas, J. concurring).
[221] _Biden v. Knight First Amendment Institute at Columbia Univ.,_ 593 U.S. _____ (2021) (Thomas, J. concurring)

remove the "verified" status (blue tick mark) if influencers posted competitor Snapchat profile links in their Instagram bio.[222]

315.

On or about January 7, 2020, Defendant Meta's head of Virtual and Augmented Reality Division, Andrew Bosworth, said that he believed allowing President Trump to run digital advertisements on Meta was responsible for President Trump's 2016 election victory.[223]

316.

Since on or about January 20, 2020, when a post or picture is factchecked by Defendant Meta, instead of being presented with sharing options when tapping the share button, Meta users are shown a further warning that says their own pages or websites could face sanctions if they share the content:

> "Independent fact-checkers at Factcheck.org say this post has false information. To help stop the spread of false news, a notice will be added to your post if you decide to share this. Pages and websites that repeatedly

[222] Wells, Georgia and Seetharaman, Deepa. "Snap Detailed Facebook's Aggressive Tactics in 'Project Voldemort' Dossier: Antitrust investigation gives competitors chance to air complaints about Facebook's hardball tactics," *The Wall Street Journal.* September 24, 2019; Pramod, Naga. "Snapchat dossier containing Facebook anti-competitive practices to be handed to the FTC," *Reclaim the Net*, September 23, 2019.
[223] Issac, Mike, Frenkel, Sheera, and Roose, Kevin. "Don't tilt scales against Trump, Facebook executive warns," *The New York Times*. January 7, 2020.

publish or share false news will see their overall distribution reduced and be restricted in other ways."[224]

317.

In June 2020, Google told *Zero Hedge*, a libertarian-oriented financial blog, that Google would demonetize the blog and prevent it from earning revenue through Google ads unless *Zero Hedge* remove and limit its acquisition of intellectual property.[225]

318.

On or about July 14, 2020, Google restored permissions for *Zero Hedge* to advertise after *Zero Hedge* deleted much of its comments section. [226]

## *PREDICATE ACT – 18 U.S.C. §1952*

*Interstate and Foreign Transportation in Aid of Racketeering Enterprises*

319.

Whoever uses the mail or any facility in interstate or foreign commerce, with intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of and thereafter performs or attempts to perform any

---

[224] Parker, Tom. "Facebook fact-checks and censors Martin Luther King Jr. memes on MLK Day," *Reclaim The Net*, January 20, 2020.
[225] Graham, Megan. "Google says Zero Hedge can run Google ads again after removing 'derogatory' comments." July 14, 2020. https://www.cnbc.com/2020/07/14/google-reinstates-zero-hedge-ad-monetization.html.
[226] Bulleri, Fabrizio. "Google reinstates monetization for Zero Hedge after stricter comment moderation changes," *Reclaim The Net*, July 14, 2020.

unlawful activity, including extortion in violation of the laws of the State in which committed or of the United States, violates 18 U.S.C. §1952.

320.

Since on or about September 13, 2019, Angel Mom Mary Ann Mendoza, who heads the Angel Families organization, has had her posts raising awareness about illegal immigrant crime removed from Facebook as "hate speech."[227]

321.

Mendoza's son, 32-year-old police officer Brandon Mendoza, was killed in May 2014 by a drunk illegal alien who was driving the wrong way down a highway in Mesa, Arizona.[228]

322.

On or about September 13, 2019, Facebook removed two of Mendoza's posts raising awareness about the impact of illegal immigrant crime, as violating its community standards on hate speech and permanently removed the donation button from the Angel Families Meta  page as punishment for the claimed violations.[229]

[227] Binder, John. "Angel Mom's Facebook Posts on Illegal Immigration Removed for 'Hate Speech'," *Breitbart*, September 13, 2019; Rankovic, Didi. "Angel Mom's post about illegal immigrant crime is censored on Facebook for 'hate speech'," *Reclaim the Net*, September 14, 2019.
[228] Binder, John. "Angel Mom's Facebook Posts on Illegal Immigration Removed for 'Hate Speech'," *Breitbart*, September 13, 2019; Rankovic, Didi. "Angel Mom's post about illegal immigrant crime is censored on Facebook for 'hate speech'," *Reclaim the Net*, September 14, 2019.
[229] Binder, John. "Angel Mom's Facebook Posts on Illegal Immigration Removed for 'Hate Speech'," *Breitbart*, September 13, 2019; Rankovic, Didi. "Angel Mom's post about illegal immigrant crime is censored on Facebook for 'hate speech'," *Reclaim the Net*, September 14, 2019.

323.

*Lead Stories* is a fact-checking website, and like most of Meta's over 60 global fact-checking partners, relies on money from Meta as critical to its solvency.[230]

324.

Mr. Duke and his co-founder Maarten Schenk, who works from his home in Belgium, were the company's sole full-time employees until November 2019, when Facebook told U.S.-based fact-checking partners that it would bankroll a sharp expansion of their work ahead of the 2020 presidential election.[231]

325.

Mr. Duke said Meta was paying *Lead Stories* a multiple of the $359,000 it earned under its 2019 contract.[232]

326.

On or about March 30, 2020, *Lead Stories* co-founder Alan Duke said about Meta users who are fact-checked, "It's embarrassing when it shows up in their timeline that they shared something that's wrong. That's not something we've been through before with fact checking—this is much more personal."[233]

---

[230] Horwitz, Jeff. "Facebook's Fact Checkers Fight Surge in Fake Coronavirus Claims," *The Wall Street Journal*, March 30, 2020.

[231] Horwitz, Jeff. "Facebook's Fact Checkers Fight Surge in Fake Coronavirus Claims," *The Wall Street Journal*, March 30, 2020.

[232] Horwitz, Jeff. "Facebook's Fact Checkers Fight Surge in Fake Coronavirus Claims," *The Wall Street Journal*, March 30, 2020.

[233] Horwitz, Jeff. "Facebook's Fact Checkers Fight Surge in Fake Coronavirus Claims," *The Wall Street Journal*, March 30, 2020.

327.

On August 6, 2020, Meta  banned ads from the Committee to Defend the President, a pro-Trump super PAC with nearly 1 million followers on Meta k that has invested hundreds of thousands of dollars on ads since 2018, "[a]s a result of the [Committee's] repeated sharing of content determined by third-party fact-checkers to be false."[234]

### *PREDICATE ACT – 18 U.S.C. §1343*
*Fraud by Wire, Radio, or Television*

328.

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits, or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, violates 18 U.S.C. §1343.

---

[234] O'Sullivan, Donie. "Facebook bans ads from pro-Trump PAC," *CNN*, August 6, 2020; Rodrigo, Chris Mills. "Facebook bans pro-Trump PAC from advertising," *The Hill*, August 6, 2020.

329.

A scheme in commission of honest services fraud occurs in the private sector when a private party breaches a fiduciary duty, which includes to "contravene - by inherently harming – the purpose of the parties' relationship," with reasonably foreseeable harm.[235]

330.

"The phrase 'scheme or artifice [to defraud] by depriv[ing] another of the intangible right of honest services,' in the private sector context, means a scheme or artifice to use the mails or wires to enable an officer or employee of a private entity (or a person in a relationship that gives rise to a duty of loyalty comparable to that owed by employees to employers) purporting to act for and in the interests of his or her employer (or of the other person to whom the duty of loyalty is owed) secretly to act in his or her or the defendant's own interests instead, accompanied by a material misrepresentation made or omission of information disclosed to the employer or other person."[236]

331.

Defendants Meta and Procter & Gamble schemed and acted in furtherance of that scheme to deprive Plaintiff Loomer of honest services owed to her as a user of Meta.

---

[235] _United States v. deVegter_, 198 F.3d 1324 (11th Cir. 1999); _see also_ 18 USC §1346.
[236] _United States v. Rybicki_, 354 F.3d 124 (2d Cir. 2003).

332.

Defendant Meta and Procter & Gamble schemed and acted in furtherance of that scheme to deprive Meta's  user base of honest services.

333.

Governments have limited a company's right to exclude when the company holds itself "out to the public but do[es] not 'carry' freight, passengers, or communications."[237]

334.

"It stands to reason that if Congress may demand that telephone companies operate as a common carrier, it can ask the same of digital platforms.  That is especially true because … restricting a digital platform's right to exclude might not appreciably impede the platform from speaking."[238]

335.

"At that point, a company's property is but its instrument, the means of rendering the service which has become *of public interest*."[239] (emphasis added)

336.

Defendant Meta devised a scheme to obtain money and intellectual property from its user base, through the use of advertisement sales from political campaigns in the

---

[237] _Biden v. Knight First Amendment Institute at Columbia Univ.,_ 593 U.S. _____ (2021) (Thomas, J. concurring)
[238] _Biden v. Knight First Amendment Institute at Columbia Univ.,_ 593 U.S. _____ (2021) (Thomas, J. concurring)
[239] _Biden v. Knight First Amendment Institute at Columbia Univ.,_ 593 U.S. _____ (2021) (Thomas, J. concurring)

2020 election, under the fraudulent pretense and false promises that advertisements from political candidates would *not* be subject to third-party review or censorship.

337.

Defendant Meta used television and electronic communications to deliver said promises to current and potential political candidates during the period from October 2019 to June 2020 as a way to procure millions of dollars in advertisement purchases, website community construction, and other social media activities leading up to the election on November 3, 2020.

338.

On October 3, 2019, Defendant Meta's spokesman said: "We don't believe that it's an appropriate role for us to referee political debates. Nor do we think it would be appropriate to prevent a politician's speech from reaching its audience and being subject to public debate and scrutiny."[240]

339.

On October 17, 2019, in an advance clip of an interview set to air October 18, 2019 on *Fox News*, Defendant Zuckerberg said he would not censor social media posts from politicians, including President Donald Trump.[241]

---

[240] Hern, Alex. "Facebook exempts political ads from ban on making false claims," *The Guardian*, October 4, 2019; Boyle, Meka. "Facebook's Updated Advertising Policy Could Enable Politicians to Spread Misinformation," *Newsweek.* October 3, 2019.
[241] Martin, Jeffery. "Zuckerberg Tells Fox News Facebook Won't Censor Politicians, While Warren Says Facebook Could Help Trump Win Again," *Newsweek.* October 17, 2019.

340.

On or about November 8, 2019, Defendant Meta's Chief Product Officer Chris Cox, who oversaw all of WhatsApp, Messenger, and Instagram, led Meta's efforts to fight misinformation and protect elections, and was reported to be one of the most powerful people at Meta, publicly stated "[Donald] Trump should not be our President" and that a campaign to spend millions on digital messaging to oppose Donald Trump in the 2020 presidential election was "something I have wanted to work on for a while."[242]

341.

On or about June 2, 2020, Defendant Meta alerted its staff that it would be changing its policies relating to the moderation of posts by politicians.[243]

342.

Defendant Meta fraudulently represented that all political candidates for the 2020 general election would be allowed to use its site for campaign activities and advertisements without third-party censorship.

---

[242] Matsakis, Louise. "Former Facebook Executive Chris Cox on Elections and Climate Change," *Wired.* November 8, 2019.
[243] Nolan, Lucas. "Mark Zuckerberg Tells Angry Facebook Employees He May Change Censorship Policy on Trump and Other World Leaders," *Breitbart*, June 2, 2020.

343.

Defendant Meta received over $100 million in advertisement revenue from political candidate Donald J. Trump during the 2020 election cycle,[244] but then changed its policies to subject those advertisements to third-party review and censorship.

344.

On March 1, 2022, Defendant Zuckerberg was accused by the Office of Special Counsel Report to the Wisconsin State Assembly of providing financing for bribery operations and to purchase illegal drop boxes for the purpose of undermining the 2020 general election.[245]

345.

This fraudulent scheme is further evidenced by the recent admissions by Zuckerberg on *The Joe Rogan Experience,* and Alex Berenson's revelations following his litigation with Twitter. It is now clear that Defendants have engaged in a wide-ranging fraudulent scheme to convince consumers that they fight election interference, when in reality, they have done and are doing the exact opposite.

346.

Defendants also committed wire fraud when they persuaded users that Plaintiffs were not worthy of donations by incorrectly labeling Ms. Loomer as "dangerous,"

---

[244] "Presidential General Election Ad Spending Tops $1.5 Billion," *Wesleyan Media Project.* October 29, 2020. https://mediaproject.wesleyan.edu/releases-102920/.
[245] Cleveland, Margot. "Breaking: Special Counsel Finds Mark Zuckerberg's Election Money Violated Wisconsin Bribery Laws," *The Federalist.* March 01, 2022.

fraudulently deactivating and banning Ms. Loomer and her political page and the option of giving donations along with that, influencing and manipulating users through its deceptive "fact-checking" notifications towards profiles of candidates that directly competed with Ms. Loomer for campaign donations and votes for office, and by changing their rules regarding political candidates and campaigns as a reaction to Ms. Loomer filing to run for political office.  This is evidenced by the fact that, on or about September 19, 2019, Defendant Zuckerberg admitted that he was aware Facebook's "factcheckers" exhibited clear activist bias and have done so for a long time. This has also been confirmed by the Twitter Files and is being exposed by ongoing Congressional investigations.

347.

Further, Defendants engaged in wire fraud by intentionally attempting to persuade social media users to redirect their attention and donate money to Defendants' purported political allies and Ms. Loomer's political opponents.

348.

Defendants further engaged in wire fraud when they took away from users the right to decide on which candidate they wanted to follow, or whether or not to donate to a political candidate of their choosing under false and malicious pretenses.

349.

Here, Defendants' misrepresentations about Ms. Loomer are related to Defendants' false claims that she is "hateful" and a "dangerous individual." In actuality, Defendants' actions were due to her political speech and political views. Defendants wrongfully induced Plaintiffs and the public to believe all political candidates and campaigns would be treated fairly and afforded the right to use their services to campaign. Those assurances were false, and these actions wrongfully denied Ms. Loomer as a candidate of the ability to spread her message to voters. Proof of this is exhibited when Defendant Zuckerberg said, "[w]e think people should be able to hear what politicians have to say. I don't think it's right for tech companies to censor politicians in a democracy."

350.

Defendant Twitter's acknowledgement that this practice was wrongful is also exhibited by (i) Mr. Musk's response of "[y]es" when asked whether "any political candidates – either in the US or elsewhere – [were] subject to shadow banning while they were running for office or seeking re-election?" (ii) his response of "[u]nequivocally true. The evidence is clear and voluminous" to the tweet "Breaking: @ElonMusk @Twitter Files show Twitter activist employees, without basis, suppressed and censored the President of the United States, @realDonaldTrump in the days before the 2020 election. This is damning evidence

of election interference" and (iii) his tweet that "election interference by social media companies obviously undermines the public's faith in democracy and is wrong."

351.

Plaintiffs' rights to manage their own political campaign profile, the equal right to spread knowledge and share that profile page, and the ability to solicit donations from users were all taken away from Plaintiffs as a result of the dishonest acts, misrepresentations, and omissions by Defendants that were intended to deceive Plaintiffs and users.

### *PREDICATE ACT – 18 U.S.C. §2339B*
*Providing material support or resources to designated foreign terrorist organizations*

352.

A person who knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, and has knowledge that the organization is a designated terrorist organization, that the organization has engaged or engages in terrorist activity, or that the organization has engaged or engages in terrorism, violates 18 U.S.C. §2339B.[246]

---

[246] *18 U.S.C. § 2339B(a)(1)*

353.

The term "material support or resources" means any property, tangible or intangible, or service, including training, expert advice or assistance, false documentation or identification, communications equipment, or facilities.[247]

354.

"A company ordinarily is a place of public accommodation if it provides lodging, food, entertainment, or other services to the public in general … Twitter and other digital platforms bear a resemblance to that definition."[248]

355.

On April 10, 2018, Defendant Zuckerberg testified before the U.S. Senate Commerce and Judiciary Committees, "[T]he way the ad system work is advertisers can come to us and say, I — I have a message that I'm trying to reach a certain type of people. They might be interested in something, they might live in a place, and then we help them get that message in front of people."[249]

---

[247] *18 U.S.C. § 2339A(b)(1)*
[248] *Biden v. Knight First Amendment Institute at Columbia Univ.*, 593 U.S. _____ (2021) (Thomas, J. concurring)
[249] "Transcript of Mark Zuckerberg's Senate hearing," *Bloomberg Government*, April 10, 2018.
https://www.washingtonpost.com/news/the-switch/wp/2018/04/10/transcript-of-mark-zuckerbergs-senate-hearing/

356.

On April 10, 2018, Defendant Zuckerberg testified before the U.S. Senate Commerce and Judiciary Committees, "We want our products to be valuable to people. And if they're valuable, then people choose to use them."[250]

357.

On April 10, 2018, Defendant Zuckerberg testified before the U.S. Senate Commerce and Judiciary Committees, "I agree that we're responsible for the content, but we don't produce the content. I — I think that when people ask us if we're a media company or a *publisher*, my understanding of what — the heart of what they're really getting at, is do we feel responsibility for the content on our platform. The answer to that, I think, is clearly '*yes*.'"[251]

358.

On or about April 19, 2019, Hezbollah and Hamas maintained a widespread presence on Facebook, YouTube and Twitter, including the Hamas television station, Al Aqsa, along with many leaders of the organizations, having a Twitter Feed and Facebook page.[252]

---

[250] "Transcript of Mark Zuckerberg's Senate hearing," *Bloomberg Government*, April 10, 2018. https://www.washingtonpost.com/news/the-switch/wp/2018/04/10/transcript-of-mark-zuckerbergs-senate-hearing/
[251] "Transcript of Mark Zuckerberg's Senate hearing," *Bloomberg Government*, April 10, 2018. https://www.washingtonpost.com/news/the-switch/wp/2018/04/10/transcript-of-mark-zuckerbergs-senate-hearing/ *(emphasis added)*
[252] Frenkel, Sheera and Hubbard, Ben. "After Social Media bans, Militant Groups Found Ways to Remain," The *New York Times*, April 19, 2019.

359.

On or about September 18, 2019, Defendant Facebook was found to have automatically generated hundreds of business pages promoting the terrorist groups ISIS and Al Qaida, allowed these pages to remain searchable and accessible by its user base through basic keyword searches for up to six weeks, and further helped "the extremist groups because it allow[ed] users to like the pages, potentially providing a list of sympathizers for recruiters."[253]

360.

In October of 2019, Carlos Monje, Jr., U.S. Policy Director for Twitter, stated that Twitter allows accounts associated with political arms of groups designated by the U.S. government as "foreign terrorist organizations," such as Hamas and Hezbollah.[254]

361.

Unlike Hamas and Hezbollah, the Taliban in Afghanistan have not been officially designated as a Foreign Terrorist Organization by the United States; however, the group was placed on the U.S. Treasury Department list of Specially Designated Global Terrorists and a Specially Designated Nationals list, as well as being

---

[253] Butler, Desmond, and Ortutay, Barbara. "Facebook still auto-generating Islamic State, al-Qaida pages," *AP News,* September 18, 2019.
[254] Birnbaum, Emily. "Twitter takes down Hamas, Hezbollah-affiliated accounts after lawmaker pressure," *The Hill*, November 4, 2019.

designated as a terrorist organization in 1999 by the United Nations Security Council, and it has not been removed from that list.[255]

362.

"In accounts swelling across Facebook, Twitter and Instagram — and in group chats on apps such as WhatsApp and Telegram — the messaging from Taliban supporters typically challenges the West's dominant image of the group as intolerant, vicious and bent on revenge, while staying within the evolving boundaries of taste and content that tech companies use to police user behavior."[256]

363.

On or about August 17, 2021, two Taliban spokesmen, Suhail Shaehee and Zabihullah Mujahid had Twitter accounts which have been active for years with more than 351,000 and 310,000 Twitter followers, respectively.[257]

364.

On and before August 17, 2021, Twitter permitted the Taliban official spokesmen to live-tweet Mujahideen terror,[258] the acquisition of arms, storming the Afghanistan capital, and the occupation of the presidential palace.[259]

---

[255] Madhok, Diksha. "How social media is dealing with the Taliban takeover," *CNN Business,* August 17, 2021.
[256] Timberg, Craig and Lima, Cristiano.  "Today's Taliban uses sophisticated social media practices that rarely violate the rules," *The Washington Post*, August 18, 2021.
[257] Eberhart, Christopher. "Taliban will be allowed to STAY on Twitter - as long as they don't 'glorify violence' - while ex-president Trump is still banned," *Dailymail.com*, August 18, 2021.
[258] This includes insurgents reportedly marrying girls as young as 12 and forcing them into sex slavery as 'spoils of war,' and the killing Afghan troops trying to surrender.
[259] Eberhart, Christopher. "Taliban will be allowed to STAY on Twitter - as long as they don't 'glorify violence' - while ex-president Trump is still banned," *Dailymail.com*, August 18, 2021.

365.

Defendants' material support of terrorists and terrorist organizations is part and parcel of their wire fraud because they lied to Plaintiffs and other users in suggesting they actually had a policy of removing Plaintiffs and users based on "hate speech" and the "Dangerous Individual" policy,  purportedly removed Plaintiffs under that policy, but intentionally did not remove known and designated terrorists and terrorist organizations – to which any "hate speech" or "Dangerous individual" policies would *actually* apply.

366.

Defendants blatantly expressed that they were aware of the terrorist activities and terrorist leaders' accounts present on their sites, yet they removed and blocked Ms. Loomer's account and labeled her a "dangerous" individual.  There is no reason to believe that Defendants *actually* think or believe that Plaintiff is more dangerous than a known terrorist leader or terrorist group that murders people.   Whether motivated by political bias or the desire to maximize advertising revenue, Defendants misled Plaintiffs and their users by dishonestly using their "dangerous individual" policy to, in fact, simply target non-violent conservatives for their political speech while allowing actual violent terrorist organizations to maintain account access.  Thus, Defendants predicate acts of providing material support to

terrorist organizations is connected to the wire fraud predicate acts and relates to the overall claim of racketeering and civil RICO.

### *PREDICATE ACT - 18 U.S.C. §2385*
*Advocating Overthrow of Government*

367.

Whoever knowingly or willfully abets or teaches the desirability or propriety of overthrowing or destroying the government of the United States or the government of any State, Territory, District or Possession thereof, or the government of any political subdivision therein, by force or violence, or by the assassination of any officer of any such government; or whoever, with intent to cause the overthrow or destruction of any such government attempts to publish, edit, issue, circulate, distribute, or publicly display any written matter advocating, advising, or teaching the desirability or propriety of overthrowing or destroying any government in the United States by force or violence; or whoever attempts to organize or help any society, group, or assembly of persons who teach, advocate, or encourage the overthrow or destruction of any such government by force or violence – or anyone who knowingly affiliates or conspires with any such group – violates 18 U.S.C. §2385.

368.

On or about September 17, 2019, Meta  facilitated the group Abolish ICE Denver and other Communist groups to organize gatherings outside the home of ICE warden Johnny Choate to harass and disrupt the lives of government officials and post direct threats, such as "FIRE TO THE PRISON" on these groups' official Meta pages, even labeling the event "Confront La Migra Where They Live."[260]

369.

On or about May 26, 2020, President Donald Trump publicly accused Defendant Twitter of "interfering in the 2020 Presidential Election." [261]

370.

On or about June 11, 2020, Meta refused to remove a page celebrating "dead cops" titled "The Only Good Cops Are Dead Cops" which openly incited violence against police officers after it was reported by its users, and said that although it may be "offensive," it does not violate any specific community standards.[262]

---

[260] Bokhari, Allum. "Denver Communists Use Facebook to Threaten ICE Facility: 'Fire to the Prison!'," *Breitbart*, September 17, 2019.
[261] Dwoskin, Elizabeth. "Twitter labels Trump's tweets with a fact check for the first time," *The Washington Post.* May 27, 2020.
[262] Watson, Paul Joseph. "Facebook Says Page Celebrating "Dead Cops" Doesn't Violate its Community Standards," *Summit*, June 11, 2020.

371.

Meta  expressly told its content moderators to allow calling police officers "pigs," and that "the policy was shaped by left-wing individuals who were seeking to influence the discourse and also influence the election."[263]

372.

On July 24, 2020, Law Enforcement Today[264] was set to hold the largest pro-police rally in Long Island, New York on July 25th, but Meta deleted the events page without any explanation.[265]

373.

On December 9, 2020, then Senate Homeland Security Committee Chairman Sen. Ron Johnson (R-WI) stated that without the interference of companies including Defendants, "Trump would have won the election. That's the enormous influence that social media and our liberal biased media played on this election. Their interference just is orders of magnitude greater than any Russian or Chinese or Iran foreign interference in this campaign."[266]

---

[263] Bokhari, Allum. "Facebook Insider Ryan Hartwig: The Company Allowed Users to Demonize Whites, Men, Cops," *Breitbart*, June 26, 2020.

[264] A pro-police advocacy group founded by Captain Robert Greenberg which operates a news website reporting first-hand accounts of what police officers go through when implementing the law.

[265] Harper, Cindy. "Facebook deletes pro-police "Back the Blue" event page," *Reclaim The Net*. July 24, 2020.

[266] Hanchett, Ian. "Ron Johnson: Social Media and Media Influence on Election 'Orders of Magnitude' Greater Than any Foreign Interference in 2020," *Breitbart,* December 9, 2020.

374.

On January 7, 2021, Meta indefinitely froze the account of the President of the United States, Donald J. Trump, "for at least the next two weeks until the peaceful transition of power is complete."[267]

375.

On January 8, 2021, Defendant Twitter permanently banned the President of the United States from its platform "due to the risk of further incitement of violence."[268]

376.

On January 11, 2021, Defendant Meta said it had begun removing content with the phrase "Stop the Steal," which had become a rallying cry among supporters of President Trump, under its Coordinating Harm Policy.[269]

377.

On August 17, 2021, Congressman Doug Lamborn, 5th District of Colorado and Ranking Member on Armed Services Committee, stated in an official letter to Defendant Dorsey that the Taliban, specifically Zabihullah Mujahid, were using Twitter accounts to provide updates and propaganda messaging in furtherance and

---

[267] Spangler, Todd. "Facebook Bans Trump Indefinitely as CEO Mark Zuckerberg Cites Need for 'Peaceful Transition of Power,'" *Variety*. January 7, 2021.
[268] Osborne, Mark. "Twitter permanently suspends Donald Trump's account; president teases new platform: The social media platform has been his preferred method of communication." *ABCNews*. January 8, 2021.
[269] Spangler, Todd. "Facebook has No Plans to Reinstate Trump Accounts, Bans Phrase "Stop the Steal," *Variety*. January 11, 2021.

support of the Taliban overthrow of United States governmental entities and interests in Afghanistan.[270]

### 378.

On August 17, 2021, Congressman Doug Lamborn, 5th District of Colorado and Ranking Member on Armed Services Committee, stated in an official letter to Defendant Dorsey that he "did not find a single fact-check on any of [Zabihullah Mujahid or Yousef Ahmadi's] tweets, nor any warnings for false or misleading content."[271]

### 379.

Defendants' illegal conduct in advocating the overthrow of government also involved wire fraud. Here, through wire communications, the Defendants' attempt to overthrow the government is associated with the terrorist activities and presence on Defendants' Platforms, and the manipulation of and interference of the election process as set forth above in an attempt to influence the American political landscape by silencing and depriving account access to political figures, including Plaintiff as a candidate for Congress, as well as then-sitting President Donald J. Trump, whom Defendants wanted to remove from office by their own admission.

---

[270] Eberhart, Christopher. "Taliban will be allowed to STAY on Twitter - as long as they don't 'glorify violence' - while ex-president Trump is still banned," *Dailymail.com*, August 18, 2021.
[271] Eberhart, Christopher. "Taliban will be allowed to STAY on Twitter - as long as they don't 'glorify violence' - while ex-president Trump is still banned," *Dailymail.com*, August 18, 2021.

## ***ONGOING IMMEDIATE THREAT***

### 380.

The "equal time rule" under the Communications Act of 1934 explicitly precludes the use of selective bias of traditional media broadcasters to manipulate the outcome of elections by limiting points of view and excluding other candidates from getting the same airtime, but does not currently extend to social media broadcasting.[272]

### 381.

In 2017, Defendant Meta's  former head of growth, Chamath Palihapitiya, stated, "we have created tools that are ripping apart the social fabric of how society works."[273]

### 382.

On or about September 17, 2019, Defendant Meta  shut down Israeli Prime Minister Benjamin Netanyahu's ability to communicate with supporters on the site, claiming a violation of local law for sharing election information.[274]

---

[272] Harper, Cindy. "Facebook's refusal to run ads for candidate Laura Loomer hints at the need for a modern-day equal-time rule," *Reclaim The Net*. July 4, 2020.
[273] Schiffer, Zoe. "WhatsApp co-founder Brian Acton still thinks you should delete Facebook," *The Verge*. November 8, 2019.
[274] Frazin, Rachel. "Netanyahu: Facebook caved to 'pressure of the Left' by suspending chatbot over illegal polls," *The Hill*, September 17, 2019.

383.

On or about October 26, 2019, U.S. Rep. Alexandria Ocasio-Cortez (D-N.Y.) accused Defendant Meta of "making active & aggressive decisions that imperil our elections."[275]

384.

On or about January 18, 2020, Reuters reported that China is Defendant Meta's largest source country for revenue after the United States, and Meta is setting up a new engineering team to focus specifically on the lucrative advertising business in the country.[276]

385.

On or about January 27, 2020, Defendant Meta was banned in China, yet the company maintains offices in the country and uses Chinese suppliers to manufacture its Oculus virtual reality headsets and its Portal family of video chat devices.[277]

---

[275] Frazin, Rachel. "Ocasio-Cortez blasts Facebook's ad decisions, calling them 'increasingly disturbing'," *The Hill*, October 26, 2019.

[276] Padilla, Mariel. "Facebook Apologized for Vulgar Translation of Chinese Leader's Name," *The New York Times*, January 18, 2020; Moreno, J. Edward. "Facebook apologizes after Chinese president's name translated into vulgar phrase," *The Hill*, January 18, 2020; "Facebook blames 'technical error' for Xi Jinping offensive name translation gaffe," *The Guardian*, January 18, 2020. https://www.theguardian.com/technology/2020/jan/18/facebook-xi-jinping-mr-shithole.

[277] Statt, Nick. "Facebook, Razer, and LG are restricting employee travel to China amid coronavirus outbreak," *The Verge*, January 27, 2020; Deese, Kaelan. "Facebook, other companies restrict travel to China," *The Hill*, January 28, 2020; Gurman, Mark and Wagner, Kurt. "Facebook Restricts Employee Travel to China on Virus Concern," *Bloomberg*, January 27, 2020.

386.

On or about February 4, 2020, U.S. Senator Ted Cruz (R-TX) stated, "For social media to be in the business of banning and censoring political speech, of silencing candidates for office, silencing citizen groups and silencing individual citizens, is profoundly harmful to our democratic process."[278]

387.

On May 29, 2020, the White House said Defendant Twitter "has determined that it will allow terrorists, dictators, and foreign propagandists to abuse its platform."[279]

388.

An April 2021 report from the Tech Transparency Project (TTP) identified a surge in Meta groups devoted to human smuggling.[280]

389.

The TTP report found that Meta's algorithms and automated features compound the problem of human smuggling by suggesting additional pages that offer border crossings, directing users to other dubious, and potentially dangerous, smuggling services."[281]

---

[278] Bokhari, Allum. "Google Censors the Congressional Record," *Breitbart*. February 4, 2020.

[279] Bokhari, Allum. "Twitter Censors Official White House Account," *Breitbart*. May 28, 2020; White, Chris. "Twitter Censors White House Account for Quoting Trump's Flagged 'THUGS' Tweet," *Daily Caller*, May 29, 2020.

[280] Simonson, Joseph. "Meta Will Allow Solicitation of Human Smuggling on Its Platforms - Policy comes amid surge in Facebook groups devoted to human smuggling," *Washington Free Beacon.* February 1, 2022.

[281] "Facebook Teems with Human Smugglers Luring Migrants," *Tech Transparency Project.* April 16, 2021. https://www.techtransparencyproject.org/articles/facebook-teems-human-smugglers-luring-migrants.

390.

On May 5, 2021, Defendant Meta's  Oversight Board upheld the January suspension of President Donald Trump's accounts for his "maintaining an unfounded narrative of electoral fraud and persistent calls to action."[282]

391.

On June 4, 2021, Defendant Meta  announced that "politicians' posts will no longer be exempt from the company's rules that prevent users from engaging in harmful speech" and "that it will no longer treat content that is posted by politicians as inherently of public interest or newsworthy."[283]

392.

On July 15, 2021, White House Press Secretary and former CNN contributor Jen Psaki stated that a person banned from one social media platform should be banned from all others, and that "we're flagging problematic posts for Facebook [Meta] that spread disinformation."[284]

---

[282] Spangler, Todd. "Donald Trump Facebook Suspension Upheld by Oversight Board Ruling," *Variety.* May 5, 2021.
[283] Rodriguez, Salvador. "Facebook reverses policy protecting politicians from engaging in harmful speech" *CNBC*, June 4, 2021.
[284] Lancaster, Jordan. "Psaki Says People Should Be Banned on All Social Media if They are Banned from One Platform," *Daily Caller*, July 16, 2021.

393.

In August of 2021, the Taliban in Afghanistan and its terrorist affiliates used Twitter and Meta  applications to organize, implement, and procure substantial resources necessary to achieve the defeat of the United States and its allies in Afghanistan.[285]

## COUNT I

### *18 U.S.C. § 1962(c) ("FEDERAL RICO") & 18 U.S.C. § 1964(c)*
*RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS*

394.

The allegations of the foregoing paragraphs are incorporated herein by reference.

395.

Any person associated with any enterprise affecting interstate or foreign commerce who participates, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity, violates 18 U.S.C. § 1962(c).

396.

Defendants violated Federal RICO and Plaintiffs were injured as a result.

---

[285] Timberg, Craig and Lima, Cristiano.  "Today's Taliban uses sophisticated social media practices that rarely violate the rules," *The Washington Post*, August 18, 2021; Eberhart, Christopher. "Taliban will be allowed to STAY on Twitter - as long as they don't 'glorify violence' - while ex-president Trump is still banned," *Dailymail.com*, August 18, 2021.

397.

Each Defendant is a "person" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961 (3).

398.

Each Defendant violated 18 U.S.C. § 1962(c) by the acts described in the prior paragraphs, and as further described hereinbelow.

399.

Defendants Meta, Twitter, Mark Zuckerberg, Jack Dorsey, and Proctor & Gamble, and Does 1-100 (including FBI agents and other agents of the federal government) collectively s constitute an enterprise (hereinafter, "Community Media Enterprise") associated in fact and engaged in, and whose activities affect, interstate commerce with the common goals of making money, acquiring influence over other enterprises and entities, and other pecuniary and non-pecuniary interests.

400.

"A jury is entitled to infer the existence of an enterprise on the basis of largely or wholly circumstantial evidence. Direct Evidence of association may be difficult to obtain; a jury is permitted to draw the natural inference arising from circumstantial evidence of association."[286]

---

[286] _United States v. Pipkins_, 378 F.3d 1281 (11th Cir. 2004).

401.

Community Media Enterprise is an enterprise engaged in and whose activities affect interstate commerce. The Defendants own, are employed by, or are otherwise associated with the enterprise.

402.

Plaintiffs have suffered the requisite direct injury to their business or property (tangibly and intangibly) by reason of substantial RICO violations committed by Defendants.

403.

The Community Media Enterprise meets the criteria for "Open-Ended Continuity."[287]

404.

A specific threat of repetition exists insofar as Defendants continue to engage in the predicates listed herein.

405.

The predicates listed below are supported by Defendants' policies and procedures for its ongoing, legitimate businesses.

---

[287] *See*, <u>*Magnifico v. Villanueva*</u>, 783 F.Supp.2d 1217 (S.D. Fla. 2011).

406.

Predicate acts can be attributed to Defendants operating as part of a long-term association that exists for criminal purposes outlined herein, as well as others currently under ongoing federal investigation.[288]

407.

"Also while a plaintiff may use predicate acts targeting other victims to show evidence of a 'pattern' of racketeering, the plaintiff needs only to be injured by a single predicate act committed in furtherance of the scheme."[289]

408.

The Defendants agreed to and did conduct and participate in the conduct of Community Media Enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiffs and others.

409.

Defendants have committed the following related predicate acts in violation of 18 U.S.C. §1343, §1951, §1952, §2339B, and §2385 as part of their standard practice, demonstrating a pattern of criminal conduct of a continuing nature, for the unlawful

---

[288] The Federal Trade Commission sued Facebook on December 9, 2020 for "illegally maintaining its personal social networking monopoly through a years-long course of anticompetitive conduct." Ftc.gov/news-events/press-releases/2020/12/ftc-sues-facebook-illegal-monopolization

[289] Hamill, John J. *et al.*, Practice Series: RICO – A Guide to Civil RICO Litigation in Federal Courts, Jenner and Block (2014); *See also, Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 488-93 (1985).*

purpose of intentionally defrauding and extorting Plaintiffs and other individuals and entities in furtherance of the goals of Community Media Enterprise.

## *Wire Fraud*

### 410.

The allegations of the foregoing paragraphs are incorporated herein by reference.

### 411.

Defendants violated 18 U.S.C. §1343 by devising or intending to devise an artifice of community policies and scheme to exploit them in order to defraud and obtain money and intangible property under the false pretense of compliance with community policies, and false promises of upholding community standards and transmitted writings by means of wire communication in interstate or foreign commerce for the purpose of executing such a scheme or artifice.[290]

## *Interference with Commerce by Threats or Violence*

### 412.

The allegations of the foregoing paragraphs are incorporated herein by reference.

### 413.

Defendants Meta , Twitter, Jack Dorsey and Mark Zuckerberg violated 18 U.S.C. §1951 by conspiring, attempting, obstructing, delaying and affecting commerce

---

[290] *18 U.S.C. § 1343,* Fraud by wire, radio, or television (United States Code (2020 Edition))

through extortion by wrongfully using the fear of public disgrace and economic harm associated with being banned and labeled a dangerous individual or group, under the color of official right, to obtain intangible property from Plaintiff Loomer, her associates, followers, and those similarly situated, with their consent.[291]

414.

Defendant Meta and its employees   used written and oral communication to maliciously threaten to injure Plaintiff Loomer's intangible property and reputation, and expose Plaintiff Loomer to the disgrace of being banned, labeled a "dangerous individual," and placed on a dangerous individual's list, with the intent to compel Plaintiff Loomer, her associates, followers, and similarly situated individuals to refrain, against their will, from speaking to or associating with other individuals or groups labeled by Defendants as "dangerous" or who are or might otherwise be in violation of Defendants' ever changing policies.

*Interstate and Foreign Transportation in Aid of Racketeering Enterprise*

415.

The allegations of the foregoing paragraphs are incorporated herein by reference.

416.

Whoever maliciously threatens to accuse another of any crime or offense, or to injure the person, property or reputation of another, or to expose another to disgrace, or to

---

[291] *18 U.S.C. § 1951,* Interference with commerce by threats or violence (United States Code (2020 Edition))

impute any deformity to another, with intent thereby to extort any pecuniary advantage whatsoever, or to compel the person so threatened, or any other person, to do any act or refrain from doing any act against his or her will, violates the Florida Extortion Statute.[292]

417.

Whoever obtains the property or other consideration from another with consent induced by a wrongful use of force, fear - including fear induced by a threat to accuse the threatened individual, or a relative, of a crime or to expose or to impute to them a disgrace or crime, or under color of official right, violates the California Extortion Statute.[293]

418.

Defendant Meta and their employees used mail, email, the internet, social media, phone calls and other facilities in interstate commerce with the intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of the unlawful activity of extortion pursuant to Fla. Stat. Ch. 836.05. and Cal. Penal Code 518.

---

[292] Fla. Stat. § 836.05.
[293] California Penal Code §518-519

419.

Defendants violated 18 U.S.C. §1952 by, through printed and electronic communication, maliciously threatening to injure the property and reputation of Plaintiffs, and those similarly situated, and to expose them to disgrace with the intent to extort pecuniary advantage and to compel Plaintiffs and those similarly situated to refrain from associating or speaking against their wills.[294]

### *Providing Material Support or Resources to Designated Foreign Terrorist Organizations*

420.

The allegations of the foregoing paragraphs are incorporated herein by reference.

421.

Defendants violated 18 U.S.C. §2339B by attempting to knowingly provide material support or resources to a foreign terrorist organization by announcing that the political wings of known foreign terrorist organizations could use its platforms, and knowingly allowing  them to do so.[295]

### *Advocating Overthrow of Government*

422.

The allegations of the foregoing paragraphs are incorporated herein by reference.

---

[294] *18 U.S.C. §1952,* Interstate and Foreign Transportation in Aid of Racketeering Enterprises (United States Code (2020 Edition))

[295] *18 U.S.C. § 2339B*, Providing material support or resources to designated foreign terrorist organizations (United States Code (2020 Edition)).

423.

Defendants violated 18 U.S.C. §2385 by conspiring to willfully abet the teaching of the propriety of overthrowing and assassinating U.S. and state officers and officials and knowingly affiliated with groups advocating and encouraging the destruction of the United States government through acts of violence and terrorism.[296]

424.

Defendants violated 18 U.S.C. §2385 by attempting and conspiring to circulate, sell, distribute, and publicly display printed matter advocating, advising, and teaching the desirability and propriety of overthrowing or destroying the United States and state governments, or their officers and officials, by force and violence.[297]

425.

Defendants violated 18 U.S.C. §2385 by helping and attempting to organize, through recruitment and formation, groups of persons who teach, advocate, and encourage the overthrow and destruction of the United States government and state governments by force and violence.[298]

426.

Pursuant to and in furtherance of their fraudulent schemes, Defendants committed multiple related acts of Wire Fraud, Extortion, Interference with commerce by

---

[296] *18 U.S.C. § 2385*, Advocating overthrow of Government (United States Code (2020 Edition)).
[297] *18 U.S.C. § 2385*, Advocating overthrow of Government (United States Code (2020 Edition)).
[298] *18 U.S.C. § 2385*, Advocating overthrow of Government (United States Code (2020 Edition)).

threats or violence, Interstate and foreign travel or transportation in aid of racketeering enterprises, Providing material support or resources to designated foreign terrorist organizations, and Advocating overthrow of government, violating 18 U.S.C.§1343, §1951, §1952, §2339B, and §2385.

427.

The acts of wire fraud, extortion, interference with commerce by threats or violence, and interstate and foreign transportation in aid of racketeering enterprises, providing material support or resources to designated foreign terrorist organizations, and advocating the overthrow of government committed against Plaintiffs by Defendants and other members of the Community Media Enterprise constitute a pattern of racketeering activity pursuant to 18 U.S.C. §1961(5).

428.

The Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

429.

As a direct and proximate result of the Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business, reputation, election activities, and property through the loss of money, employment

opportunities, property, intangible rights, equal opportunity, campaign exposure, goodwill, and donations.


## COUNT II

### 18 U.S.C. § 1962(d) & 18 U.S.C. § 1964(c)
*FEDERAL RICO CONSPIRACY*

430.

The allegations of the foregoing paragraphs are incorporated herein by reference.

431.

"A plaintiff can establish a RICO conspiracy claim in one of two ways: (1) by showing that the defendant agreed to the overall objective of the conspiracy; or (2) by showing that the defendant agreed to commit two predicate acts. Direct evidence of a RICO agreement is not required; rather it may be inferred from the conduct of the participants."[299]

432.

Defendants agreed and conspired to violate 18 U.S.C. § 1962(c).

433.

Defendants conspired to conduct and participate in the conduct of the affairs of the Community Media Enterprise through a pattern of racketeering activity (§ 1962(c)).

---

[299] *Magnifico v. Villaneuva*, 783 F.Supp.2d 1217 (S.D. Fla. 2011).

434.

The allegations of the foregoing paragraphs are incorporated herein by reference.

435.

The Defendants have intentionally conspired and agreed to directly and indirectly conduct and participate in the conduct of the affairs of the Community Media Enterprise through a pattern of racketeering activity. The Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described hereinabove. That conduct constitutes a conspiracy to violate 18 U.S.C.A. § 1962(c), in violation of 18 U.S.C. § 1962(d).

436.

As a direct and proximate result of the Count II Defendants' conspiracy, the overt acts undertaken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiffs have been injured in their business, reputation, election activities, and property through the loss of money, employment opportunities, property, intangible rights, equal opportunity, campaign exposure, goodwill, and donations.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs request that this Court enter judgment against the Defendants as follows:

A. On Count I, $150,000,000.00 in Actual Damages, $450,000,000.00 in Treble Damages, $5,000,000,000.00 in Punitive Damages, reasonable investigator and attorneys' fees, and Order Defendants to cease all use of current "hate speech", "dangerous individuals and organizations", and other violative community policies and practices that Defendants are engaged in using as a means for carrying out their criminal conduct as set forth above; and

B. On Count II, $150,000,000.00 in Actual Damages, $450,000,000.00 in Treble Damages, $5,000,000,000.00 in Punitive Damages, reasonable investigator and attorneys' fees, and Order Defendants to cease all use of current "hate speech," "dangerous individuals and organizations," and other violative community policies and practices that Defendants are engaged in using as a means for carrying out their criminal conduct as set forth above.

Respectfully submitted this 7th Day of March, 2023.

/s/ John M. Pierce

John M. Pierce
CA Bar # 250443
jpierce@johnpiercelaw.com
21550 Oxnard St., 3rd Fl PMB 172
Woodland Hills, CA 91367
Telephone: (213) 349-0054
*Attorney for Plaintiffs*