**JOHN PIERCE LAW P.C.**
John M. Pierce
jpierce@johnpiercelaw.com
21550 Oxnard St., 3rd Flr., PMB 172
Woodland Hills, CA 91367
(213) 349-0054

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| LAURA LOOMER, as an individual, LAURA LOOMER, in her capacity as a Candidate for United States Congress, and LAURA LOOMER FOR CONGRESS, INC.,<br><br>Plaintiffs,<br><br>vs.<br><br>META PLATFORMS, INC., MARK ZUCKERBERG, in his capacity as ceo of Meta Platforms, Inc. and as an individual, TWITTER, INC., and JACK DORSEY, in his capacity as former CEO of Twitter, Inc. and as an individual, THE PROCTOR & GAMBLE CO., and DOES 1-100, individuals,<br><br>Defendants | Case No.: 3:22-cv-02646-LB<br>Hon. Laurel Beeler<br><br>**PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITIONS TO MOTION FOR LEAVE TO FILE SAC** |

## INTRODUCTION

Despite an incredible amount of new information coming forth publicly – including an admission from Twitter CEO Elon Musk that he purchased a "crime scene" and historical revelations in Congressional hearings that elements of the federal government were conspiring with Big Tech on JIRA to censor and silence criticism of the Government – Defendants continue to repeat the arguments of Section 230 and RICO insufficiency in their oppositions that they have previously made. However, these arguments fall short and, as such, Plaintiffs' motion for leave to amend to file the SAC should be granted, the Defendants should answer, and this case should proceed to discovery.

# ARGUMENT

## I.   PLAINTIFFS' MOTION FOR LEAVE TO AMEND IS NOT FUTILE

### A.  Plaintiffs' Claims Are Not Barred By Res Judicata

Res judicata does not apply when "there are changed conditions and new facts which were not in existence at the time the action was filed upon which the prior judgment is based." *Planning & Conservation League v. Castaic Lake Water Agency*, 180 Cal.App.4th 210, 227 (internal citations omitted). Here, there are at least four new facts that were discovered after the final judgment in *Loomer I* was rendered in August of 2020. This new evidence could not have been discovered with due diligence prior to the final judgement being that most of it occurred well after the final judgment was rendered:

#### 1.  The "Twitter Files" and Musk's Admissions

The Twitter Files and Musk's admissions were not released and made public until the first half of December of 2022. Although the files may have been in existence prior to them being released, it would have been impossible for Plaintiffs or Plaintiffs' counsel to have discovered Twitter's internal files relating to Twitter's coordination with federal government agents for the purpose of interfering in US elections and silencing conservative Americans, including Plaintiff Loomer. *See, e.g.*, Aimee Picchi, *Twitter Files: what they are and why they matter*, CBS News, (Dec. 14, 2022, 6:46 PM), https://www.cbsnews.com/news/twitter-files-matt-taibbi-bari-weiss-michael-shellenberger-elon-musk/.

#### 2.  Twitter House Oversight Hearing

This hearing took place on February 8, 2023, over 2 years after the judgment was rendered, and as a direct result of the Twitter Files being released. Therefore, the information from this hearing could not have been ascertained prior to the judgment in *Loomer I*. *See, e.g.*, *Twitter's Response to Hunter*

*Biden Laptop Story*, CSPAN (Feb. 8, 2023), https://www.c-span.org/video/?525786-1/twitters-response-hunter-biden-laptop-story.

### 3. Mark Zuckerberg's 8/25/22 Joe Rogan Interview

This interview was conducted on August 25, 2022, two years after the judgment was rendered and could not have been ascertained prior to it taking place. *See, e.g.*, Thomas Barrabi, *Mark Zuckerberg tells Joe Rogan Facebook was wrong to ban The Post's Hunter Biden laptop story,* N.Y. Post (Aug. 25, 2022 4:03 PM), https://nypost.com/2022/08/25/mark-zuckerberg-criticizes-twitters-handling-of-the-posts-hunter-biden-laptop-story/.

### 4. Berenson's 8/12/22 Settlement with Twitter

Similarly, Alex Berenson settled with Twitter on August 12, 2022, two years after the judgment. All of the new information that Plaintiff asserts in the SAC was not discovered until after 2022, a long time after the final judgment was made in the case that Defendants are relying on to argue that Plaintiffs' current action is time-barred. This newly discovered evidence is significant because it supports Plaintiffs' claims that the Defendants engaged in a RICO conspiracy with federal agents that caused harm to the Plaintiffs and many other people.

### B. Plaintiffs' Claims are not barred by § 230 of the Communications Decency Act (CDA)

Defendants Facebook and Twitter attempt to bar Plaintiffs' claims by asserting that they are immune from liability from user generated content posted on their platforms and are protected under § 230 of the CDA. § 230 states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1) (2022). In other words, online platforms that host or republish speech are shielded from a variety of laws that could otherwise be used to hold them legally responsible for what others say and do. However, Plaintiffs are not suing Defendants based on their editorial choices.

Rather, Plaintiffs seek to recover for the direct acts made by Facebook and Twitter, and the role they played in a criminal conspiracy with the government to, *inter alia*, interfere in elections and censor certain political speech. Nonetheless, even if for arguments sake § 230 did apply, it would not protect Defendant Twitter after they blatantly admitted to patrolling content on their site and being a publisher: "[l]ike a newspaper or a news network, Twitter makes decisions about what content to include, exclude, moderate, filter, label, restrict, or promote, and those decisions are protected by the First Amendment... [which] protects the 'exercise of a publisher's editorial control and judgment.'" (ECF No. 120 at 20). The same could be said for Facebook as well, when during prior litigation with Plaintiff Loomer, Facebook itself admitted to being a publisher. *See* https://www.dailymail.co.uk/news/article-7487307/Facebook-refers-publisher-says-censor-wants.html.

### C. Plaintiffs Have Sufficiently Pled a RICO Claim

Defendants again state that despite these new facts, Plaintiffs still fail to cure the alleged defects that were referred to in their Motions to Dismiss. Defendants attempt to argue that Plaintiffs' claim fails to "plausibly allege conduct of a RICO enterprise, a pattern of racketeering activity, a cognizable injury proximately caused by the conduct alleged, a RICO predicate act or a conspiracy to violate RICO." (ECF No. 120 at 17).

#### 1. Plaintiffs Have Established a RICO Enterprise

Plaintiffs have established that Defendants formed an enterprise that performed the aforesaid conduct. "An 'enterprise' is statutorily defined as 'any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.'" *Bunnett & Co. v. Gearheart*, No. 17-cv-01475-RS, 2018 U.S. Dist. LEXIS 31873, at 7 (N.D. Cal. Feb. 27, 2018) (quoting 18 U.S.C. § 1961(4)). "For purposes of a Section 1962(c) claim, an enterprise is 'an entity, for present purposes a group of persons associated together for a common

purpose of engaging in a course of conduct.'" *Id*. at 7-8 (quoting *United States v. Turkette*, 452 U.S. 576, 583, 101 S. Ct. 2524, 69 L. Ed. 2d 246 (1981)).  To establish such an enterprise, "a plaintiff must provide both evidence of an ongoing organization, formal or informal, and evidence that the various associates function as a continuing unit." *Id*. at 8. Further, "[t]he Ninth Circuit has expressly rejected that a plaintiff need show or allege 'any particular organizational structure, separate or otherwise.'" *Id*. (quoting *Odom v. Microsoft Corp*., 486 F.3d 541, 551 (9th Cir. 2007)).  "The Supreme Court has clarified that an enterprise must be 'separate and apart from the pattern of activity in which it engages.'" *Id*. (quoting *Turkette*, 452 U.S. at 683).  Therefore, to adequately plead that an enterprise exists, "Plaintiffs need to allege (1) a common purpose among defendants, (2) ongoing organization, formal or informal, and (3) a continuing unit." *Id*.

Plaintiffs have established that Defendants had the common purpose of suppressing speech, censoring news coverage surrounding the 2020 Presidential election, censoring reports regarding the Hunter Biden Laptop Scandal for which they regularly met with each other to discuss, defrauding Plaintiffs and others, and undermining elections by censoring and deplatforming plaintiffs among other illegal activities with the shared goal of influencing the results of the 2020 elections.  Contrary to Defendants claiming they had no knowledge of a common purpose and that their content moderation was "lawful parallel conduct," Plaintiffs have demonstrated that Defendants colluded with one another and with individuals within the FBI, and other parts of the Executive Branch and federal agencies both directly, internally, and on a private cloud server (as was revealed during the February 2023 House Oversight Hearing in the US Congress), to determine which individuals to ban from their Platforms. This has now been unequivocally established by the Twitter Files, admissions from Twitter's new owner and CEO Elon Musk, who called Twitter "both a social media company and a crime scene" in a Tweet posted December 10, 2022, and revelations in the Congressional Oversight Hearing regarding

JIRA. Defendants acted together to ensure that banned individuals would have no ability to share their political views nor promote their campaigns on any major internet Platforms, and to shape the public narratives of politicians, ideologies, and political events.

      Plaintiffs have also established that Defendants formed an ongoing organization. In coordination with FBI agents, Defendants Facebook and Zuckerberg algorithmically suppressed stories about the Hunter Biden laptop scandal leading up to the 2020 election in an effort to influence the 2020 presidential election in Joe Biden's favor. Further, in coordination with FBI agents and others within the Executive Branch, Defendants Twitter and Dorsey banned certain individuals from the platform to suppress criticisms against the government. Moreover, Defendant P&G required Defendants Facebook and Zuckerberg to ban certain individuals from Facebook unless those individuals disavowed the Proud Boys, as was admitted to Plaintiffs in 2019 by Facebook employee Josh Althouse, who serves as a Public Policy Manager at Facebook in Washington DC. In this way, Defendants comprised an organization acting with the common purpose of suppressing speech and influencing elections, in line with P&G's requests and threats to remove advertising revenue unless certain users were banned.

      Finally, Plaintiffs have demonstrated that Defendants' organization is a continuing unit. As of August 23, 2022, when Candidate Loomer was robbed of her Republican primary election victory for U.S. Congress in Florida's 11th District by less than 6,000 votes, her campaign was the only de-platformed campaign in the United States, and the only de-platformed campaign in the state of Florida. This is further evidence that Defendants continued with the goals of the enterprise, because even when Ms. Loomer satisfied the requirements of being a political candidate, Facebook went against their prior statements and the statements of their CEO by banning Candidate Loomer within 24 hours of the time she attempted to create a campaign account, and also keeping her banned even after she won her primary on August 18th, 2020 in her first campaign for federal office. SAC ¶¶ 336-339; *see also* https://www.breitbart.com/tech/2020/07/03/facebook-blacklists-laura-loomers-campaign-ads/;

https://www.breitbart.com/tech/2019/11/14/politicians-wont-be-allowed-on-facebook-if-theyve-previously-been-banned/.

## 2.  Plaintiffs Have Established a RICO Pattern

Plaintiffs have adequately alleged that Defendants displayed a pattern of racketeering activity. A pattern of racketeering activity requires two or more acts of racketeering and "requires the showing of a relationship between predicates [] and of the threat of continuing activity..." *See Gidding v. Anderson*, No. C 07-04755 JSW, 2009 U.S. Dist. LEXIS 24351, at *23 (N.D. Cal. Mar. 13, 2009) (quoting *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 232, 238 (1989) (alteration in original)). "Predicate acts are related if they have 'the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" *Id*. Continuity "refer[s] either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id*. When a RICO claim is brought alleging open-ended continuity, as Plaintiffs bring in this action, "liability depends on whether the threat of continuity is demonstrated." *Id*. at 24. Furthermore, Plaintiffs argue that predicate acts targeting other victims is evidence of a racketeering 'pattern', since the plaintiff only needs to show a single predicate act committed in furtherance of the scheme. See SAC ¶ 407.

Plaintiffs have demonstrated that the predicate acts alleged are related because these acts were performed with similar methods of commission, by banning certain individuals and ideas from social media Platforms, and with similar purposes of suppressing speech, thereby controlling public narratives and undermining American elections.

Plaintiffs have also demonstrated a threat of continuing activity. Defendants used an excuse of regular business practices to support their ban of Plaintiffs and other conservatives while allowing terrorists and foreign propagandists to remain on such Platforms. Despite Defendants' objections, Plaintiffs explained that, as recently as August 2021, "the Taliban in Afghanistan and its terrorist

PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITIONS TO MOTION FOR LEAVE TO FILE SAC
7

affiliates used Twitter and Facebook applications to organize, implement, and procure substantial resources necessary to achieve the defeat of the United States and its allies in Afghanistan." Therefore, because Defendants regularly coordinate with paying entities to determine which individuals and groups to permit on their Platforms, their predicate acts have a threat of continuing and demonstrate an ongoing pattern of racketeering activity.

### 3. Defendants Engaged in Racketeering Activity

Plaintiffs have adequately alleged that Defendants engaged in racketeering activity "Racketeering activity is defined to include a number of generically-specified criminal acts, as well as the commission of one of a number of listed predicate offenses." *Zapata v. Wells Fargo Bank, N.A.*, No. C 13-04288 WHA, 2013 U.S. Dist. LEXIS 173187, (N.D. Cal. Dec. 10, 2013) (citing 18 U.S.C. § 1961(1)). Included in this list are indictable acts under 18 U.S.C. § 1343, § 1951, and § 1952.

Under 18 U.S.C. § 1343, "[a] wire fraud violation consists of (1) the formation of a scheme or artifice to defraud; (2) use of the United States wires or causing a use of the United States wires in furtherance of the scheme; and (3) specific intent to deceive or defraud." *Bonner v. Select Portfolio Servicing, Inc.*, No. 10-00609 CW, 2010 U.S. Dist. LEXIS 84857, at 20 (N.D. Cal. July 26, 2010). Wire fraud requires the intent "to deprive the victim of money or property by means of deception." *RJ v. Cigna Health & Life Ins. Co.*, No. 5:20-cv-02255-EJD, 2022 U.S. Dist. LEXIS 159152, at 14 (N.D. Cal. Sept. 2, 2022). "Allegations of predicate acts of mail and wire fraud in RICO claims must be pled with specificity" and satisfy the particularity requirement of Rule 9(b). *See Fraser v. Team Health Holdings, Inc.*, No. 20-cv-04600-JSW, 2022 U.S. Dist. LEXIS 60544, at 26 (N.D. Cal. Mar. 31, 2022). "However, the particularity requirement does not apply to allegations of fraudulent intent, which only must be 'alleged generally.'" *Id*.

First, Plaintiffs have pleaded allegations of wire fraud with particularity. Each allegation of fraud (Defendants coordinated with one another to de-platform and/or ban Plaintiffs, Defendants intentionally deceived the public by making fraudulent statements and illegally interfering in US elections etc.) have been stated with the date such conduct occurred, the location or meeting at which fraudulent statements were made, and the parties present or involved in the fraudulent actions. Therefore, these allegations have been stated with such particularity that Defendants were put on notice of particular misconduct (as demonstrated by the Twitter Files, Elon Musk's and Mark Zuckerberg's own public statements, and the recent Congressional hearings), but access to discovery would provide even further evidence to satisfy those requirements.

Next, Plaintiffs have demonstrated that Defendants formed a "scheme or artifice" to defraud when they deprived Plaintiffs the intangible right of honest services. The scope of § 1343 previously "encompassed only schemes to defraud another of money or other property rights, but not schemes to defraud another of intangible rights." *United States v. deVegter*, 198 F.3d 1324, 1327 (11th Cir. 1999). However, Congress passed § 1346 to "extend[] wire fraud liability to schemes to defraud another of intangible rights, including an intangible right of honest services." *Id.* While Congress has not expressly defined "honest services," courts have interpreted the doctrine to apply to:

> "[1] government officials who defraud the public of their own honest services; [2] elected officials and campaign workers who falsify votes and thereby defraud the electorate of the right to an honest election; [3] private actors who abuse fiduciary duties by, for example, taking bribes; and [4] private actors who defraud others of certain intangible rights, such as privacy." *Rybicki*, 354 F.3d at 133 (quoting *United States v. Handakas*, 286 F.3d 92, 101 (2d Cir.), *cert. denied*, 537 U.S. 894, 123 S. Ct. 168, 154 L.Ed.2d 160 (2002)).

Further, an honest services scheme or artifice is one which "use[s] the mails or wires to enable an officer or employee of a private entity to secretly act" in his or her or the defendant's own interests instead, by misrepresentations or omissions disclosed to the employer or other person." *Id.* at 127.

Defendants Facebook and P&G schemed to deprive Ms. Loomer of her honest services when P&G provided a list of users for Facebook to ban, and Facebook obliged. As a result, Ms. Loomer was deprived of her intangible right not to have her reputation damaged by being labeled a "Dangerous Individual" and subsequently deplatformed. Also, Defendants used the United States wires, in furtherance of the scheme when Facebook used television and electronic communications to deliver promises that political candidates would be permitted to use its Platform without worry that their speech would be suppressed. Twitter also made these same false promises. *See* https://www.thegatewaypundit.com/2019/12/twitter-to-verify-all-congressional-and-gubernatorial-candidates-but-will-not-be-reinstating-laura-loomer/.

Finally, Plaintiffs have shown that Defendants had the specific intent to deceive or defraud Plaintiffs after publicly misrepresenting that political candidates would have the ability to use Facebook and Twitter as a method of communicating their political ideas. SAC ¶¶ 331, 337-339, 342, 345. Therefore, Plaintiffs have adequately alleged that Defendants engaged in racketeering activity by violating 18 U.S.C. § 1343.

Plaintiffs have also shown that Defendants committed extortion in violation of 18 U.S.C. § 1951.  Extortion is "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."  18 U.S.C. § 1951(b)(2). Defendants argue that Plaintiffs have not alleged that Defendants acted wrongfully, obtained Plaintiffs' property, nor that Defendants used force, violence, or fear to do so.  However, Plaintiffs have alleged that Defendant Facebook commits extortion by obtaining contractual, speech, and other rights and intellectual property from its users by threatening that it will ban its users, label them as dangerous individuals, label them as users of "hate speech," or label their content as false information. Defendants wrongfully used the fear of public disgrace and economic harm associated

with being banned and labeled as a dangerous individual or group, under the color of official right, to obtain intangible property from Ms. Loomer, her associates, followers, and those similarly situated, with their consent.

While Defendants Facebook and Zuckerberg argue that Plaintiffs did not allege any "preexisting legal right to access Facebook while violating its policies or to use Facebook without being deemed a dangerous individual under its Community Standards," Plaintiffs have indeed shown that Facebook was acting as a State Actor in making its decisions to suppress Plaintiffs' and others' speech and to interfere in Ms. Loomer's congressional elections. As a State Actor, Defendant Facebook was required not to violate its users' First Amendment rights. Therefore, Plaintiffs had the preexisting legal right to use the Platform, which Defendants wrongfully removed.

Defendants Facebook and Zuckerberg then argue that Plaintiffs' speech rights are not items of value. Opp. to Motion to Amend FAC at 17, ECF No. 119. Defendants then state that Plaintiffs cannot adequately plead extortion by alleging that Defendants "gain[ed] some speculative benefit" by restricting Plaintiffs' activities, and that Defendants "must actually appropriate (or attempt to appropriate) the victim's property." *Id*. at 17 (quoting *United States v. McFall*, 558 F.3d 951, 957-58 (9th Cir. 2009)). However, Plaintiffs have demonstrated that, by Defendants Facebook and Zuckerberg suppressing Plaintiffs' speech rights, Defendants gained the valuable benefit of P&G advertising on the Platform. P&G is Facebook's largest advertiser. In 2020, P&G spent $284.2 million advertising on Facebook. *See* https://www.statista.com/statistics/1250193/social-media-advertisers/ - :~:text=Leading social media advertisers in the U.S. 2020&text=Disney was the largest advertiser,top three with 235.2 million. In this way, Defendants obtained valuable property from Plaintiffs. Therefore under § 1951, Plaintiffs have adequately alleged that Defendants committed extortion by obtaining property from

Plaintiffs by wrongfully threatening users and causing them to fear being de-platformed and labeled as dangerous individuals.

Under § 1952 (SAC ¶¶ 415-419) Defendants Twitter and Dorsey argue that Plaintiffs' allegations regarding § 1952 "do not mention Twitter" and "cannot suffice to demonstrate that Twitter used 'the mail or any facility in interstate or foreign commerce' to carry out any 'unlawful activity.'" However, when Plaintiffs raised RICO as a cause of action and discussed interference with commerce by threats or violence, Plaintiffs established that Defendants, including Twitter, committed extortion in violation of the laws of Florida, California, and the United States by using the mail, email, the internet, social media, and other facilities in interstate commerce to injure Plaintiffs' reputation and to disgrace Plaintiffs by banning them from Defendants' Platforms for "hateful" conduct and labeling Ms. Loomer as a dangerous individual and a "white supremacist," even though she is a Jewish woman.

### a. Defendants Violated 18 U.S.C. § 2339B: Providing Material Support or Resources to Designated Foreign Terrorist Organizations

Defendants Facebook and Zuckerberg argue that Plaintiffs have not plausibly alleged that Defendants Facebook and Zuckerberg "knew that any particular account was affiliated with an FTO and failed to remove it." Further, Defendants Facebook and Zuckerberg claim that they actively remove terrorist content from Facebook and can't be liable for the content of others. Defendants Twitter and Dorsey similarly argue that Plaintiffs have alleged that members of the Taliban remain on Twitter, but that the Taliban is not a "designated foreign terrorist organization." Defendants Twitter and Dorsey further state that they terminate accounts affiliated with Hamas or Hezbollah.

However, Plaintiffs have explained that Hezbollah and HAMAS maintained a widespread presence on Facebook, YouTube, and Twitter, and that Al Aqsa and many of its leaders have Twitter feeds and Facebook pages. It is unlikely that these feeds and pages remained undetected by Facebook and Twitter, because Defendant Facebook has automatically generated hundreds of business pages

promoting ISIS and Al Qaida, allowed them to be searchable and accessible for up to six weeks, and allowed users to like their pages, and because Defendant Twitter permits accounts associated with political arms of Hamas, Hezbollah, and the Taliban to maintain Twitter accounts. While the Taliban in Afghanistan have not been officially designated as a Foreign Terrorist Organization by the United States, it has been listed as a terrorist organization by other government departments. This was also brought to light during the Congressional hearing in February 2023. SAC ¶ 246. Therefore, Plaintiffs have properly alleged that Defendants knowingly provided material support to foreign terrorist organizations by allowing such organizations to use their Platforms.

### b. Defendants Violated 18 U.S.C. § 2385: Advocating Overthrow of the Government

18 U.S.C. § 2385 prohibits "knowingly or willfully abet[ting] or teach[ing] the desirability or propriety of overthrowing or destroying the government of the United States... by force or violence, or by the assassination of any officer of any such government." Further, it prohibits "whoever, with intent to cause the overthrow or destruction of any such government attempts to publish, edit, issue, circulate, distribute, or publicly display any written matter advocating, advising, or teaching the desirability or propriety of overthrowing or destroying any government in the United States by force or violence." Lastly, it prohibits "knowingly affiliat[ing] or conspir[ing] with any such group." SAC ¶¶ 422-429.

Defendants argue that Plaintiffs do not allege that Defendants advocated concrete violent action to overthrow the United States government or that Defendants' actions could cause an imminent rebellion. However, Plaintiffs have clearly demonstrated that Defendants attempted to overthrow the government by silencing President Donald Trump while he was in office and was still the active Commander in Chief, despite Defendant Zuckerberg's prior statements. SAC ¶ 349. Defendant Facebook's Chief Product Officer Chris Cox publicly stated that "[Donald] Trump should not be our President" and took part in a campaign to spend millions on digital messaging to oppose Donald Trump

in the 2020 presidential election. Additionally, CEO Elon Musk publicly released internal Twitter documents exposing how, "[u]nder pressure from hundreds of activist employees, Twitter deplatforms Trump, a sitting US President, even though they themselves acknowledge that he didn't violate the rules." Elon Musk, Twitter (Dec. 12, 2022).  Defendants engaged in this censoring of the President of the United States, while also advocating for the violent overthrow of the government by permitting Iranian threats to assassinate Donald Trump, allowing for thousands of posts to remain posted that actively encouraged and called for the assassination of President Trump and his supporters, and assisting in the violent Arab Spring revolution and publicly supporting the violent Black Lives Matter riots in the U.S.

Further, Plaintiffs state that Defendant Facebook also refused to remove a page celebrating "dead cops" that was titled "The Only Good Cops Are Dead Cops" and that openly incited violence against police officers. Defendant Facebook subsequently deleted a Facebook events page of a group planning to hold a pro-police rally in Long Island, New York. SAC ¶¶ 370-372. In this way, Defendant Facebook published and circulated written material, which advocated for the destruction of ICE and/or government law enforcement, and Defendant Facebook did so with the intent to cause the destruction of ICE and/or local and federal law enforcement.

Defendants Twitter and Dorsey claim that Plaintiffs fail to name specific terrorist leaders, yet Plaintiffs mention Zabihullah Mujahid, who used Twitter accounts to provide updates and propaganda messaging in furtherance and support of the Taliban's overthrow of United States governmental entities and interests in Afghanistan. By allowing the Taliban to promote such extremism, violence and terrorist views on Twitter, Defendants Twitter and Dorsey advocated concrete violent action against the government, and the Taliban could have committed an imminent rebellion based on the Taliban's message and broad reach on social media. SAC ¶¶ 362-366. Therefore, because Defendants permitted

pages and feeds from terrorist leaders, but went out of their way to target and ban Plaintiffs, they intended to cause destruction of government entities and published and circulated written information in furtherance of this intent.

### D. Plaintiffs' RICO Conspiracy Claim (Count II) Is Supported by Sufficient Facts And A Cognizable Legal Theory For Relief

Federal RICO conspiracy may be established under 18 U.S.C. § 1962(d) and 18 U.S.C. § 1964(c) by showing either (1) "that the defendant agreed to the overall objective of the conspiracy," or (2) "that the defendant agreed to commit two predicate acts." *Magnifico v. Villaneuva*, 783 F. Supp. 2d 1217 (S.D. Fla. 2011). "Direct evidence of a RICO agreement is not required; rather it may be inferred from the conduct of the participants." *Id*.

Defendants argue that Plaintiffs have not stated a § 1962(d) conspiracy claim because they believe that Plaintiffs' § 1962(c) claim fails and is not particularly plead. However, Plaintiffs have adequately alleged in the Complaint, and stated in the arguments above, that Defendants injured Plaintiffs by committing the predicate acts alleged. Plaintiffs have also shown in the Complaint and above that Defendants agreed and conspired to violate 18 U.S.C. § 1962(c) by participating in the conduct of the affairs of the Community Media Enterprise. Through this Enterprise, Defendants operated and managed a RICO enterprise by directing other members of the Enterprise to censor and ban certain speech and individuals. Therefore, Plaintiffs have shown that Defendants participated in a RICO conspiracy to violate 18 U.S.C. § 1962(c).

### II. Plaintiffs' Motion for Leave to File Second Amended Complaint Is Not Made In Bad Faith

"The trial court has discretion to permit or deny the amendment of the complaint, but instances justifying the court's denial of leave to amend are rare." *Armenta ex rel. City of Burbank v. Mueller Co.*, 142 Cal.App.4th 636, 642 (2006). In deciding a request for leave to amend, a court considers "bad faith, undue delay, prejudice to the opposing party, futility of amendment, and whether the plaintiff has

previously amended the complaint." *Pyara v. Sysco Corporation*, 2016 WL 6897251, at 2 (E.D. Cal. November 23, 2016). "The party opposing amendment carries the burden of showing why leave to amend should not be granted" *Id.*

      Plaintiffs do not seek to file the Second Amended Complaint in bad faith because pleading facts not previously known is neither frivolous nor improper; rather, it is incumbent on Plaintiffs' counsel to include these newly discovered facts. Additionally, on January 13, 2023, Twitter's new CEO and owner Elon Musk tweeted, "Transparency builds trust." Discovery will provide this transparency, and the proposed SAC is necessary to further demonstrate that Defendants engaged in a RICO conspiracy that injured Plaintiffs and others. Indeed, the facts relevant to this case are evolving on a nearly daily basis as more revelations occur regarding the conspiracy among Big Tech, federal agents, the U.S. federal government, and corporate America. In light of this, Plaintiffs have moved with extraordinary speed to attempt to bring the relevant additional allegations to the Court's attention.

## CONCLUSION

      For the foregoing reasons, Plaintiffs' motion for leave to file a Second Amended Complaint should be granted.

Dated  March 28, 2023                                    Respectfully submitted,

/s/ John M. Pierce
John M. Pierce
John Pierce Law P.C.
jpierce@johnpiercelaw.com
21550 Oxnard St., 3rd Fl PMB 172
Woodland Hills, CA 91367
(213) 349-0054

*Attorney for Plaintiffs*
