UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| LAURA LOOMER, et al., | Case No. 22-cv-02646-LB |
| Plaintiffs, | |
| v. | **ORDER GRANTING MOTIONS TO DISMISS** |
| MARK ZUCKERBERG, et al., | Re: ECF Nos. 79–81, 114 |
| Defendants. | |

**INTRODUCTION**

The plaintiff is a former congressional candidate who was banned from Twitter and Facebook in 2018 and 2019 for alleged hateful conduct and for appearing with others banned for hateful conduct. She sued Facebook and Twitter over those bans several times before. In this case, she alleges that providers of social-media platforms, Procter & Gamble (which advertises on those platforms), and unnamed government officials constitute a racketeering enterprise that "unlawfully censors conservative voices and interfere[s] with American elections." She claims that the enterprise violates the Racketeer Influenced and Corrupt Organizations (RICO) Act by engaging in interference with commerce by threats or violence, interstate transportation in aid of racketeering, wire fraud, providing material support to terrorists, and advocating overthrow of the government.

The plaintiff sued the members of the alleged enterprise: Mark Zuckerberg, Meta Platforms (Facebook), Jack Dorsey, X Corp. (Twitter), and Procter & Gamble. The defendants moved to

dismiss the First Amended Complaint (FAC) under Federal Rule of Civil Procedure 12(b)(6). The Twitter and Facebook defendants contend that the claims are barred by the doctrine of res judicata and § 230 of the Communications Decency Act, and all defendants contend that the plaintiff cannot plausibly plead RICO claims. In addition to opposing the motions to dismiss, the plaintiff moved for leave to amend her complaint to add new allegations, which are mostly about internal Twitter documents that allegedly show coordination between Twitter and the federal government.

The court grants the motions to dismiss with prejudice because res judicata bars the claims against Twitter and Facebook, § 230 also bars those claims, and the RICO claims are futile.

## STATEMENT

### 1.  The Alleged Enterprise and its Banning the Plaintiff from Facebook and Twitter

The plaintiff, who lives in Florida, ran for Congress in 2020 and 2022. In 2020, she was the Republican nominee in the general election to represent Florida's 21st congressional district in the U.S. House of Representatives.[1] In 2022, she ran in the Republican primary election for Florida's 11th congressional district.[2] She is the CEO of Laura Loomer for Congress, Inc., which is also a plaintiff in this case.[3]

Defendants X Corp. (Twitter) and Meta Platforms (Facebook) operate social-media platforms that are "the new public town square."[4] Mr. Zuckerberg is the Chairman and CEO of Facebook.[5] Mr. Dorsey is the former CEO of Twitter.[6] The Procter & Gamble Company is an Ohio corporation that advertises on Twitter and Facebook.[7] "Defendants Does 1–100 are persons within the [FBI], and potentially others within the Executive Branch of the United States government and

---

[1] First Am. Compl. (FAC) – ECF No. 69 at 3 (¶¶ 5–6). Citations refer to material in the Electronic Case File (ECF); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] *Id.* at 4 (¶ 7).

[3] *Id.* (¶¶ 8, 10).

[4] *Id.* at 4–5 (¶¶ 11, 13), 9–10 (¶¶ 25–26, 30–31); Corp. Disclosure Statement – ECF No. 123.

[5] FAC – ECF No. 69 at 4 (¶ 12).

[6] *Id.* at 5 (¶ 14).

[7] *Id.* at 5 (¶¶ 15–16), 71–72 (¶¶ 238–39).

United States District Court
Northern District of California

corporate America, including executives and advertising officials at [Procter] & Gamble, who conspired with other [d]efendants to commit the [alleged] unlawful acts[.]"[8]

The plaintiff alleges that the defendants constitute an enterprise engaged in a pattern of racketeering. The general premise is that "big tech" companies and the U.S. government are conspiring to ban conservatives from social-media platforms, and thereby interfere in elections, by "fraudulently us[ing] the pretext of 'hate speech.'"[9] The plaintiff is allegedly "one of the primary victims of that conspiracy."[10]

On August 12, 2018, Facebook suspended the plaintiff for thirty days.[11] On November 21, 2018, Twitter banned the plaintiff "for 'hateful' conduct."[12] On May 2, 2019, Facebook banned the plaintiff and others after designating them as "dangerous individuals" due to "their alleged off-platform associations with affiliates of the Proud Boys."[13] The plaintiff had appeared with Gavin McInnes and praised Faith Goldy, both designated previously by Facebook as "hate figures."[14]

On August 2, 2019, the plaintiff announced her candidacy for the Republican nomination for Florida's 21st congressional district.[15] Her campaign created a Facebook page for her "as a candidate rather than a private citizen" on November 11, 2019.[16] But the next day, Facebook banned that page "and subsequently deleted all messages and correspondence with the campaign."[17] This was allegedly done "under the pretext of violations of [Facebook's] 'hate speech policy.'"[18] On November 14, 2019, in response to inquiries about the plaintiff and her

---

[8] *Id.* at 4 (¶ 16).

[9] *Id.* at 2–3 (¶¶ 2–3), 11–12 (¶ 37).

[10] *Id.* at 3 (¶ 4).

[11] *Id.* at 66 (¶ 216).

[12] *Id.* (¶ 217).

[13] *Id.* at 48 (¶ 160).

[14] *Id.* at 66 (¶ 218).

[15] *Id.* at 67 (¶ 219).

[16] *Id.* at 68 (¶ 225).

[17] *Id.* (¶ 226).

[18] *Id.* at 69 (¶ 227).

United States District Court
Northern District of California

campaign being banned, Facebook changed its policy on political candidates to exclude candidates who had already been banned.[19] Later, in July 2020, the plaintiff was told that if a Political Action Committee tried to promote her campaign on Facebook with ads, the ads "would be taken down."[20] The next day, that happened, and Facebook allegedly adopted a "new policy . . . that nothing about [the plaintiff] is permitted on Facebook, and that for the duration of the election cycle[,] the [plaintiff's] campaign [would] not have access to run any of its own ads."[21]

No other federal candidate in the country was banned from advertising on Facebook.[22] Twitter also did not allow the plaintiff to use its platform during the election.[23] At the time, the pandemic "mandate[ed] reliance on digital and social media to reach and interact with prospective voters."[24] On August 18, 2020, the plaintiff won the Republican primary election.[25] Her Democratic opponent Lois Frankel advertised on Facebook throughout the campaign, which allegedly gave Ms. Frankel an unfair advantage.[26] Ms. Frankel won the election in November 2020.[27]

The plaintiff also ran in the Republican primary election for Florida's 11th congressional district prior to the 2022 mid-term elections. She sought to unseat forty-year incumbent Daniel Webster, and she "out-fundraised" him consistently. As in 2020, her campaign was "the only de-platformed campaign in the nation." In August 2022, Mr. Webster won the primary election by 5,210 votes, "the smallest margin for any incumbent who ran for re-election" in Florida.[28]

There are also allegations about defendant Procter & Gamble. On April 11, 2019, at the annual meeting of the Association of National Advertisers, Procter & Gamble's Chief Brand Officer

---

[19] *Id.* (¶ 230).

[20] *Id.* at 72 (¶ 241).

[21] *Id.* at 72–73 (¶¶ 242, 244).

[22] *Id.* at 72 (¶ 245).

[23] *Id.* at 74 (¶ 247).

[24] *Id.* at 69–70 (¶¶ 231–32).

[25] *Id.* at 73 (¶ 246).

[26] *Id.* at 72–73 (¶¶ 242–43).

[27] *Id.* at 74 (¶ 248).

[28] *Id.* at 74–75 (¶¶ 249–51).

"announced the creation of a 'New Media Supply Chain' wherein [Procter & Gamble] would require advertising platforms to 'prove' that their content was 'under their complete control.'"[29] In May 2019 (the same month the plaintiff was banned from Facebook for her affiliation with the Proud Boys), Procter & Gamble allegedly demanded that Facebook designate a list of individuals as "dangerous" and ban them unless they "disavowed the Proud Boys."[30] Later, in June 2020, Procter & Gamble's Chief Brand Officer said that Procter & Gamble would not advertise "on or near content that we determine is hateful, denigrating or discriminatory."[31] "Where we determine our standards are not met, we will take action, up to and including stopping spending, just like we've done before."[32] On the same day, Facebook said that it routinely discusses policy matters with advertisers and would continue doing so.[33]

The FAC has allegations about government officials. In 2019, the FBI red-flagged the plaintiff in its "[NICS] database," causing her to be prohibited from possessing a firearm.[34] In the weeks leading up to the 2020 presidential election, Facebook allegedly "algorithmically suppressed stories about the Hunter Biden laptop scandal" at the FBI's request or warning.[35] And COVID-19 vaccine skeptic Alex Berenson was allegedly banned from Twitter at the White House's request.[36]

## 2. The Alleged Predicate Acts

The plaintiff alleges that the racketeering enterprise has engaged in the following criminal acts (or "predicate acts"): interference with commerce by threats or violence, 18 U.S.C. § 1951; interstate transportation in aid of racketeering, *id.* § 1952; wire fraud, *id.* § 1343; providing material support to terrorists, *id.* § 2339B; and advocating overthrow of the government, *id.* § 2385.

---

[29] *Id.* at 70 (¶ 233).

[30] *Id.* at 70–71 (¶¶ 234–35).

[31] *Id.* at 71 (¶ 237).

[32] *Id.* at 72 (¶ 239).

[33] *Id.* at 71 (¶ 236).

[34] *Id.* at 79 (¶ 261).

[35] *Id.* at 2 (¶ 1), 76–77 (¶¶ 254–55, 258).

[36] *Id.* at 2–3 (¶ 2), 78 (¶ 259).

United States District Court
Northern District of California

United States District Court
Northern District of California

As to interference with commerce by threats or violence, the plaintiff alleges that Facebook and Google induce changes in their users' behavior "by the threat of banning and labeling." For example, when Facebook users try to share a post that has been fact-checked, Facebook displays a warning that "[p]ages and websites that repeatedly publish or share false news will see their overall distribution reduced and [will] be restricted in other ways." Google induced the website Zero Hedge to delete much of its comment section by telling Zero Hedge that if it did not do so, it would not be able to earn revenue through Google ads.[37] And the plaintiff alleges that Facebook threatened to ban her and label her a "dangerous individual" to compel her to refrain from associating with other people labeled by the defendants as dangerous.[38]

In support of her claim of interstate transportation in aid of racketeering, the plaintiff alleges that Facebook has banned or limited hate speech and false content. In September 2019, Facebook removed two posts by the head of the "Angel Families" organization and permanently removed the group's donation button because the posts violated Facebook's hate-speech policy. In August 2020, Facebook banned ads by the "Committee to Defend the President" due to the Committee's "repeated sharing of content determined by third-party fact-checkers to be false."[39] As for the plaintiff, the defendants allegedly exposed her to disgrace to compel her "to refrain from associating or speaking."[40]

The plaintiff also asserts wire fraud. She alleges that "Facebook and Procter & Gamble schemed . . . to deprive [her] of honest services due to her as a user of Facebook." Also, during the 2020 election campaign, Facebook allegedly falsely promised that candidates would not be subject to restrictions "as a way to procure millions of dollars in advertisement purchases," but then "changed its policies to subject [Donald Trump's Facebook] advertisements to third-party review and censorship."[41]

---

[37] *Id.* at 80–84 (¶¶ 262–78).

[38] *Id.* at 110–11 (¶ 365).

[39] *Id.* at 84–87 (¶¶ 279–87).

[40] *Id.* at 112 (¶ 370).

[41] *Id.* at 87–92 (¶¶ 288–305), 109–10 (¶ 362).

United States District Court
Northern District of California

For the predicate act of providing material support to terrorists, the plaintiff alleges that "Hezbollah and Hamas maintained a widespread presence on Facebook, YouTube and Twitter." A Hamas television station and leaders of each organization had accounts on Facebook and Twitter. On September 18, 2019, Facebook allegedly "was found to have automatically generated hundreds of business pages promoting the terrorist groups ISIS and Al Qaida" and allowed those pages to remain online for up to six weeks. In October 2019, a U.S. policy director for Twitter said that "Twitter allows accounts associated with political arms of groups designated by the U.S. government as 'foreign terrorist organizations.'" Taliban supporters and spokesmen also maintained accounts on Facebook and Twitter.[42]

The last alleged predicate act is advocating overthrow of the government. Facebook "facilitated" the group "Abolish ICE Denver" when it "organize[d] gatherings outside the home of ICE warden Johnny Choate" and "post[ed] direct threats, such as 'FIRE TO THE PRISON.'" Facebook "refused to remove a page celebrating 'dead cops' titled 'The Only Good Cops Are Dead Cops.'" On January 7 and 8, 2021, Facebook and Twitter banned Donald Trump's accounts. And in August 2021, members of the Taliban used Twitter "to provide updates and propaganda messaging in furtherance and support of the Taliban['s] overthrow of United States governmental entities and interests in Afghanistan."[43]

### 3. Allegations in the Proposed Second Amended Complaint

The plaintiff moved for leave to amend her complaint and submitted a proposed Second Amended Complaint (SAC).[44] In the SAC, the defendants, racketeering-enterprise members, predicate acts, and claims are the same.[45] The new allegations are as follows.

In the months after Elon Musk became the owner of Twitter in October 2022, internal Twitter documents were released by independent journalists. The documents allegedly show "Twitter's

---

[42] *Id.* at 93–97 (¶¶ 306–18), 113 (¶ 372).

[43] *Id.* at 97–101 (¶¶ 319–30), 113–14 (¶ 374–76).

[44] SAC, Ex. A to Pierce Decl. in Supp. of Mot. for Leave – ECF No. 114-2.

[45] *See generally* Blackline – ECF No. 126.

coordination with federal government agents (primarily the [FBI]) to fraudulently censor core political speech" protected by the First Amendment, including the plaintiff's, and to "defraud hundreds of millions of American[s] (including [the plaintiff]) by interfering in multiple elections, including the 2020 [p]residential election."[46] In December 2022, Mr. Musk tweeted that "[t]he evidence is clear and voluminous" that Twitter interfered in the 2020 election. He also said that Twitter was "both a social media company and a crime scene."[47]

The Twitter documents allegedly "revealed the extraordinary measures that Twitter implemented to suppress the Hunter Biden laptop scandal." Twitter's Trust and Safety chief Yoel Roth, who met weekly with the FBI from 2018 to 2020, "wasn't immediately comfortable" removing the New York Post's article on the matter, but then ordered that it be suppressed based on expert consensus that it "look[ed] a lot like a hack-and-leak." This order was allegedly given "[a]t the consistent prompting of Twitter special counsel and former FBI agent James Baker." Twitter removed links to the article, posted warnings that the article may be unsafe, and blocked its transmission via direct message. These actions allegedly "interfered in the 2020 [p]residential election, because[] as a 2020 MRC poll found, '9.4 percent of Biden voters would have abandoned him [if they had been fully aware of the scandal], flipping all six of the swing states he won to former President Donald Trump.'"[48]

The internal Twitter documents allegedly also showed how easily "outside forces" could "manipulate" Twitter to "censor" content on the platform. The FBI and Mr. Roth "exchanged more than 150 emails from January 2020 until November 2022. Many of these emails were requests by the FBI for Twitter to take action on election misinformation." Other federal agencies also requested that Twitter take action, "sending lists of hundreds of problem accounts and content identified as possible terms of service violation[s]."[49]

---

[46] SAC, Ex. A to Pierce Decl. in Supp. of Mot. for Leave – ECF No. 114-2 at 5–6 (¶¶ 1, 3), 78–79 (¶¶ 233–34).

[47] *Id.* at 92–93 (¶¶ 247–50).

[48] *Id.* at 79–80 (¶¶ 236, 238).

[49] *Id.* at 81–82 (¶¶ 239–40).

United States District Court
Northern District of California

Twitter engaged in "shadowbanning" or "visibility filtering" of users' accounts. Twitter shadowbanned "prominent conservatives." Mr. Musk said that this was done with political candidates. It is "extremely likely" that Twitter shadowbanned the plaintiff's account.[50]

Twitter, Facebook, and persons within the federal government allegedly communicated with each other using software called Jira. According to the plaintiff, this communications channel strengthens her allegations about a conspiracy to eliminate "unwanted political speech" and interfere in elections.[51] In light of this communications channel, the plaintiff alleges that the FBI's red-flagging her in its NICS database was likely related to the defendants' de-platforming her.[52]

In February 2023, the House Committee on Oversight and Accountability held a hearing on the Twitter documents.[53] Representative Gary Palmer cited a Princeton University study saying that Twitter "allowed terrorist organizations, such as the Taliban, to have Twitter accounts." According to Mr. Palmer, as the United States withdrew from Afghanistan between April and September 2021, "[t]here were more than 126,000 accounts in the Taliban support network," even though "the US government classifies the Taliban as an insurgent group." Mr. Roth responded that "Twitter's policies at the time distinguished between some of the more violent portions of the Taliban and some of [its] more political portions."[54]

The proposed SAC also has new allegations about the plaintiff. In May 2019, a Public Policy Manager at Facebook named Josh Althouse called the plaintiff and one of her associates and said that Procter & Gamble had sent Facebook a list of people "who were to be banned from [Facebook] unless [they] disavowed the Proud Boys," if Facebook "wished to maintain its advertising revenue agreement" with Procter & Gamble. Mr. Althouse encouraged the plaintiff to make a statement disavowing the Proud Boys "as a way to placate [Procter & Gamble]." He also said that Procter & Gamble was Facebook's largest advertiser at the time. Later that month, Mr.

---

[50] *Id.* at 82–83 (¶ 241), 88–90 (¶ 245), 93 (¶ 251).

[51] *Id.* at 7–8 (¶¶ 8–9).

[52] *Id.* at 77–78 (¶ 232).

[53] *Id.* at 6–7 (¶¶ 5–7).

[54] *Id.* at 90–92 (¶ 246).

United States District Court
Northern District of California

Althouse told the plaintiff that Procter & Gamble had demanded that Facebook label her a "dangerous individual" and ban her.[55]

After Twitter banned the plaintiff, there allegedly were "smear campaigns" targeting her, including by accusing her of being anti-Muslim and a conspiracy theorist. After she won the Republican primary election in 2020, Twitter Global Partnership Solutions lead Lara Cohen re-tweeted a tweet calling the plaintiff a bigot and an extremist. Articles at that time called the plaintiff an "Islamophobe" and a "white supremacist," which "caused Florida voters to view [the plaintiff] in a negative light."[56] And there were many imposter accounts purporting to be the plaintiff and using slurs "to make her look bad."[57]

The plaintiff created an account on "free speech social media platform Parler" after Twitter banned her, and she gained 1.6 million followers there. But after January 6, 2021, Parler was removed from the Apple and Google app stores and from Amazon Web Services, in a "conspiracy" between the FBI and big-tech platforms.[58] Parler came back online one month later, but "the vast majority of its previous active users did not return, and [the plaintiff] did not have the ability to reach anywhere near as great an audience as she previously had."[59]

The proposed SAC also adds predicate-act allegations, mostly centered on wire fraud.

The defendants allegedly misrepresented that the plaintiff is "hateful" and a "dangerous individual," when in fact the defendants were acting on "her political speech and political views." In doing so, the defendants "persuaded users that [the plaintiff] [was] not worthy of donations." The defendants falsely induced the public to believe that political candidates would be treated fairly: for example, Mr. Zuckerberg said "I don't think it's right for tech companies to censor politicians in a democracy." Mr. Musk said that "election interference by social media companies . . . is wrong." But the defendants "chang[ed] their rules regarding political candidates and campaigns as a reaction

---

[55] *Id.* at 98–99 (¶¶ 270–71).

[56] *Id.* at 105–06 (¶¶ 291–92).

[57] *Id.* at 108 (¶ 296).

[58] *Id.* at 109 (¶ 298).

[59] *Id.* at 110 (¶ 300).

United States District Court
Northern District of California

to [the plaintiff's] filing to run for political office." This denied the plaintiff "the ability to spread her message to voters" and denied users "the right to decide on which candidate they wanted to follow, or whether or not to donate to a political candidate of their choosing."[60]

The defendants' "material support of terrorists and terrorist organizations" is allegedly "part and parcel of their wire fraud." They represented that they had a policy of removing users who are dangerous individuals, "but intentionally did not remove known and designated terrorists," and instead "simply target[ed] non-violent conservatives for their political speech."[61]

The defendants' "advocating the overthrow of government" also allegedly "involved wire fraud." Their "attempt to overthrow the government" is "associated with" terrorist presence on their platforms and their "manipulation of and interference [with] the election process."[62]

### 4.  The Plaintiff's Previous Lawsuits Against Twitter and Facebook

The plaintiff brought four previous lawsuits in connection with her suspensions and bans from Twitter and Facebook.

First, in *Freedom Watch, Inc. v. Google, Inc.*, the plaintiff and a non-profit claimed that Google, Facebook, Twitter, and Apple "work[ed] together to 'intentionally and willfully suppress politically conservative content,'" in violation of federal antitrust and other laws. 368 F. Supp. 3d 30, 34 (D.D.C. 2019).[63] The plaintiff alleged that Facebook suspended her for thirty days (her Facebook ban had not occurred yet) and Twitter banned her.[64] *Id.* The court dismissed the complaint because it did not "state viable legal claims." *Id.* at 37.

---

[60] *Id.* at 123–26 (¶¶ 346, 348–50).

[61] *Id.* at 131 (¶¶ 365–66).

[62] *Id.* at 136 (¶ 379).

[63] "A defense of res judicata is appropriately addressed at the motion to dismiss stage of litigation, and in so doing, the court can take judicial notice of the earlier proceedings that give rise to the defense." *Nnachi v. City of San Francisco*, No. C 10-00714 MEJ, 2010 WL 3398545, at *2 (N.D. Cal. Aug. 27, 2010) (cleaned up).

[64] The plaintiff also alleged the tweet that led to her Twitter ban: "Ilhan [Omar] is pro Sharia Ilhan is pro- FGM Under Sharia homosexuals are oppressed & killed. Women are abused & forced to wear the hijab. Ilhan is anti Jewish." Am. Compl., *Freedom Watch, Inc. v. Google, Inc.*, No. 1:18-cv-02030-TNM (D.D.C. Dec. 6, 2018), ECF No. 28 at 14 (¶ 68).

United States District Court
Northern District of California

Second, in *Illoominate Media, Inc. v. CAIR Found.*, the plaintiff and Illoominate Media sued the CAIR Foundation and Twitter over the plaintiff's Twitter ban. No. 19-CIV-81179-RAR, 2019 WL 13168767, at *1–2 (S.D. Fla. Nov. 19, 2019). The plaintiffs voluntarily dismissed Twitter before service. *Id.* at *1 n.1.

Third, the plaintiff claimed in another case that Facebook defamed her when it suspended and then banned her. Am. Compl., *Loomer v. Facebook, Inc.*, No. 9:19-cv-80893-RS (S.D. Fla. Aug. 5, 2019), ECF No. 7. The case was transferred to the Northern District of California. *Loomer v. Facebook, Inc.*, No. 19-CV-80893, 2020 WL 2926357, at *4 (S.D. Fla. Apr. 13, 2020). The plaintiff later voluntarily dismissed the case with prejudice. Notice of Voluntary Dismissal, *Loomer v. Facebook, Inc.*, No. 4:20-cv-03154-HSG (N.D. Cal. Aug. 13, 2020), ECF No. 88.

Fourth, the plaintiff also sued Facebook for defamation in state court in Florida, and Facebook removed the case to federal court. Notice of Removal, *Loomer v. Facebook, Inc.*, No. 9:20-cv-80484-RS (S.D. Fla. Mar. 24, 2020), ECF No. 1. The plaintiff then voluntarily dismissed the case without prejudice. Notice of Voluntary Dismissal, *id.* (S.D. Fla. Apr. 22, 2020), ECF No. 20.

## 5. Relevant Procedural History

The FAC asserts two RICO claims under 18 U.S.C. § 1964(c), which provides for civil remedies for violations of 18 U.S.C. § 1962, which contains the criminal provisions of the RICO Act. Claim one is for violation of § 1962(c), which prohibits participation in an enterprise through a pattern of racketeering activity.[65] Claim two is for violation of § 1962(d), which prohibits conspiracies to violate § 1962(c).[66] The plaintiff alleges damages "in the form of reputational damage," "lost employment opportunities," "lost future profits," "deprivation of equal access to voters and campaign donations," and "loss of votes in a federal election."[67]

---

[65] FAC – ECF No. 69 at 106–15 (¶¶ 345–80).

[66] *Id.* at 116–17 (¶¶ 381–87).

[67] *Id.* at 75–76 (¶¶ 252–53).

United States District Court
Northern District of California

The court has federal-question jurisdiction. 28 U.S.C. § 1331. All parties consented to magistrate-judge jurisdiction.[68] The court held a hearing on May 11, 2023.

## STANDARD OF REVIEW

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief" to give the defendant "fair notice" of (1) what the claims are and (2) the grounds upon which they rest. Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, "[a] complaint may fail to show a right to relief either by lacking a cognizable legal theory or by lacking sufficient facts alleged under a cognizable legal theory." *Woods v. U.S. Bank N.A.*, 831 F.3d 1159, 1162 (9th Cir. 2016).

A complaint does not need detailed factual allegations, but "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (cleaned up). A complaint must contain factual allegations that, when accepted as true, are sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *NorthBay Healthcare Grp., Inc. v. Kaiser Found. Health Plan, Inc.*, 838 F. App'x 231, 234 (9th Cir. 2020). "[O]nly the *claim* needs to be plausible, and not the facts themselves. . . ." *NorthBay*, 838 F. App'x at 234 (citing *Iqbal*, 556 U.S. at 696); *see Interpipe Contracting, Inc. v. Becerra*, 898 F.3d 879, 886–87 (9th Cir. 2018) (the court must accept the factual allegations in the complaint "as true and construe them in the light most favorable to the plaintiff") (cleaned up).

Put another way, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."

---

[68] Consents – ECF Nos. 26, 35, 36, 50, 77.

*Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (cleaned up).

If a court dismisses a complaint because of insufficient factual allegations, it should give leave to amend unless "the pleading could not possibly be cured by the allegation of other facts." *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990). If a court dismisses a complaint because its legal theory is not cognizable, the court should not give leave to amend. *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1184 (9th Cir. 2016); *see Steele-Klein v. Int'l Bhd. of Teamsters, Loc. 117*, 696 F. App'x 200, 202 (9th Cir. 2017) (leave to amend may be appropriate if the plaintiff "identifie[s] how she would articulate a cognizable legal theory if given the opportunity").

## ANALYSIS

The defendants moved to dismiss the FAC under Rule 12(b)(6). Twitter and Facebook contend that the claims are barred by res judicata and § 230 of the Communications Decency Act, and all defendants contend that the plaintiff cannot plausibly plead RICO violations. In addition to opposing the motions to dismiss, the plaintiff moved for leave to amend her complaint.[69] The court dismisses the claims with prejudice: res judicata and § 230 bar the claims against Twitter and Facebook, and the RICO claims are futile.

### 1. Res Judicata

The Twitter and Facebook defendants contend that the plaintiff's claims are barred by the doctrine of res judicata, because like her prior lawsuits against Twitter and Facebook, this case is an attack on their banning her.[70] The plaintiff responds that new facts (and thus new claims) have developed since the previous cases, including new "conspiratorial acts" constituting "First Amendment violations."[71]

---

[69] Mots. to Dismiss – ECF Nos. 79–81; Opp'n – ECF No. 87; Mot. for Leave to Amend – ECF No. 114.

[70] Twitter Mot. – ECF No. 79 at 18–22; Facebook Mot. – ECF No. 80 at 17–19.

[71] Opp'n – ECF No. 87 at 12–13 & n.2.

The doctrine of res judicata, or "claim preclusion," bars parties from relitigating claims that they raised or could have raised in a prior lawsuit between the same parties. *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2305 (2016); *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008); *C.D. Anderson & Co. v. Lemos*, 832 F.2d 1097, 1100 (9th Cir. 1987). For the doctrine to apply, there must be (1) an identity of claims, (2) a final judgment on the merits, and (3) privity among the parties. *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 322 F.3d 1064, 1077 (9th Cir. 2003).

The plaintiff does not dispute that some of her previous lawsuits ended in final judgments on the merits. As for Facebook, the court dismissed the plaintiff's defamation suit with prejudice under Rule 41(a)(2). *Loomer v. Facebook, Inc.*, No. 4:20-cv-03154-HSG (N.D. Cal. Aug. 14, 2020), ECF No. 89. That qualifies as a final judgment on the merits. *Marlow v. Winston & Strawn*, 19 F.3d 300, 305 (7th Cir. 1994); *Schwarz v. Folloder*, 767 F.2d 125, 130 (5th Cir. 1985). As for Twitter, the *Freedom Watch* court dismissed the complaint under Rule 12(b)(6). 368 F. Supp. 3d at 37. That is also a final judgment on the merits. *Stewart v. U.S. Bancorp*, 297 F.3d 953, 957 (9th Cir. 2002).

The plaintiff also does not dispute that there is privity among the parties. Mr. Zuckerberg and Mr. Dorsey were not defendants in the previous lawsuits, but officers and former officers of a corporation are in privity where the corporate conduct at issue is the same as before. *Pedrina v. Chun*, 97 F.3d 1296, 1302 (9th Cir. 1996). And even though the plaintiff's campaign committee was not a party in the previous cases, she controls the campaign committee and there is privity between a party and her "litigating agent," or an agent whose "conduct of the [new] suit is subject to the control of the party who is bound by the prior adjudication." *Taylor*, 553 U.S. at 906.

The issue thus is whether there is an identity of claims between this case and the previous cases. The previous cases, like this one, centered on the plaintiff's removal from Facebook and Twitter. Specifically, the plaintiff was banned by Twitter and suspended by Facebook before she filed her previous cases. But some of the allegations here postdate her filing the previous cases: Facebook banned her, she ran for political office twice, and her political campaigns were not allowed to create accounts on Facebook or Twitter. And she now claims that a racketeering

1   enterprise interfered in her elections. The exact issue, then, is whether the new allegations and

2   RICO theory amount to new "claims" for purposes of res judicata.

3       The court first clarifies that federal preclusion rules apply here. The previous judgments were

4   rendered by federal courts, so "federal common law applies." *Camofi Master LDC v. Associated*

5   *Third Party Administrators*, No. 16-cv-00855-EMC, 2016 WL 3345427, at *2 (N.D. Cal. June 16,

6   2016). It is true that the plaintiff's defamation lawsuit against Facebook was a diversity case

7   decided by a federal court in California, meaning that federal common law incorporates

8   California's preclusion rules. *Id.* (citing *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497,

9   508–09 (2001), and *Taylor*, 553 U.S. at 891 n.4). But that only leads back to federal common law,

10  because "California law . . . determines the res judicata effect of a prior federal court judgment by

11  applying federal standards." *Miletak v. AT&T Servs., Inc.*, No. 17-cv-00767-EMC, 2017 WL

12  2617961, at *3 (N.D. Cal. June 16, 2017) (quoting *Costantini v. Trans World Airlines*, 681 F.2d

13  1199, 1201 (9th Cir. 1982)).

14      Under the federal common law of res judicata, the Ninth Circuit considers four factors in

15  determining whether there is an identity of claims between the present and previous cases:

16      (1) Whether rights or interests established in the prior judgment would be destroyed
        or impaired by prosecution of the second action; (2) whether substantially the same
17      evidence is presented in the two actions; (3) whether the two suits involve
        infringement of the same right; and (4) whether the two suits arise out of the same
18      transactional nucleus of facts.

19  *Headwaters Inc. v. U.S. Forest Serv.*, 399 F.3d 1047, 1052 (9th Cir. 2005) (cleaned up). The

20  fourth factor "is the most important." *Id.*

21      A key question is whether the facts pleaded in the present case occurred before or after the

22  plaintiff filed the operative complaints in her previous cases. The Ninth Circuit often phrases this

23  question as whether the claims in the present case "could have been brought" in the previous case.

24  *Turtle Island Restoration Network v. U.S. Dep't of State*, 673 F.3d 914, 918 (9th Cir. 2012) ("In

25  most cases, the inquiry into the 'same transactional nucleus of facts' is essentially the same as

26  whether the claim could have been brought in the first action.") (cleaned up). Thus, "claim

27  preclusion does not apply to claims that accrue after the filing of the operative complaint" in the

28

United States District Court
Northern District of California

previous case. *Howard v. City of Coos Bay*, 871 F.3d 1032, 1040 (9th Cir. 2017); *Media Rts. Techs., Inc. v. Microsoft Corp.*, 922 F.3d 1014, 1021–22 (9th Cir. 2019).

Identifying when a claim has "accrued" requires distinguishing between completed and continuing conduct. Completed conduct "gives rise to a single claim for all resulting harm," including harm that "continue[s] into the future." Wright & Miller, 18 Fed. Prac. & Proc. Juris. § 4409 (3d ed. 2023); *see, e.g.*, *Anderson v. City of St. Paul*, 849 F.3d 773, 777–78 (8th Cir. 2017). On the other hand, "[a]ggravation of an original injury by separate or continuing conduct may support a new claim." Wright & Miller, 18 Fed. Prac. & Proc. Juris. § 4409 (3d ed. 2023) (collecting federal appellate cases); *Frank v. United Airlines, Inc.*, 216 F.3d 845, 851 (9th Cir. 2000) ("A claim arising after the date of an earlier judgment is not barred, even if it arises out of a continuing course of conduct that provided the basis for the earlier claim.").

As these principles suggest, the claim-preclusion analysis may present a difficult line-drawing problem in the case of continuing conduct (as, for example, in the case of a plaintiff who was banned from social media and then subject to renewed bans once she became a congressional candidate). In that regard, appellate decisions have analyzed whether continuing or renewed conduct gives rise to a new claim in the RICO context.

In *Monterey Plaza Hotel Ltd. P'ship v. Loc. 483 of Hotel Emps. & Rest. Emps. Union, AFL-CIO*, the Ninth Circuit addressed — under California law — a continuing series of alleged predicate acts. 215 F.3d 923, 927–28 (9th Cir. 2000). A hotel sued a union in two prior cases for business interference caused by mass picketing and for defamation. *Id.* at 927. In the new case, the hotel brought a federal RICO claim and alleged mail and wire fraud, witness intimidation, and vandalism. *Id.* "[M]any of the alleged predicate acts charged in the RICO complaint occurred after the filing of [the hotel's] state court actions." *Id.* at 928.

The court held that res judicata applied. "[T]o state a federal RICO claim, the [plaintiff] must allege that all of the predicate acts, taken together, constitute a single course of conduct aimed at benefitting the wrongdoer by harming the [plaintiff]." *Id.* at 927–28 (citing *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 & n.14 (1985)). "The [plaintiff] thus cannot attempt to separate out

prior torts . . . from recent ones in an effort to create and preserve a new RICO claim distinct from its [earlier] causes of action." *Id.* at 928.

It is true that the *Monterey Plaza* court applied California law, which "approaches the [res judicata] issue by focusing on the 'primary right' at stake: if two actions involve the same injury to the plaintiff and the same wrong by the defendant[,] then the same primary right is at stake even if in the second suit the plaintiff pleads different theories of recovery . . . or adds new facts supporting recovery." *Henry v. Clifford*, 32 Cal. App. 4th 315, 321 (1995). Indeed, "California courts have specifically rejected the contention that new predicate acts might give rise to a different pattern of racketeering activity and consequently a new primary right." *Monterey Plaza*, 215 F.3d at 928 (citing *Abdallah v. United Savings Bank*, 43 Cal. App. 4th 1101, 1110 (1996)). Still, the court described "federal RICO claim[s]" as requiring that "all of the predicate acts, taken together, constitute a single course of conduct." *Id.* at 927–28 (citing *Sedima*, 473 U.S. at 496 & n.14). Also, California law's "primary right" concept is very similar to the third *Headwaters* factor. 399 F.3d at 1052.

The result in *Feminist Women's Health Ctr. v. Codispoti* was similar to that in *Monterey Plaza*. 63 F.3d 863, 867–68 (9th Cir. 1995). The court applied Washington res judicata law, which is virtually (if not entirely) the same as federal law for purposes of determining whether two cases have an identity of claims. *Compare id.*, with *Headwaters*, 399 F.3d at 1052. The plaintiff, a health clinic that provided abortions, had filed a previous lawsuit against alleged arsonists, and it argued that res judicata should not apply because the evidence necessary to sustain its new RICO claim against the arsonists was not available at the time of its earlier case. *Feminist Women's Health Ctr.*, 63 F.3d at 868. The court held that res judicata applied, reasoning in part that sufficient events had occurred in time to assert a RICO claim in the first case, even if "the third fire [and] the decision to close the clinic" had not occurred in time. *Id.* at 868 n.4.

Other appellate decisions have taken a somewhat different approach to claim preclusion in the RICO context by holding in effect that the alleged predicate acts should be divided according to whether they occurred in time to be raised in the previous case. In *Howard v. Am. Online, Inc.*, for example, the Ninth Circuit held that alleged billing fraud that was the subject of a prior suit could

not be relied on as a predicate act in a new suit. 208 F.3d 741, 747–48 (9th Cir. 2000). But the court analyzed the other predicate acts alleged by the plaintiffs on the merits. *Id.* at 748–51. Similarly, in *Spiegel v. Cont'l Ill. Nat'l Bank*, the Seventh Circuit held that claim preclusion barred only those alleged predicate acts that could have been raised in the prior case. 790 F.2d 638, 645–46 (7th Cir. 1986).

Here, the analysis is different as to Facebook and Twitter, but the court generally follows the reasoning of *Monterey Plaza* and *Feminist Women's Health Ctr*. The plaintiff has two previous cases against these defendants that ended in judgments on the merits, and the analysis should take into account what conduct by Twitter and Facebook occurred after the filing of the operative complaints in those cases. *Howard*, 871 F.3d at 1040; *Media Rts. Techs.*, 922 F.3d at 1021–22.

As for Facebook, the operative complaint in the plaintiff's defamation suit was filed on August 5, 2019. Am. Compl., *Loomer v. Facebook, Inc.*, No. 4:20-cv-03154-HSG (N.D. Cal. Aug. 5, 2019), ECF No. 7. This was after the plaintiff was banned from Facebook (May 2, 2019) and after she first became a political candidate (August 2, 2019).[72] It was also after a Facebook Public Policy Manager allegedly told the plaintiff about Procter & Gamble's pressuring Facebook to ban her.[73] Given this timing, the plaintiff could have raised her RICO claim (that the defendants suppressed her political speech and interfered with her elections by banning her from social-media platforms) in the defamation case, even though it was not until after the operative complaint was filed in the defamation case that Facebook banned the plaintiff's campaign page. *Feminist Women's Health Ctr.*, 63 F.3d at 868 & n.4.

The analysis is somewhat different for Twitter, but with the same result. The operative complaint in *Freedom Watch* (the plaintiff's antitrust suit against Twitter, Facebook, and others) was filed on December 6, 2018. Am. Compl., *Freedom Watch, Inc. v. Google, Inc.*, No. 1:18-cv-02030-TNM (D.D.C. Dec. 6, 2018), ECF No. 28. Twitter banned the plaintiff before then, but it

---

[72] FAC – ECF No. 69 at 48 (¶ 160), 67 (¶ 219).

[73] SAC, Ex. A to Pierce Decl. in Supp. of Mot. for Leave – ECF No. 114-2 at 98–99 (¶¶ 270–71). The court considers the SAC allegations here for purposes of determining whether amendment would be futile.

United States District Court
Northern District of California

was not until later that the plaintiff became a political candidate. Twitter announced after the plaintiff's primary-election victory that she would remain banned,[74] and around that time, Twitter's Global Partnership Solutions Lead re-tweeted a tweet calling the plaintiff a bigot.[75] As Twitter emphasized at the hearing, though, the plaintiff's broad array of racketeering allegations don't have much — if anything — to do with Twitter's conduct toward the plaintiff. The FAC and the proposed SAC have separate sections for the alleged predicate acts, and neither section has any allegation about Twitter's harming or otherwise interacting with the plaintiff.[76] (By contrast, the plaintiff alleges that Facebook engaged in wire fraud by telling its users that political candidates wouldn't be banned but then banning the plaintiff's campaign page.[77])

Twitter has engaged only in "a single course of conduct" that the plaintiff cannot split into two cases. *Monterey Plaza*, 215 F.3d at 927–28. The plaintiff already asserted a concerted effort to "willfully suppress politically conservative content" the first time around. *Freedom Watch*, 368 F. Supp. 3d at 34. And the many allegations that are unrelated to Twitter don't change this result. *Kahr v. Damm*, No. 207CV00231DAERJJ, 2007 WL 9728869, at *13 (D. Nev. Dec. 18, 2007) (rejecting the plaintiff's argument that res judicata did not apply as to the "state defendants" despite an alleged "ongoing pattern of racketeering activity" by the defendants "subsequent to the raids of May 29, 2003," because the state defendants were not alleged to have engaged in that post-raid conduct), *aff'd*, 342 F. App'x 267 (9th Cir. 2009).

The plaintiff contends that "new material facts" occurred after *Freedom Watch*: individuals within the federal government worked with Twitter and Facebook to "suppress[] . . . the Hunter Biden laptop scandal," ban Alex Berenson from Twitter, and prevent the plaintiff from possessing a firearm. The plaintiff further argues that these allegations show that the defendants are state

---

[74] FAC – ECF No. 69 at 74 (¶ 247).

[75] SAC, Ex. A to Pierce Decl. in Supp. of Mot. for Leave – ECF No. 114-2 at 105 (¶ 292).

[76] FAC – ECF No. 69 at 80–101 (¶¶ 262–330); SAC, Ex. A to Pierce Decl. in Supp. of Mot. for Leave – ECF No. 114-2 at 111–36 (¶¶ 302–79).

[77] FAC – ECF No. 69 at 88–90 (¶¶ 291–92, 296), 91 (¶ 302).

1   actors engaged in First Amendment violations.[78] She does not allege or claim First Amendment

2   violations in this case, though. In any event, the purported "new material facts" are not material

3   because they are unrelated to Twitter's conduct towards the plaintiff.

4       In sum, the doctrine of res judicata bars the plaintiff's claims against the Twitter and Facebook

5   defendants (including Mr. Dorsey and Mr. Zuckerberg).

6

7   **2.   Section 230**

8       The Twitter and Facebook defendants also contend that § 230(c)(1) of the Communications

9   Decency Act bars the claims against them.[79] The court considers the § 230 issue as an alternative

10  ground for dismissal and dismisses the claims against the Twitter and Facebook defendants on this

11  ground too.

12      Under the Communications Decency Act, website operators generally are immune from

13  liability for third-party content posted on their websites and for removing such content, but

14  website operators are not immune when they create or develop the information, in whole or in

15  part. 47 U.S.C. § 230(c)(1) & (f)(3). Thus, "[i]mmunity from liability exists for (1) a provider or

16  user of an interactive computer service (2) whom a plaintiff seeks to treat . . . as a publisher or

17  speaker (3) of information provided by another information content provider." *Dyroff v. Ultimate*

18  *Software Grp., Inc.*, 934 F.3d 1093, 1097 (9th Cir. 2019) (cleaned up).

19      For the first factor, an "interactive computer service" is "any information service [or] system . . .

20  that provides or enables computer access by multiple users to a computer server." 47 U.S.C.

21  § 230(f)(2). "Twitter qualifies as an interactive computer service." *Brittain v. Twitter, Inc.*, No. 19-

22  cv-00114-YGR, 2019 WL 2423375, at *2 (N.D. Cal. June 10, 2019) (collecting cases). So does

23  Facebook. *Fraley v. Facebook, Inc.*, 830 F. Supp. 2d 785, 801–02 (N.D. Cal. 2011). As for Mr.

24  Dorsey and Mr. Zuckerberg, where a plaintiff sues them based on Twitter and Facebook's conduct,

25  they are immune under § 230 to the same extent as Twitter and Facebook. *Igbonwa v. Facebook,*

26

27  [78] Opp'n – ECF No. 87 at 12–13 (citing FAC – ECF No. 69 at 76–79 (¶¶ 254–61)).

28  [79] Twitter Mot. – ECF No. 79 at 33–36; Facebook Mot. – ECF No. 80 at 34–36.

United States District Court
Northern District of California

*Inc.*, No. 18-cv-02027-JCS, 2018 WL 4907632, at *5 (N.D. Cal. Oct. 9, 2018), *aff'd*, 786 F. App'x 104 (9th Cir. 2019); *Klayman v. Zuckerberg*, 753 F.3d 1354, 1357–58 (D.C. Cir. 2014).

For the second and third factors, courts evaluate "whether the cause of action inherently requires the court to treat the defendant as the publisher or speaker of content provided by another." *Gonzalez v. Google LLC*, 2 F.4th 871, 891 (9th Cir. 2021) (cleaned up), *rev'd on other grounds by Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023). "[P]ublication involves reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009). Thus, "any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230." *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1170–71 (9th Cir. 2008).

Here, the plaintiff's RICO claims depend on Twitter and Facebook's acting as publishers. Her RICO theory generally is that the alleged enterprise unlawfully bans conservatives from social-media platforms and thereby interferes in elections.[80] She alleges that she became a victim of this scheme when she was banned from Twitter and Facebook and then her political campaign was banned, too.[81] Those were decisions by Facebook and Twitter to exclude third parties' content, meaning that Facebook and Twitter are immune from liability for those decisions. *Id.*; *Fed. Agency of News LLC v. Facebook, Inc.*, 432 F. Supp. 3d 1107, 1117–18 (N.D. Cal. 2020) (section 230(c)(1) immunity applies where plaintiffs "seek to hold Facebook liable for removing [their] Facebook account, posts, and content").

Similarly, the alleged predicate acts consist of decisions by Facebook and Twitter about whether to publish, remove or restrict third parties' content. For example, regarding interference with commerce by threats or violence, the plaintiff alleges that when Facebook users try to share a post that has been fact-checked, Facebook displays a warning that "[p]ages and websites that repeatedly publish or share false news will see their overall distribution reduced and [will] be restricted in

---

[80] FAC – ECF No. 69 at 2–3 (¶¶ 2–3), 11–12 (¶ 37).

[81] *Id.* at 48 (¶ 160), 66 (¶¶ 216–17), 68 (¶ 226), 72–74 (¶¶ 242, 244, 247).

other ways."[82] This again is "activity that can be boiled down to deciding whether to exclude material that third parties seek to post online." *Roommates.com*, 521 F.3d at 1170–71; *Lewis v. Google LLC*, 461 F. Supp. 3d 938, 954 (N.D. Cal. 2020) ("[R]estricting [as opposed to removing] postings falls within a publisher's traditional functions."), *aff'd*, 851 F. App'x 723 (9th Cir. 2021).

As another example, for the predicate act of providing material support to terrorists, the plaintiff alleges that "Hezbollah and Hamas maintained a widespread presence on Facebook . . . and Twitter."[83] This is an allegation that Facebook acted as a publisher. *Force v. Facebook, Inc.*, 934 F.3d 53, 65 (2d Cir. 2019) (rejecting the plaintiffs' attempt "to hold Facebook liable for giving Hamas a forum with which to communicate" because "that alleged conduct by Facebook falls within the heartland of what it means to be the 'publisher' of information under [§] 230(c)(1)").

Furthermore, the fact that the plaintiff alleges a broad racketeering enterprise does not bring her claims outside the scope of § 230 immunity, even though § 230 provides that it does not "impair the enforcement of . . . Title 18[] or any other Federal criminal statute." 47 U.S.C. § 230(e)(1). "Courts have consistently held that § 230(e)(1)'s limitation on § 230 immunity extends only to criminal prosecutions, and not to civil actions based on criminal statutes." *Gonzalez*, 2 F.4th at 890 (collecting cases).

Because the plaintiff's RICO theory against Twitter and Facebook is predicated entirely on their acting as publishers, § 230(c)(1) bars the claims.

The plaintiff contends that § 230 immunity does not apply because Twitter and Facebook act as "information content providers," not just "interactive computer services." She cites *Roommates.com* for the proposition that "even displaying user information such as age, hometown, college, likes, and occupation would make [the] [d]efendants information content providers." Similarly, the plaintiff argues that Twitter and Facebook rearrange user content to group it with third-party logos, "employ fact checkers to flag posts that could be misleading,"

---

[82] *Id.* at 83 (¶ 276).

[83] *Id.* at 95 (¶ 312).

1   "collect[], stor[e], and us[e] consumers' data," allow targeted and deceptive ads, "subject[] users

2   to scams and counterfeit merchandise," and "control[] the narrative."[84] These arguments fail.

3       Again, website operators are not immune from liability for third-party content posted on their

4   websites when the operators create or develop the information, in whole or in part. 47 U.S.C. §

5   230(c)(1) & (f)(3). For example, in *Roommates.com*, the defendant operated a website that

6   matched people renting rooms to people looking for a place to live. 521 F.3d at 1161. It required

7   subscribers to create profiles and answer questions — about themselves and preferences in

8   roommates — regarding criteria including sex, sexual orientation, and whether they would bring

9   children to the household. *Id.* The Ninth Circuit held that the defendant was not immune for

10  eliciting discriminatory preferences that violated federal and state fair-housing laws:

11          By requiring subscribers to provide the information as a condition of accessing its
            service, and by providing a limited set of pre-populated answers, [the defendant]
12          [became] much more than a passive transmitter of information provided by others;
            it [became] the developer, at least in part, of that information. And section 230
13          provides immunity only if the interactive computer service does not "creat[e] or
            develop[]" the information "in whole or in part."
14

15  *Id.* at 1166 (citing 47 U.S.C. § 230(f)(3)). Thus, the court "interpret[ed] the term 'development' [in

16  § 230] as referring not merely to augmenting the content generally, but to materially contributing

17  to its alleged unlawfulness." *Id.* at 1167–68.

18      The conduct of Twitter and Facebook at issue here is not enough to make them information-

19  content providers, for several reasons. First, content that "comes entirely from subscribers and is

20  passively displayed by [the website operator]" does not make the website operator an information-

21  content provider. *Id.* at 1173–74. Second, the plaintiff has not cognizably alleged that Twitter and

22  Facebook's manipulating or editing users' content contributes to any illegality. For example, she

23  does not explain how flagging posts as factually misleading amounts to anticompetitive conduct.

24  *See Dangaard v. Instagram, LLC*, No. C 22-01101 WHA, 2022 WL 17342198, at *2, *4 (N.D.

25  Cal. Nov. 30, 2022) (the "Meta defendants [were] not entitled to [§ 230] immunity for operation of

26  their filtering system," because the filtering system allegedly demoted competitors of the website

27

28  ---
    [84] Opp'n – ECF No. 87 at 21–23.

OnlyFans while favoring OnlyFans, which materially contributed to anticompetitive conduct). Third, what is at issue here is not the "alleged unlawfulness" of any content on Twitter and Facebook, but rather Twitter and Facebook's removal of the plaintiff's accounts. *See Roommates.com*, 521 F.3d at 1167–68.

### 3. RICO

The next issue is whether the plaintiff has plausibly pleaded RICO claims against Procter & Gamble. Procter & Gamble argues generally that it "is alleged only to have asserted its own legitimate business interest in not having its advertisements appear next to hateful, denigrating, discriminatory, or other similarly offensive content." It also joins in Facebook and Twitter's motions to dismiss, which argue that the plaintiff "failed to validly allege any of the required elements of a RICO claim, including a RICO enterprise, a pattern of racketeering activity, causation, injury, predicate acts, or conspiracy."[85]

The RICO Act was enacted to "develop new methods for fighting crime." *Sedima*, 473 U.S. at 498. To state a civil RICO claim, a plaintiff must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to the plaintiff's 'business or property.'" *Grimmett v. Brown*, 75 F.3d 506, 510 (9th Cir. 1996); *Synopsys, Inc. v. Ubiquiti Networks, Inc.*, No. 17-cv-00561-WHO, 2017 WL 3485881, at *12 (N.D. Cal. Aug. 15, 2017) (citing *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014)).

Procter & Gamble contends that because it was pursuing its individual economic interests in an ordinary commercial transaction, the plaintiff's allegations do not satisfy the "common purpose" element of a RICO enterprise.[86]

Generally, a RICO enterprise "includes any union or group of individuals associated in fact." *United States v. Turkette*, 452 U.S. 576, 580 (1981); 18 U.S.C. § 1961(4). To plausibly plead an associated-in-fact enterprise, a plaintiff must allege that the enterprise has (1) "a common

---

[85] Procter & Gamble Mot. – ECF No. 81.

[86] *Id.* at 6–8.

purpose," (2) "a structure or organization," and (3) "longevity necessary to accomplish the purpose." *Eclectic Props.*, 751 F.3d at 997 (citing *Boyle v. United States*, 556 U.S. 938, 946 (2009)). Stated somewhat differently, the enterprise's existence "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Odom v. Microsoft Corp.*, 486 F.3d 541, 549 (9th Cir. 2007) (quoting *Turkette*, 452 U.S. at 583).

As for the "common purpose," "RICO liability 'depends on showing that the defendants conducted or participated in the conduct of the 'enterprise's affairs,' not just their own affairs." *In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prod. Liab. Litig.*, 497 F. Supp. 3d 552, 598 (N.D. Cal. 2020) (quoting *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001)). Thus, in the corporate context, "[c]ases recognize that where the individual constituents of an asserted enterprise are alleged only to have conducted the regular business of the corporate entity or business in their own interests, those allegations are insufficient to support a RICO enterprise." *Id.* at 599–600 (collecting cases); *Woodell v. Expedia Inc.*, No. C19-0051JLR, 2019 WL 3287896, at *8 (W.D. Wash. July 22, 2019) (collecting other cases). If, on the other hand, "the common purpose of the enterprise is fraudulent or unlawful," the result is different. *Gilbert v. MoneyMutual, LLC*, No. 13-cv-01171-JSW, 2018 WL 8186605, at *13 (N.D. Cal. Oct. 30, 2018).

Here, even granting generous inferences to the plaintiff, she alleges essentially that Procter & Gamble pressured Facebook to ban her by threatening to pull advertisements from Facebook if it did not do so, and that Facebook capitulated.[87] The proposed SAC makes these inferences explicit by alleging that a Public Policy Manager at Facebook told the plaintiff that Procter & Gamble — Facebook's largest advertiser at the time — demanded that Facebook label the plaintiff a "dangerous individual" and ban her if Facebook "wished to maintain its advertising revenue agreement with [Procter & Gamble]."[88]

---

[87] FAC – ECF No. 69 at 48 (¶ 160), 70–72 (¶¶ 233–37, 239)

[88] SAC, Ex. A to Pierce Decl. in Supp. of Mot. for Leave – ECF No. 114-2 at 98–99 (¶¶ 270–71).

These are allegations that Facebook and Procter & Gamble each conducted "business in their own interests." *In re JUUL Labs*, 497 F. Supp. 3d at 599. Procter & Gamble did not want to advertise "on or near content that [it] determine[s] is hateful, denigrating or discriminatory."[89] Facebook has a "Community Standards" policy for its users and routinely discusses policy issues with its advertisers.[90] These are lawful business decisions, and the plaintiff thus has not plausibly pleaded that Procter & Gamble is part of a RICO enterprise. *Id.* at 598–600 (no RICO enterprise where the defendants' alleged common purpose "was to increase the number of nicotine addicted consumers and to target the youth market to create a new generation of nicotine addicts"); *Odom*, 486 F.3d at 552 (a RICO enterprise's common purpose was adequately alleged where "Microsoft and Best Buy had a common purpose of increasing the number of people using Microsoft's Internet service through fraudulent means"). The court grants Procter & Gamble's motion to dismiss.

The court will not reach all of the defendants' other (valid) arguments that the plaintiff's RICO claims aren't plausibly pleaded. But it bears emphasizing that the "predicate acts" a plaintiff must plausibly allege are crimes, not torts. *See, e.g.*, *Oscar v. Univ. Students Coop. Ass'n*, 965 F.2d 783, 786 (9th Cir. 1992), *abrogated on other grounds by Diaz v. Gates*, 420 F.3d 897 (9th Cir. 2005). The defendants here have not committed crimes. For example, the plaintiff alleges that Facebook engaged in "interference with commerce by threats" by threatening to ban her and label her a "dangerous individual."[91] But rather than economic extortion, she has alleged only "legally acceptable business dealings." *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1133 (9th Cir. 2014) (Hobbs Act extortion requires the plaintiff to allege that she "had a pre-existing right to be free from the threatened harm").

---

[89] FAC – ECF No. 69 at 71 (¶ 237).

[90] *Id.* at 32 (¶ 106), 71 (¶ 236).

[91] *Id.* at 110–11 (¶ 365).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

**4.  Amendment**

The final issue is whether amendment would be futile. That depends on whether the proposed SAC, submitted with the plaintiff's motion for leave to amend, changes any of the outcomes above.[92] It does not.

The new allegations are about Twitter's allegedly coordinating with the federal government to suppress users' content (as revealed by internal Twitter documents), Procter & Gamble's allegedly demanding that Facebook ban the plaintiff (as already addressed), the plaintiff's injuries after being banned from social media, and wire fraud. None changes the court's conclusions that (1) res judicata applies as to Facebook and Twitter, (2) the claims against Facebook and Twitter would require the court to treat Facebook and Twitter as publishers, in violation of § 230, and (3) the allegations against Procter & Gamble are about lawful business decisions, not a racketeering enterprise. The court thus dismisses the plaintiff's claims with prejudice.

## CONCLUSION

The court grants the motions to dismiss with prejudice. This resolves ECF Nos. 79, 80, 81, and 114.

**IT IS SO ORDERED.**

Dated: September 30, 2023

_____

LAUREL BEELER
United States Magistrate Judge

---

[92] Mot. for Leave – ECF No. 114.